# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

CHIEF DPT. JERRY LUMAN;
ASST. CHIEF NORMAN VERBOSKY;
LIEUTENANT DAVID WILLIAMS;
SENIOR SERGEANT SARA CYNTHIA;
"CINDY" VARA-LEIJA;
SERGEANT MARCUS ANDERSON;
CORPORAL REED CLARK;
SENIOR DEPUTY ANA HERRERA;
DEPUTY CLAUDIA ARELLANO;
DEPUTY DWAYNE PACIFICO;
CHIEF CLERK MARY ANN CARRION;
AND
EMILY RIVERA.
     *Plaintiffs,*

V.

CHRISTOPHER DIAZ,
IN HIS INDIVIDUAL CAPACITY AS
CONSTABLE, PCT. 2, OF HARRIS
COUNTY, TEXAS;
HARRIS COUNTY, TEXAS;
ANA DIAZ, IN HER INDIVIDUAL
CAPACITY AS MAYOR OF JACINTO
CITY, TEXAS; AND
JACINTO CITY, TEXAS.

     *Defendants.*

NO. 4:19-cv-4920
(JURY DEMANDED)

## PLAINTIFFS' FIRST AMENDED COMPLAINT

     COMES NOW, CHIEF DPT. JERRY LUMAN, ASST. CHIEF NORMAN VERBOSKY, LIEUTENANT DAVID WILLIAMS, SENIOR SERGEANT SARA CYNTHIA "CINDY" VARA-LEIJA, SERGEANT MARCUS ANDERSON,

CORPORAL REED CLARK, SENIOR DEPUTY ANA HERRERA, DEPUTY CLAUDIA ARELLANO, DEPUTY DWAYNE PACIFICO, CHIEF CLERK MARY ANN CARRION, AND EMILY RIVERA, Individually, and on behalf of all those similarly situated (the "Plaintiffs"), Plaintiffs in the above styled case, and makes this their first amended complaint against HARRIS COUNTY and CHRISTOPHER E. DIAZ, in his individual capacity, and JACINTO CITY, TEXAS, and ANA DIAZ, in her individual capacity, and for cause of action in violation of the First Amendment would show as follows:

## PARTIES AND SERVICE

1.      Plaintiff, Chief Deputy Jerry Luman, is an individual and resident of the State of Texas.

2.      Plaintiff, Assistant Chief Norman Verbosky, is an individual and resident of the State of Texas.

3.      Plaintiff, Senior Sergeant Sara Cynthia "Cindy" Vara-Leija, is an individual and resident of the State of Texas.

4.      Plaintiff, Lieutenant David Williams, is an individual and resident of the State of Texas.

5.      Plaintiff, Sergeant Marcus Anderson, is an individual and resident of the State of Texas.

6.      Plaintiff, Corporal Reed Clark, is an individual and resident of the State of Texas.

7.      Plaintiff, Senior Deputy Ana Herrera, is an individual and resident of the State of Texas.

8.      Plaintiff, Deputy Claudia Arellano, is an individual and resident of the State of Texas.

9.      Plaintiff, Deputy Dwayne Pacifico, is an individual and resident of the State of Texas.

10.     Plaintiff, Chief Clerk Mary Ann Carrion, is an individual and resident of the State of Texas.

11.     Plaintiff, Emily Rivera, is an individual and resident of the State of Texas.

12.     Defendant, Christopher Diaz, who is sued in his individual capacity, may be served with process at 10826 Munn St, Houston, Texas 77029.

13.     Defendant, Harris County, Texas, is a governmental entity organized under Texas law. Harris County, Texas, may be served with process through Judge Lina Hidalgo at 1001 Preston, Suite 911, Houston, Texas 77002.

14.     Defendant, Ana Diaz, who is sued in her individual capacity, may be served with process at 10826 Munn St, Houston, Texas 77029.

15.     Defendant, Jacinto City, Texas, is a municipal entity organized under Texas law. Jacinto City, Texas, may be served with process through the City Attorney, Jim Defoyd, at 103 Eastway St, Galena Park, Texas 77547.

## JURISDICTION AND VENUE

16.     This case is brought under 42 U.S.C. § 1983 for the violation of the plaintiffs' first amendment rights. The Court has jurisdiction of this case according to 28 U.S.C. §§ 1331 and 1343.

17.     Venue is invoked pursuant to 28 U.S.C. § 1391.

## FACTS

### CHRIS DIAZ

18.     After Diaz was elected to the position of constable, Diaz shiftily instituted reforms within Precinct 2 to ensure that he would continue to be elected.     Chief among these reforms involved requiring employees, as a condition of employment, to work for the Diaz campaign and to perform certain campaign functions. Two primary campaign functions, which are at issue in this case, involve (1) securing the necessary capital to fund the Diaz campaign and (2) the acquisition of participants to perform the Diaz's campaign's administrative functions, such as notification of employees of upcoming campaign events, securing necessary participants, and locating items which would could be sold to raise capital for the Diaz campaign.

19.     Diaz required Precinct 2 employees to perform these essential campaign functions and conditioned employment upon their performance.  Additionally, anyone impleading Diaz campaign functions, including reporting or participating in any investigation into how Diaz operated his campaign, would be retaliated against.  This includes those employees who participated in the Texas Rangers investigation into misappropriated Harvey donations by the Diaz campaign.  Every employee who provided the Texas Rangers with

information that impleaded the operation of the Diaz campaign has been disciplined. This includes: Chief Deputy Jerry Luman, Assistant Chief Norman Verbosky, Lieutenant David Williams, Senior Sergeant Cindy Vara-Leija, Corporal Reed Clark, Senior Deputy Ana Herrera, and Chief Clerk Mary Ann Carrion.

20. Employees who also generally spoke out or refused to participate in the Diaz campaign would also be disciplined. For example, soon after Sergeant Marcus Anderson told Diaz that he was not going to participate in campaign fundraising event at Top Golf, Diaz immediately transferred and demoted him.

21. Employees who supported opposition candidates would be disciplined. For example, Deputy Claudia Arellano was terminated and given a "dishonorable discharge" for supporting an opposition candidate while her partner, Pernelli Jones, was not disciplined for the same conduct allegedly giving rise to her termination.

22. Diaz also conditioned advancement within Precinct 2 upon a quantitative evaluation of that employee's contribution to the Diaz campaign, such that, coveted positions would go to employee who had contributed the most. This evident from Diaz's failure to promote Senior Deputy Ana Herrera to a position given to Blanca Martinez, as the public campaign finance reports from the Diaz campaign show that Blanca Martinez gave $9,945.00, while during that same time period Senior Deputy Herrera was unable compete with that amount and refused to contribute in 2019.

23. If an employee did not live up to Diaz' expectations, or refused to continue performing these essential campaign functions, the employee would be disciplined. Discipline would take many forms, but generally, involved some type of involuntary transfer or demotion in an effort to constructively discharge the employee. In other words, force the employee to quit. This is evident by the demotion of Lieutenant Williams who

was transferred and demoted to the rank of deputy before being terminated and received a pay reduction of almost 50%.

24.     Depending upon the severity of the employees' disobedience, Diaz could exact the highest price:  termination by dishonorable discharge.  A dishonorable discharge would effectively prohibit an officer from obtaining employment with another law enforcement agency.  This is evident from the termination of Chief Deputy Jerry Luman and Deputy Claudia Arellano, who both received a dishonorable discharge.  The dishonorable discharge was reported their F-5 separation of license report sent to Texas Commission on Law Enforcement (or "TCOLE").

25.     After taking some action contrary to Diaz's employment policy or speaking on matters of public concern with regards to how the campaign operated, each of the Plaintiffs in this case suffered the same type of adverse employment action, including demotion, involuntary transfer, termination or constructive discharge.

26.     Diaz's policy is evident from the Diaz campaign finance reports.  The review of the Diaz campaign finance reports, which are documents readily available to the general public, show Diaz's impact upon the employees of Precinct 2.   For one, each and every Plaintiff in this lawsuit is listed as a donor and/or, at one point in time, felt coerced to donate to the Diaz campaign.   Diaz only began to seek retribution against each Plaintiff when each employee refused to participate.

27.     In review of the Diaz campaign finance reports, the following is evident:

1.  Chief Deputy Jerry Luman, the second highest ranking classified police officer at Precinct 2 and second only to Diaz himself, was terminated on July 30, 2019.  Chief Deputy Jerry Luman's replacement, Lee Hernandez (as well has his wife), gave $1,980.67 to the Diaz campaign in 2019, while during that same time period Chief Luman refused to contribute.

2. Assistant Chief Norman Verbosky, the third highest ranking classified police officer at Precinct 2, was terminated on March 7, 2019. Assistant Chief Verbosky's replacement, Lee Hernandez, gave a substantial sum of money to the Diaz campaign, as indicated above, while Assistant Chief Verbosky refused to contribute during this same time period. This is the same Lee Hernandez that replaced Chief Luman and was, therefore, promoted twice within a short time period: first, to replace Verbosky and, second, to replace Luman. The swift advancement of Hernandez from a reserve deputy to chief deputy is unprecedented in the history of Harris County.

3. Captain (or sometimes referred to as "Interim Captain") Paul Martinez was later promoted to Verbosky's position after Hernandez was promoted to Luman's position. Captain Paul Martinez gave $1,750.00 to the Diaz campaign in 2019. Before being promoted to captain, Interim Captain Paul Martinez was a reserve deputy at Precinct 2. The swift advancement of Martinez from a reserve deputy to a captain is also unprecedented in the history of Harris County.

4. Lieutenant David Williams, who was the primary supervisor over the Internal Affairs Division (or "IAD"), was repeatedly demoted and involuntarily transferred on many different occasions. Eventually, after being reduced to the rank of deputy, a reduction of several ranks, Lieutenant David Williams was constructively discharged on August 28, 2019. Lieutenant Williams refused to contribute to the Diaz campaign in 2019, while Corporal Rene Vela gave $400 over this same time period. Corporal Rene Vela was rewarded by Diaz, hired, promoted to the rank of corporal and awarded Lieutenant David Williams' position as an IAD investigator. Corporal Rene Vela also investigated Luman, Arellano, and Williams. Corporal Rene Vela should not have investigated Williams, because Vela was biased. Corporal Vela had inherited a majority of Williams job duties, and, thus, had a vested interest in finding that Williams had committed misconduct. Diaz believed that it is was important to gain control of the Internal Affairs Division because Diaz could use IAD as a tool to terminate officers.

5. Cindy Vara-Leija's job duties were stripped from her and were given to Latrisha White. While White was a new hire, she had contributed $400 to the Diaz campaign in 2019, while Vara-Leija refused to contribute.

6. After Sergeant Anderson was forced to resign, his job duties were given to Blanca Martinez. While Anderson had refused to contribute \ to Diaz towards the end of 2018, Blanca Martinez, on the other hand, gave $9,945.00 to the Diaz campaign. Diaz rewarded her for her contributions to his campaign.

28.     The following are detailed accounts of Plaintiff's experiences with Diaz.   The experiences are organized from the date of the first adverse employment action.

29.     Overall, the United States Supreme Court expressly prohibits government from requiring employees to contribute to private parties they find objectionable.   All the plaintiff in this case bring a Fifth Amendment cause of action against Harris County and Constable Chris Diaz.

30.     The lack of civil service protection, under Chapter 143 of the Local Government Code, for each of the plaintiffs in this case contributed to environment in which Diaz was allowed to exploit his position for personal gain.

## DEPUTY REED CLARK
(Demoted and involuntary transferred on October 16, 2018)
(Terminated on June 9, 2019)

31.     Prior to working for Precinct 2, Clark had an extensive background in working on previous campaigns and would, often, interact with Diaz and Kim Bellotte at various community events.    Eventually, Clark agreed to work for Diaz and Bellotte with the understanding that Clark was hired, primarily, for his fundraising ability.   Clark, fully aware of the reason why he was hired, knew that his job depended upon his contributions to the Diaz campaign. Thus, Clark is another example of personnel decisions being made at Precinct 2 on the basis of their ability to contribute to the Diaz campaign, and not related to serving some greater police function.

32.     After Clark was hired, Clark worked for a short time in patrol and then was transferred into the newly created community outreach division, which was, at that time, led by Kim Bellotte. Bellotte was recently promoted to the rank of senior lieutenant by Diaz in order to run Diaz's community outreach division which was, in all reality, another

branch of the Diaz campaign. Bellotte's promotion to lieutenant immediately after completing the academy is unprecedented in the history of Harris County.

33.     While working in the community outreach division, Clark was responsible for organizing events, fundraisers, silent auctions, and block walking. Clark spent a considerable amount of time securing donations for the Diaz campaign.

34.     While working in the community outreach division, Clark was ordered by Bellotte to transport a large amount of food and other supplies that were intended for flood victims of Hurricane Harvey to Bellotte's residence. Clark believed that these food and supplies should not have been transported to Bellotte's residence and, eventually, reported this issue to the Chief Deputy Luman. Chief Deputy Luman, in term, reported what Clark told him to Texas Ranger Daron Parker.

35.     On April 12, 2018, Clark was questioned Texas Ranger Daron Parker. Clark provided unfavorable testimony to Diaz. His testimony showed that Bellotte had misappropriated items intended to be given to Hurricane Harvey flood victims. Clark worried that Diaz would perceive his unfavorable statements to Parker as challenging the way that Diaz ran his campaign.

36.     Shortly after being called to give a statement by Parker, Clark noticed that Bellotte's attitude and demeanor toward him began to change. Bellotte became verbally abusive. Clark stopped receiving notifications of campaign events and was not invited to participate in breakfast meetings. Clark was removed from the Diaz campaign's social media outlets. During this time period, Clark also told Lee Hernandez, who had replaced Bellotte as head of the community outreach division, that he no longer desired to participate in the Diaz campaign.

37.     On October 16, 2018, Clark was called into the meeting with the executive command, which included, at that time, Luman, Verbosky, Williams, and Lt. Michael Kritzler.    Based upon direct orders by Diaz, Clark was demoted and involuntarily transferred to a less desirable position in the patrol division.    The change was both a demotion and an involuntary transfer.    Clark was being stripped of has administrative duties in the community outreach division and placed into a reactive patrol assignment. As evidence of this, Clark also lost the ability to work on the weekends.    The change was also an involuntary transfer, because Clark was being transferred, against his will, from the day shift to the night shift.

38.     As further evidence to the retaliatory nature of the change of employment, Clark was not given notice as required under Section 614.023 Texas Local Government Code. Prior to his transfer and demotion, Clark did not have any disciplinary history, was not written up, and his disciplinary record was clean.    Clark's demotion and involuntary transfer, which would be the first of many more to come, was made in retaliation for his refusal to contribute to the Diaz campaign and his challenge to the way that Diaz ran his campaign.

39.     Unable to cope with these intolerable working conditions, Clark was forced to resign on June 9, 2019.

### SERGEANT MARCUS ANDERSON
(Demoted and Involuntary Transferred on December 4, 2018)
(Terminated on January 4, 2019)

40.     In order to appease Diaz, in late September 2018, Sergeant Marcus Anderson participated, as he had done in the past, in a Diaz campaign meeting at a business known as "Spanky's" located in Pasadena.    As standard practice at Precinct 2, the purpose of the event was to assign Precinct 2 employee various tasks that needed to be completed prior to

a scheduled Diaz fundraising event.  At the time of this September 2018 meeting, an event at Top Golf was planned to occur on  October 25, 2018.

41.    As Anderson had done in the past, Anderson knew that Diaz required him to purchase tickets for the Top Golf event, which were priced at $125 each, as well as contribute approximately 16 to 20 hours preparing for the event.   Anderson, however, had become disgusted with Diaz's continual exploitation of his employment relationship and believed that the relationship was damaged beyond repair.   Anderson told Diaz at the campaign meeting at Spanky's that he was not going to contribute to the Top Golf event on October 25, 2018.  In response, Diaz turned to Anderson and stated:

> *"You have money to go on vacation, but you don't have money for this golf tournament."   Diaz then added, "It must be nice to have money to go on vacation."*

42.    At the September 2018 campaign meeting at Spanky's, Diaz addressed the employees and indicated that he needed money for the Diaz campaign. Diaz also told employees if they did not have a money, they needed to borrow it from their own retirement accounts or get a loan from a bank. This was the same rhetoric that was emphasized at a majority of prior campaign meetings.

43.    Three days after Sergeant Anderson refused to participate in the event at Top Golf, Sergeant Anderson was ordered to report to the conference room for a meeting held by Luman and Williams. At the meeting, Luman told Anderson that Diaz was upset about Sergeant Anderson's lack of support for the Diaz campaign. Luman further told Anderson that Anderson was being demoted and stripped Anderson of his car allowance.

44.    On or about October 12, 2018, Sergeant Anderson took his family to Disney World. Sergeant Anderson did not enjoy his time with his family because he worried about the status of his job and his financial security.

45.     On December 3, 2018, Sergeant Anderson reiterated in front of Assistant Clerk Jessica Duran, Deputy Dwayne Pacifico, Clerk Emily Rivera, and Chief Deputy Jerry Luman that he refused to give any further time or funds to the Diaz campaign.

46.     On December 4, 2018, Luman and Williams told Anderson that Diaz had ordered Anderson to be involuntarily transferred and demoted to night shift.  Diaz did not give Luman any reason for the change.  Anderson was involuntarily transferred from day to night shift, and demoted by moving from a proactive assignment in warrants to a reactive patrol assignment. Anderson explained that his vision is impaired at night and he had not worked nights since 2006. Concerned about safety, Anderson advised Luman and Williams that he could not effectively operate a patrol vehicle at night and might injure himself or the citizens of Harris County.  Luman and Williams advised Sergeant Anderson that, unfortunately, they were powerless to change Diaz's mind. Because of the adamant and agitated nature in which Diaz conveyed the order to both Luman and Williams, Williams told Anderson that Diaz was not concerned about Anderson's safety.

47.     Although Diaz, officially, had not provided Anderson with any notice of the reason for his demotion and involuntary transfer, Anderson understood that he had been demoted and involuntarily transferred because of his refusal to participate in the Diaz campaign.

48.     Thereafter, Sergeant Anderson contacted the Mann Eye Clinic and had his vision checked.  Anderson advised the doctor that he had trouble seeing at night.  The doctor indicated there was no corrective procedure.

49.     After seeing the doctor, Sergeant Anderson advised his supervisor, Lieutenant Mike Kristzler, that he could not see at night and could not perform his patrol duties at night. Kristzler advised that he was also powerless to make any sort of change to Anderson's shift

because Diaz was adamant about Anderson being on that shift.  Sergeant Anderson also approached Luman about the issue, but Luman reiterated what Kritlzer had told him.

50.      Fearing for his safety and the safety of the citizens of Harris County, Sergeant Anderson was forced to resign on January 4, 2019.

51.      As further evidence to the retaliatory nature of the Anderson's demotion and involuntary transfer, Anderson was not given a 614.023 notice as required under Section 614.023 Texas Local Government Code.

## ASSISTANT CHIEF NORMAN VERBOSKY
### (Terminated on March 7, 2019)

52.      In addition to Clark, Assistant Chief Norman Verbosky also participated in the Texas Rangers investigation conducted by Texas Ranger Daron Parker.  On May 11, 2018, Verbosky was interviewed by Texas Ranger Daron Parker and provided unfavorable testimony to Diaz which primarily examined the extent of Kim Bellotte's involvement in the Diaz campaign.   By providing said testimony to Texas Ranger Daron Parker, Verbosky sent a clear message to Diaz that he would no longer tolerate Diaz's continual use of the employment relationship at Precinct 2 as a means by which Diaz would continue to get elected.    Verbosky also declined to provide Diaz with any further assistance to his campaign and stopped attending campaign functions.

53.      On November 16, 2018, Assistant Chief Deputy Norman Verbosky went out on FMLA leave for medical issues related to cancer.  On February 11, 2018, Verbosky returned back to work, although not taking all the time that was allowed.

54.     On February 11, 2018, Diaz approached Chief Jerry Luman and ordered Luman to inquire about whether Verbosky wanted to retire.   On that same day, Luman confirmed that Verbosky did not want to retire.

55.     On March 7, 2019, Luman was ordered to report to a restaurant, called "Ernie's," located near Beltway 8 at Pasadena.  Luman went into the restaurant to meet Diaz. After meeting Diaz, Diaz instructed Luman to walk outside to his car. After the two walked outside, Diaz handed Luman a letter indicating that Assistant Chief Deputy Verbosky was to be terminated today. Diaz then added, "I want you to put Lee [Hernandez] in that spot, assistant chief, and move [Clint] Brown into his spot." Diaz added, "Do it immediately!"

56.     Later, on March 7, 2019, Verbosky was ordered to report to Luman.  At the meeting, Luman informed Verbosky that he was terminated, effective immediately, as ordered by Diaz. Diaz also ordered Lieutenant Hernandez to be present at the meeting. Assistant Chief Verbosky's termination letter stated, "This decision is based on my loss of confidence, complete lack of trust and faith in your continued ability to perform your duties, and actions that demonstrate you no longer support my strategy and vision moving forward." Assistant Chief Verbosky believes that his termination letter refers, specifically to the terms "lack of trust," to Assistant Chief Verbosky's participation in the Texas Ranger's investigation.

57.     As further evidence of the retaliatory nature of the employment change, Verbosky was not given a notice as required under Section 614.023 Texas Local Government Code. Prior to his transfer and demotion, Verbosky did not have any disciplinary history, was never written up, and his disciplinary record was clean.   Overall, throughout his entire tenure at Precinct 2, Verbosky was an exemplary deputy.   Diaz does not have a legitimate basis for his termination.

**EMILY RIVERA**
(Terminated on March 15, 2019)

58.    On February 21, 2019, while working at Precinct 2, Emily Rivera received a text from Christy Hernandez, Lee Hernandez's wife, about Jessica Duran's status and other matters related to the Diaz campaign. Rivera responded that she did not want to discuss logistics related to the Diaz campaign while on duty.

59.    On March 5, 2019, Christy Hernandez notified Rivera of an upcoming Diaz campaign event that was to be kept private. The individuals expected to meet at the event included Christy Hernandez, Lee Hernandez, Chris Diaz, Jessica Duran, Eric Lister, Julian Garza, Blanca Martinez, Claudia Arellano, and John Miller. Rivera responded that she would not attend the event. Christy Hernandez replied that she needed Rivera's "help manage this group of people and keep up goal oriented." Rivera did not respond.

60.    On March 5, 2019, while Rivera was still at work, she was approached by Hernandez.  Hernandez walked up to Rivera and said, "so you just said the hell with it?" Assistant Chief Lee Hernandez added that "you know that he [referring to Diaz] really needs your help, right?" Rivera responded, "Yes, but he needs to find a campaign manager." Hernandez responded, "I think he is going to ask you to do it." Rivera responded, "I do not have time for that." Hernandez responded, "So you are going to tell him no?" Rivera responded, "If I am telling you no, then, yes, I am going to tell him no too."

61.    Based upon that conversation, Rivera realized that Diaz and Hernandez would see her as insubordinate for refusing to participate in the Diaz campaign. Rivera was aware of Diaz's expectations for political loyalty from his employees and knew from others' experience that she too would be retaliated against. Rivera therefore decided to give her

two-week notice. Before turning in her two-week notice, Diaz asked her "Not everyone is cut out for politics?" Clerk Emily Rivera responded, "I agree, it is not for everyone."

62.     On March 15, 2019, Diaz held a going away ceremony for Rivera as well as another clerk who was leaving. At the ceremony, Diaz likened Rivera to a dog, and referred to her being "chained up" and then "cut loose."

### SENIOR DEPUTY ANA HERRERA
(Demoted and Involuntarily Transferred on March 27, 2019)
(Terminated on July 19, 2019)

63.     On January 17, 2019, Senior Deputy Ana Herrera approached Lieutenant Lee Hernandez about a sergeant position that had become available after Anderson was terminated.

64.     Although, typically, promotional recommendations should had gone up the chain of command and given to Chief Jerry Luman (who would, in turn, make recommendations to Diaz),  Herrera knew that in order to be promoted to this new position she needed to reach out to Hernandez, who had essentially taken over Kim Bellotte's position within the Diaz campaign after Bellotte was forced to resign in the wake of the Texas Rangers report. When Senior Deputy Herrera spoke with Hernandez, she did not highlight her police experience, and, instead, explained all that she has done to contribute to the Diaz campaign, which included block walking, and attending various campaign functions.

65.     Herrera waited for a response from Hernandez, but did not receive any.  On February 4, 2019, Herrera met with Hernandez again for a second time about the open sergeant position. Hernandez responded and indicated that the position had been given to Corporal Blanca Martinez. Even though Corporal Blanca Martinez had less experience, Senior Deputy Herrera knew that the sergeant position had been awarded to Corporal Blanca

Martinez on the basis that she had given a substantial sum of money to the Diaz campaign, a sum that Herrera could not compete with.

66.     Disgusted with this promotional policy, on March 14, 2019, Herrera asked Hernandez, "Why would I help, when I don't get the recognition or the consideration for advancement?"  Herrera further added, "I'm not doing anything else for someone who doesn't appreciate me." Hernandez responded, by referring to the campaign, and asked, "So, you're not going to help?" Senior Deputy Herrera responded with a stern, "No."

67.     On or about March 19, 2019, just a few days after her March 14, 2019 encounter with Hernandez, Herrera was informed by Luman that she was being involuntarily transferred and demoted to a position as a School Resource Officer ("SRO" for short). Luman received an order directly from Diaz.  The SRO assignment was a less desirable position.  Herrera would lose her take home car and would be required to wear a uniform. Before being demoted to this SRO position, Herrera performed background checks on new applicants and worked as an IAD investigator under Lieutenant David Williams.  The new SRO assignment performed a reactive patrol like function at schools located within Precinct 2.  As further evidence to the retaliatory nature of this change, Herrera was not given a notice as required under Section 614.023 Texas Local Government Code.

68.     Herrera's transfer was not approved by the school.  Herrera did not have any training on how to interact with students and it is likely that the school did not want to lose the deputy already assigned to the school.

69.     On or about March 27, 2019, Hernandez informed Herrera that she would be involuntarily transferred and demoted to an evening shift patrol assignment.  As with the SRO position, the position on evening shift patrol was a less desirable position.   Herrera would lose her take home car and would be required to wear a uniform.   Herrera would also lose the ability to work her extra jobs.   As further evidence to the retaliatory nature of

the change, Herrera was not given notice as required under Section 614.023 Texas Local Government Code.

70.     Unable to cope with these intolerable working conditions, Herrera was forced to resign on or about July 19, 2019.

## DEPUTY DWAYNE PACIFICO
(Demoted and Involuntarily Transferred on March 29, 2019)

71.     On February 15, 2019, Deputy Dwayne Pacifico participated in an investigation relating to Jessica Duran's use of a suspended driver's license.   Diaz perceived the investigation as an attack upon his campaign functions, as Jessica Duran was a large supporter and had worked closely with Lee Hernandez within the community outreach division.   Duran reported directly to Hernandez.

72.     On March 29, 2019, Pacifico received a phone call from Lieutenant Michael Kritzler who indicated that Pacifico was to report to duty on night shift in the patrol division. Kritzler was ordered by Lee Hernandez to demote and involuntarily transfer Deputy Pacifico.   Deputy Pacifico was not provided a Section 611.023 notice and received no reason for his transfer and demotion.

73.     On April 1, 2019, Deputy Pacifico completed his first shift as a night shift patrol deputy.   The night shift in the patrol division position was less desirable.   Pacifico lost his take-home car, was required to wear a uniform, and lost extra job and "z-time" income. Pacifico was moved from a proactive investigatory position, where he investigated crimes from theft to sexual assault, and placed in a reactive patrol assignment.

74.    On April 2, 2019, prior to conducting auctions and tax sales, Deputy Claudia Arellano ran into Lieutenant Eric Slaughter in the hallway.   Slaughter requested Arellano come into her office for a quick meeting.   Although Arellano thought that she was being called into Slaughter's office for some legitimate reason, Slaughter indicated that the meeting was about Jerry Garcia – who was Diaz's primary challenger in the 2020 election. Slaughter stated to Arellano that Lee Hernandez would be present at the auctions in order to "watch" what was going on. Slaughter added, looking directly at Arellano, that "I know Garcia used to be your supervisor and our friend but he's the opponent now." Slaughter continued, "Again, I can't tell y'all what to do, but [Hernandez] will be watching everyone."

75.    After appearing at the auctions, Arellano did speak to Jerry Garcia. Arellano worried that if Jerry Garcia approached her and someone saw it, the matter would be reported back to Diaz.

76.    On April 9, 2019, Claudia felt compelled to attend a campaign meeting located at Taqueria Tepatitlan, located at 10337 East Fwy, Houston, Texas 77029.   This event was attended with a majority of deputies and civilian employees of Precinct 2.   Notice of the event was given by Christy Hernandez, Lee Hernandez' wife.  Employees were required to sign in for the event.   The sign in sheet existed so that Diaz could monitor employee attendance.

77.    As per the normal procedure at these events, Diaz took the stage and began ranting about the importance of politics. Diaz addressed the political loyalty of those present:

> *"How many people in here are on the Diaz campaign today? I don't want to see you on the fence. I want to see you a hundred percent. Come on. I want*

*to see some hands. I don't want to see no bullshit in here. Come on. No riding the damn fence. If you're with this campaign, I want you here tonight. If you're not, get the hell out of here. I'm telling you because I don't need nobody on the fence. If you're— If you're going to be— You've got to be loyal. You've got to be loyal to this campaign. If you're not loyal, you ain't no good to us."*

At this point during the speech, Diaz turned directly to Arellano and got within inches from her face – almost to the point of touching lips. Now signaling out Arellano, Diaz continued:

*"I mean, I grew up across the street. My kids grew up across the street from Claudia. You know? I mean, she's like this. Me and her are like this. We're close, right Claudia? I mean, you're loyal as the day is long, right? See? So you know when you got that loyalty, that means a lot, because if you're not loyal, you're never going to go anywhere. When you're on ship, you need to stay on the ship. Don't jump off the ship when the waters get rough, and they 'Uh, I don't know this. I don't know that.' Hey, we need to all go down together."*

78.     After the speech, it took Arellano a couple of minutes to get out from her seat, as her legs trembled from the embarrassment of being singled out by Diaz. About ten minutes later, Diaz came up to Arellano and demanded that she put up a campaign sign for "Ramon Garza." Arellano indicated that she would comply. Because Diaz lives across the street from Arellano, Diaz would be able to easily monitor whether Arellano would comply with his directive. Arellano refused to place the campaign sign in her yard.

79.     Arellano immediately left the campaign meeting and took a moment to collect herself. Arellano called her husband and told him that she "can't take this anymore," after describing what had transpired. Although Arellano had been coerced to support the Diaz campaign, Arellano began to realize that the threat of Diaz's retribution would never end.

80.     On April 15, 2019, Arellano received a call from Lieutenant Mike Kristzler indicating that she has been demoted from the civil division to patrol and involuntarily transferred to an evening position at patrol. The transfer would change Arellano's hours

from daytime hours (Monday through Friday) to evening hours (Thursday through Monday). Slaughter indicated that the assignment "starts on Saturday" (on April 20, 2019). Arellano struggled to maintain her composure. Arellano worried about how she could provide day care for her children. Arellano experienced an anxiety attack.

81. On the morning of April 18, 2019, Arellano met with Corporal Rene Vela who indicated that he was investigating an anonymous letter. Vela repeatedly asked Arellano if she was friends with Jerry Garcia. Arellano indicated that she did not know he reason why she was transferred and requested Vela to find out. As further evidence to the retaliatory nature of the change, Arellano was not given a 614.023 notice as required under Section 614.023 Texas Local Government Code for the transfer and demotion.

82. Later, on April 18, 2019, a meeting was called between Arellano, Hernandez, and Slaughter. Hernandez explained that Arellano has been transferred due to a loss of confidence relating to a writ incident involving a tenant on March 15, 2019. Again, Arellano was not provided notice under Section 614.023 Texas Local Government Code.

83. After work on April 18, 2019, Arellano put up a yard sign for Jerry Garcia. The same day, Tony Gonzalez made a Facebook post with a picture of the sign in Arellano's front yard. The post indicated that Deputy Claudia Arellano was disloyal, echoing similar language stated by Diaz at the campaign rally at Taqueria Tepatitlan. Tony Gonzalez is the brother-in-law of Diaz.

84. On April 24, 2019, Deputy Claudia Arellano received notice from the City of Jacinto City, the municipality in which Arellano lived, that she was in violation of City ordinances relating to building without a permit on her residence. At no point during any relevant time period of this case was Arellano building on her residence. Arellano believes that given the timing of this notice to the proximity of the above described events show that Ana Diaz, acting under the authority as Mayor of Jacinto City, allowed this notice to be placed on

Arellano's property. Ana Diaz is the wife of Chris Diaz. Both Ana Diaz and Chris Diaz live on the same street as Arellano and would have knowledge of the condition of Arellano's property. Such acts by Ana Diaz and Jacinto City amount to an abuse of power without justification to threaten or intimidate Arellano for exercising her First Amendment right to support of Jerry Garcia.

85.     On or about May 15, 2019, Arellano, with counsel present, was interrogated by Vela. The interrogation involved allegations that Arellano had committed official oppression and violated a tenant's due process rights under the Fourteenth Amendment by evicting the tenant on March 19, 2019 without a writ. Vela indicated that the complaint had come from Diaz.

86.     On May 30, 2019, Arellano was terminated from Precinct 2. The termination letter did not provide any basis for termination. Later, Arellano received notice that her F-5 separation of license report had been updated by Blanca Martinez to show that she had been "dishonorably discharged." The only disciplinary category that could have supported a "dishonorable discharge" was the criminal act related to official oppression.

87.     Arellano filed a separate petition to challenge the dishonorable discharge. During the hearing on Arellano's petition, Harris County provided exhibits indicating that she had not committed official oppression, and, therefore, Diaz had given Arellano the wrong discharge category. The investigation conducted by Vela determined that Arellano had committed a due process violation, despite the fact that Arellano had not committed any act showing that she was deliberately indifferent to the tenant's due process rights.

88.     The investigatory files received from Harris County, as authored by Vela, also show that Vela did not locate the video showing that Arellano had been accompanied by another deputy, Pernelli Jones, on the date of the alleged writ incident. Furthermore, a statement from Jones indicated that he did not have any knowledge of the writ incident on March 19,

2019, yet this is contrasted by the video, which shows Jones at the tenant's property on March 19, 2019 reading the alleged writ to the tenant.

## SENIOR SERGEANT CINDY VARA-LEIJA
(Stripped of job duties before termination)
(Demotion and Involuntary Transferred on July 25, 2019)
(Terminated on August 2, 2019)

89.     Senior Sergeant Cindy Vara-Leija also participated in the Texas Rangers investigation conducted by Texas Ranger Daron Parker.   On April 12, 2018, Leija was interviewed by Texas Ranger Daron Parker and provided unfavorable testimony to Diaz which primarily examined the extent of Kim Bellotte's involvement in the Diaz campaign. Leija did not trust Bellotte's judgment and noted that Bellotte had distributed a large number of donated items to others.

90.     By providing said testimony to Texas Ranger Daron Parker, Leija sent a clear message to Diaz that she would no longer tolerate Diaz's continual use of the employment relationship at Precinct 2 as a means by which Diaz would continue to be elected.   Leija also declined to provide Diaz with any further assistance to his campaign and stopped attending campaign functions.

91.     Soon afterwards, Diaz started stripping Leija of all her job duties in order to force her to resign.  Diaz removed Leija's responsibility to process new applicants and gave those job responsibilities to Latrisha White.   Diaz ordered Leija to work in uniform, which was countermanded by Luman, and, then Diaz ordered Leija to be back into uniform.  Diaz also stripped Leija of her duties to report employee changes to TCOLE.  These job duties were given to Blanca Martinez.   Leija was not provided notice under Section 614.023 Texas Local Government Code for any of the disciplinary changes.

92.    Finally, on July 25, 2019, Lee Hernandez, along with Paul Martinez, called Leija for a meeting.  As a result of that meeting, Leija was demoted and involuntarily transferred, without notice as required under Section 614.023 Texas Local Government Code. Hernandez turned, looked directly at Leija and stated, "You do not want to get caught in my crosshairs like Williams did."  Leija was placed on a 3:00 p.m. to 11:00 p.m. patrol evening shift.  This patrol shift was a reactive assignment and was considered less desirable than the administrative position she had occupied prior to her demotion and involuntary transfer.

93.    In protest, Leija wrote an email to Diaz indicating that she had never worked on patrol before and was not experienced.  Diaz did not respond to her email.  After working as a patrol supervisor for approximately a week, Leija was forced to resign on August 2, 2019.

## CHIEF JERRY LUMAN
(Stripped of job duties on May 6, 2019)
(Terminated on July 30, 2019)

94.    On February 13, 2018, Chief Jerry Luman participated in the Texas Rangers Investigation by giving what he perceived as a true account of his interactions with Kim Bellotte.  Like all plaintiffs in this case, however, Luman was met with stiff opposition by Diaz, who was responsible for demoting and/or terminating, at the direction and orders of Diaz, some of the plaintiffs who participated in the Texas Rangers Investigation.  This includes the termination of Norman Verbosky, demotion and involuntary transfer of Marcus Anderson and Reed Clarke.

95.    On May 6, 2019, Chief Deputy Jerry Luman was placed on indefinite suspension and served in that capacity until he was terminated on July 30, 2019.   Shortly after Luman was placed on indefinite suspension, Luman's name was removed from his office and his chief deputy status was given to Lee Hernandez who proudly displayed the chief deputy's

stars on his uniform. These acts occurred while Luman was placed on indefinite suspension and before the IAD investigation, which lead to his termination, was concluded.

96. Although an IAD investigation was conducted into allegedly derogatory statements that Luman told Lee Hernandez, the IAD investigation, launched a Diaz's direction, failed to take into account that Lee Hernadez was biased, being a supporter of Diaz and a contributor to his campaign, and an individual who had received Luman's job before the investigation had concluded. As a result of that IAD investigation, Luman was terminated based on statements that he allegedly told Hernandez.

97. While Luman was placed on indefinite suspension, but before he was terminated, on May 16, 2019, Luman, like Deputy Arellano, did also receive notice that his property, which was located inside the city limits of Jacinto City, Texas, was in violation of an ordinance relating to the height of the grass on the property. Luman's property was not in violation of any grass height restriction. Luman believes that given the timing of this notice to the proximity of the events described in this lawsuit show that Ana Diaz, acting under the authority as Mayor of Jacinto City, allowed this notice to be placed on his property. Ana Diaz is the wife of Chris Diaz. Diaz had knowledge that Luman owned the property because Diaz had visited the property before with Luman. Such acts by Ana Diaz and Jacinto City amount to an abuse of power without justification to threaten or intimidate Luman for exercising his First Amendment rights.

**MARY ANN CARRION**
(Stripped of job duties before termination)
(Terminated on June 3, 2019)

98. On April 17, 2018, Mary Ann Carrion participated in the Texas Rangers Investigation by giving what she perceived as a true account of her interactions with Kim Bellotte.

99.     Instead of being commended for exposing Kim Bellotte's corruption, however, Carrion experienced a gradual reduction of duties in retaliation for her participation in the Texas Rangers report.  One of the clerks that worked under her – Jessica Duran – was given the ability to approve purchase orders, purchase items for the department such as pens, pencils with Diaz' name printed on them, access payroll and budget documents.  Jessica Duran, who reported directly to Diaz and Hernandez, was insubordinate and refused to correctly document her timesheets.

100.    On March 2019, Diaz directed that Carrion cease her involvement in handling FMLA for the department and was directed to train Dora Lopez so that she could take over this duty.  Carrion was removed from the hiring process and, after being ordered to do so, Lee Hernandez hired two civilian entry-level clerks, including Shelly Rivas, the wife of a sitting Jacinto City Council Member, and Victoria Gutierrez, Hernandez's son's girlfriend.  In May 2019, Carrion's payroll duties were taken away from her and given to Shelly Rivas.  In May 2019, Diaz blamed Carrion for late Chapter 59 reports after Carrion had promptly acted to obtain an extension of the deadline.  Carrion informed Diaz that there was a glitch with the reporting system at the state level and he had received emails documenting the issue.

101.    While Diaz was stripping away her job responsibilities, Carrion told Luman that she no longer wished to donate to the Diaz campaign, and refused to participate in any additional Diaz campaign functions.

102.    In response, Carrion was also ordered to submit a log of her daily activities because Hernandez and Diaz suddenly did not know what Carrion was doing in the office.  Diaz and Hernandez also made specific references to the fact that Carrion was not participating in  Diaz'  campaign functions.  Hernandez likely  was  aware  of  this  fact

because of his wife's – Christy Hernandez – monitoring of employee participation at campaign functions.

103.    Due to the intolerable working conditions, Carrion was forced to resign on June 3, 2019.

### LIEUTENANT DAVID WILLIAMS
(Demotion on April 1, 2019)
(Stripped of job duties on April 11, 2019)
(Demoted to deputy on August 9, 2019)
(Terminated on August 28, 2019)

104.    On February 13, 2018, Lieutenant David Williams participated in the Texas Rangers Investigation.   At the conclusion of the Texas Rangers Investigation, David Williams also prevented Diaz from rehiring Kim Bellotte.  If she was rehired, Williams explained to Diaz that he would be required to investigate Bellotte.  Rather than subjecting Bellotte to another investigation, however, Bellotte resigned. Williams actions in this regard shows Diaz that he need control over the IAD department in order to facilitate sham investigations of alleged officer misconduct.

105.    On April 1, 2019, Williams was informed by Hernandez that he would be demoted by stripping him of a majority of his assignments, including (1) supervision of the Internal Affairs Division, (2) criminal warrants, (3) recruiting, and (4) background investigations. Williams was also ordered to vacate his office.  With regards to the internal affairs division, Williams' job duties were given to Vela, who would later investigate Williams.   No explanation was provided to Williams for the employment change, and Williams did not receive the required notice under Section 614.023 Texas Local Government Code for the change.

106.    On April 11, 2019, Hernandez informed Williams, now losing his "Internal Affairs" designation, that he would be transferred and demoted to the evening shift.  This is the infamous 3:00 p.m. to 11:00 p.m. patrol evening shift.  Williams reported to Lieutenant Michael Kritzler, the division commander.  Prior to this transfer and demotion, Williams had been in Kritzler's chain of command, and now the chain of command, with respect to Williams and Kristzler, had been reversed.  This evening shift lieutenant position never existed before and was specifically created for Williams.  Williams perceived this position as less desirable, as he was no longer a member of Diaz's command staff, originally being the third individual in charge of all personnel at Precinct 2, excluding Diaz, and was ordered to report directly to Kritzler, the division commander, who was previously his subordinate. No explanation was provided to Williams for the employment change, and Williams did not receive the required notice under Section 614.023 Texas Local Government Code for the change.

107.    On May 30, 2019, Hernandez informed Williams that he was again involuntarily transferred and demoted to a task force position previously occupied by Deputy Ricardo Rodriguez.  The task force position was a day shift assignment and was perceived as a less desirable. The individual who Lieutenant Williams replaced was a deputy.  No explanation was provided to Williams for the employment change, and Williams did not receive the required notice under Section 614.023 Texas Local Government Code for the change. Hernandez further indicated that Williams needed to contribute to the Diaz campaign, but Williams refused.

108.    About a week later, Williams was transferred back into the 3:00 p.m. to 11:00 p.m. patrol evening shift.  This time, however, Williams was ordered to be placed back into uniform for the first time.  Williams did not have any real job responsibilities, because this shift was supervised by Lieutenant Michael Kritzler.  No explanation was provided to Williams for the employment change, and Williams did not receive the required notice under Section 614.023 Texas Local Government Code for the change

109. On July 17, 2019, the patrol car being driven by Williams was burglarized. Shortly thereafter, Williams filed a report, but was placed on administrative leave without pay on July 24, 2019. The investigation was assigned to Vela. As a result of that investigation, although Williams was cleared by any wrongdoing relating to the burglary, Williams was demoted, on August 9, 2019, for (1) insubordination, (2) untruthfulness, and (3) violation of an extra employment policy.

110. The results of the investigation were explained to Williams orally by Paul Martinez on August 9, 2019. Williams has a difficult time understanding the results of the investigation, as his attorney was prohibited from asking questions,[1] but, it appears that the insubordination was related to alleged schedule change that occurred on July 12, 2019. Williams has reviewed his timesheet submitted for July 12, 2019 and that timesheet indicates that Williams only claimed the usual 3:00 p.m. to 11:00 p.m. patrol evening shift. As best as Williams is able to determine, the untruthfulness was related to a statement that Williams did not work at Hendricks Polygraph, Inc., which Williams correctly indicated to Vela that he had not worked at Hendricks for a long time. Finally, IAD investigation determined that Williams had violated an extra employment policy with Hendricks Polygraph, Inc. while Williams was suspended. Williams did conduct several polygraph examinations while he was suspended, but did not get paid, and Williams donated his time. Therefore, the polygraph examinations were not an extra job.

111. On August 14, 2019 and, again, on August 26, 2019, Williams filed two grievances related to an issue with his pay which arose after his demotion on August 9, 2019. After

---

[1] Martinez claimed that policy did not allow an attorney to ask questions. Upon further review of the polices, Williams has not been able to identify any policy indicating that an attorney cannot ask questions. This is especially troubling given the confusing nature of Martinez explanation as to the alleged policy violations that he claimed Williams had violated. Questions were certainly warranted in this instance. Denial of effective representation in this matter is another example of retaliatory animus.

receiving no response, August 28, 2019, Lieutenant David Williams was constructively discharged.

## CAUSE OF ACTION AND DAMAGES FOR
## VIOLATIONS OF THE FIRST AMENDMENT

112.    The Plaintiffs file a cause of action against Harris County and Constable Chris Diaz, in his individual capacity, for violation of their rights for freedom of speech and freedom of association as guaranteed by the First Amendment

113. The Defendants coerced the receipt of services and funds to the Diaz campaign upon the Plaintiffs' employment at Harris County.

114.    Ana Diaz and the City of Jacinto City, Texas also abused their position of power in order to threaten and intimidate the Plaintiffs for exercising their rights under the First Amendment.

115.    Additionally, when the plaintiffs were fired or otherwise suffered adverse employment actions by the defendants, the law was well-settled that terminating a public employee or otherwise subjecting him or her to adverse employment actions because of that individual's support for an individual running for elected office violated a clearly-established constitutional right.

116.    The law was also well-settled at the time that terminating a public employee because the employee was associated with an individual exercising his or her right to freedom of speech violated a clearly-established constitutional right.

117.    The plaintiffs' rights under the first amendment outweighed the interest of the defendant(s) in promoting the defendants' efficiency. Their actions did not have, and could

not reasonably be expected to have, a detrimental effect on the defendants' efficient delivery of public services.

118.    Diaz was acting "under color of state law" when he deprived the plaintiffs of their rights under the Constitution of the United States.

119.    As a Constable, Diaz is an official policymaker of Precinct 2. He was authorized to and had final authority to terminate the plaintiffs. Diaz abused or misused a power that he possessed only because he was an official of Harris County, Texas.

## RELIEF REQUESTED

120.    The plaintiffs ask that this Court enter a judgment:

(1)    Declaring that the acts and practices complained of in this Complaint are in violation of law, including all discipline received by the plaintiffs that required notice under Section 614.023 Texas Local Government Code, but no notice was issued.   Plaintiffs request that any and all discipline received by the defendants that did not comport with Section 614.023 Texas Local Government Code be overturned;

(2)    Declaring that the acts and practices complained of in this Complaint are in violation of law under *Janus v. Am. Fed'n of State, Cty., & Mun. Employees Council 31*, 138 S. Ct. 2448 (2018);

(3)    Enjoining and permanently restraining the Defendants from conditioning employment upon contributions to the Diaz campaign;

(4)   Enjoining and permanently restraining the Defendants from retaliating against them and all other employees who engage in activities protected by the first amendment;

(5)   Directing the Defendants to pay damages for lost wages and employee benefits suffered by the plaintiffs and caused by the unlawful retaliation against them from the time of their termination to the time of trial;

(6)   Directing the Defendants to pay the plaintiffs compensatory damages that they suffered, past and future, caused by the unlawful retaliation against them;

(7)   Directing the Defendants to reinstate each plaintiff to his or her former or an equivalent position at a comparable rate of pay or, in the alternative, pay each individual's front pay for the maximum reasonable time into the future when he or she can be reasonably expected to secure substantially comparable employment with the same or better pay and benefits or when each reaches his or her normal retirement age;

(8)   Awarding Plaintiffs pre-judgment interest on the amounts owed at the maximum rate allowed by law;

(9)   Awarding Plaintiffs the costs of this action, together with reasonable attorneys' fees and expert witness fees;

(10)  Awarding Plaintiffs post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

(11)  Awarding Plaintiffs such other relief, legal or equitable, as may be warranted.

Respectfully submitted,

**THE POERSCHKE LAW FIRM, PC**

/s/ R. Scott Poerschke, Jr.
R. SCOTT POERSCHKE, JR.
SDTX No. 1134348
State Bar. No. 24067822
5111 Center Street
Houston, Texas 77007
Phone 713.974.1600
Fax 713.621.2106
scott@rsplegal.com

**<u>PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES</u>**