# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| EMILY RIVERA, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-4920 |
| | § | |
| HARRIS COUNTY *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is (1) a motion to dismiss the claims made against defendant Christopher Diaz (Dkt. 29);[1] and (2) a motion for leave to supplement the record filed by the plaintiffs (Dkt. 56). Having reviewed the motion for leave to supplement and response, the court finds that the motion to supplement the record (Dkt. 56) should be GRANTED. Additionally, having reviewed the motion to dismiss, response, reply, supplemental evidence, and applicable law, the court is of the opinion that the motion to dismiss should be GRANTED IN PART AND DENIED IN PART.

---

[1] Christopher Diaz filed his motion to dismiss when the second amended complaint was the live pleading. *See* Dkt. 9 (second amended complaint); Dkt. 29 (motion to dismiss). The plaintiffs have since filed a third amended complaint. *See* Dkt. 55 (filed June 7, 2020). The plaintiffs amended their complaint after the court granted a motion to dismiss the claims against different defendants, but did so without prejudice to amending the complaint with regard to those defendants. *See* Dkt. 53. The court has reviewed the third amended complaint, and the claims against Christopher Diaz appear to be substantially similar to the claims made in the second amended complaint. *Compare* Dkt. 9, *with* Dkt. 55. Thus, the court will consider Diaz's arguments as if they were directed at dismissal of the third amended complaint.

# I. BACKGROUND

The plaintiffs brought this lawsuit for alleged violations of their First Amendment Rights. Dkts. 1, 3, 9. Among other defendants, the plaintiffs sued Christopher Diaz in his individual capacity as Constable, Precinct Two of Harris County, Texas. Dkt. 9 (second amended complaint); *see also* Dkt. 55.. The plaintiffs contend that Christopher Diaz violated "their rights for freedom of speech and freedom of association as guaranteed by the First Amendment." Dkts. 9, 55. Specifically, the plaintiffs allege that Christopher Diaz conditioned employment on the performance of essential campaign functions including contributing monetarily and assisting in administrative functions of the campaign. Dkts. 9, 55. Additionally, the plaintiffs argue that Diaz retaliated against those who reported or participated in investigations relating to how Diaz was operating his campaign. Dkts. 9, 55.

All of the plaintiffs are or were employees of Precinct Two. Dkts. 9, 55. The plaintiffs assert that Christopher Diaz required them to work for his campaign, and that employees who "spoke out," refused to participate in the campaign, or provided information in an investigation related to how Christopher Diaz operated his campaign, were disciplined in retaliation. Dkts. 9, 55. Plaintiffs Jerry Luman, Norman Verbosky, Cindy Vara-Leija, David Williams, Reed Clark, Ricardo Rodriquez, and Mary Ann Carrion all participated in a Texas Rangers' investigation into alleged misconduct by former Lieutenant Kimberly Bellotte. Dkts. 9, 55. Clark, Rodriguez, and Vara-Leija specifically talked to the Texas Rangers' investigator about Bellotte's alleged misappropriation of items that were supposed to be given to Hurricane Harvey flood victims. Dkts. 9, 55. The plaintiffs allege that Diaz viewed their testimony relating to Bellotte as challenging the way he ran his campaign and that he took adverse employment actions against them shortly after they participated. Dkts. 9, 55.

Plaintiff Dwayne Pacifico participated in a separate investigation into Assistant Chief Clerk Jessica Duran, who worked closely with Lee Hernandez, the individual who replaced Bellotte; Duran allegedly was a large supporter for the Diaz campaign. Dkts. 9, 55. Hernandez worked closely with Diaz and allegedly would sometimes serve as an intermediary between Diaz and the plaintiffs when discussing their employment or loyalty. *See* Dkts. 9, 55. Hernandez was eventually promoted to replace Verbosky as assistant chief, and, a few months later, he was again promoted to replace Luman as chief deputy. Dkts. 9, 55.

Plaintiffs Marcus Anderson, Ana Herrera, Javer Zavala, and Emily Rivera declined to participate in campaign functions, and some chose to support other candidates over Diaz in the election. Dkts. 9, 55. The plaintiffs allege that in response to these actions, Diaz retaliated against them through demotion, involuntary transfer, or termination. Dkts. 9, 55.

Prior to the present suit, Luman, Verbosky, Williams, and Pacifico ("TWA Plaintiffs") sued Harris County, Lee Hernandez, and Christopher Diaz individually in Texas state court under the Texas Whistleblower Act for unlawful employment practices involving the termination of employment. Dkt. 29, Ex. 1. The 333rd Judicial District Court of Harris County signed an order on September 5, 2019, granting the TWA Plaintiffs' unopposed motion to dismiss their claims against Christopher Diaz and Lee Hernandez. Dkt. 29, Ex. 2. The TWA Plaintiffs subsequently amended the petition and removed Diaz's name. Dkt. 47, Ex. 1. However, the TWA Plaintiffs state that the removal of Diaz's name was inadvertent and as a result they have amended the petition again to include Diaz's name in the fourth amended petition. Dkt. 49, Ex. 1. On June 9, 2020, Judge Daryl Moore signed an order vacating the previous order dismissing Diaz from the state case with prejudice and signed a first amended order dismissing Diaz "without prejudice." Dkt.56, Exs. 1, 2. Plaintiff Claudia Arellano previously filed a claim with the Texas Workforce Commission ("TWC")

3

for unemployment benefits relating to her termination from Precinct Two. Dkt. 29. The TWC Appeal Tribunal found that Arellano was discharged for misconduct, and as a result was disqualified from receiving benefits. Dkt. 29, Ex. 4. Arellano also filed a separate petition to challenge her dishonorable discharge classification. Dkt. 37 ¶ 97. Upon examination of the evidence presented, an Administrative Law Judge found that Arellano did not commit any workplace misconduct and ordered the Texas Commission on Law Enforcement to change Arellano's report to reflect that she was honorably discharged. Dkt. 37, Ex. 3. Following this finding, Arellano filed a motion for rehearing with the TWC based upon the new evidence. *Id.* Arellano's appeal is still pending. Dkt. 37 n.16.

Christopher Diaz moves to dismiss all of the claims made against him in the second amended complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that the plaintiffs fail to plead facts to establish an ordinary citizen First Amendment retaliation claim against him because the plaintiffs' allegations are all conclusory and do not state a cognizable claim. Dkt. 29. He asserts a heightened pleading standard applies. *Id.* He also argues that even if the plaintiffs stated a valid First Amendment claim, they have failed to allege facts sufficient to disprove the presumption Diaz is immune from suit because Diaz's alleged actions, if true, did not violate clearly established law. *Id.* Additionally, Christopher Diaz contends that the claims by the TWA Plaintiffs and Arellano are barred by *res judicata*. *Id.*

The plaintiffs assert that they need only comply with the Federal Rule of Civil Procedure Rule 8 pleading standard, requiring a "short and plain statement of his complaint," which they argue they have done through many pages detailing their case with factual specificity. Dkt. 37 (citing *Anderson v. Valdez*, 845 F.3d 580, 589-90 (5th Cir. 2016)). The plaintiffs further refute Christopher Diaz's assertion that the law was not clearly established, arguing that it is clearly established that an

employer is prohibited from terminating an individual's employment in retaliation for the individual's exercise of protected speech. *Id.* The plaintiffs have provided a plethora of cases that they allege support their contention that a reasonable official in Christopher Diaz's situation would have known that his conduct violated a Constitutional right. *Id.* They argue that this is a "perfectly straightforward case of political corruption in public office" and one which "gives rise to § 1983 actions to which an immunity defense is no defense at all." *Id.* The plaintiffs also contest the defendant's claim that res judicata bars litigation of some of their claims because (1) the order signed in the Texas state court was not a final order or an adjudication on the merits; and (2) Arellano's administrative hearings do not bar subsequent § 1983 claims. *Id.*

In reply, Christopher Diaz maintains the positions that a heightened pleading standard is required, that the plaintiffs have failed to allege sufficient facts to support a First Amendment violation, and that there is no allegation of a violation of "clearly established law" to overcome the presumption of qualified immunity. Dkt. 47. Christopher Diaz also argues—for purposes of *res judicata*—that even if the state court's dismissal with prejudice does not function as a final determination on the merits, the fact that the TWA Plaintiffs subsequently amended their petition makes the dismissal order a final judgment. *Id.*

## II. MOTION TO SUPPLEMENT

The plaintiffs filed a motion to supplement the record in which they request to supplement the record with two exhibits. Dkt. 56. The first is an order vacating an order in which the state court had dismissed Diaz from the case with prejudice. Dkt. 56, Ex. 1. The second is an amended order dismissing Diaz without prejudice. Dkt. 56, Ex. 2. Diaz opposes the motion to supplement, arguing that (1) the court is not permitted to look beyond the pleadings when ruling on the motion to dismiss; and (2) the plaintiffs took affirmative action in the state court "to re-write history solely in an effort

to avoid dismissal of their claims" on *res judicata* grounds.  Dkt. 62.  Diaz also argue that it is irrelevant whether the claims were dismissed with or without prejudice because the decision was final for purposes of *res judicata*.  *Id.*

First, the documents referred to are public records.  Second, Diaz's argument that the court cannot consider the public filings in the case that Diaz claims bars this case on *res judicata* grounds is nonsensical.  Third, certainly whether the case was dismissed with or without prejudice *is* relevant to a *res judicata* finding.  While Diaz may not agree with the state-court judge's decision to reconsider the dismissal with prejudice and change it to without prejudice, the judge did reconsider and issued a new ruling.  Additionally, Diaz argues that the relevant state-court petition is the amended petition that removed Diaz's name.  *See* Dkt. 62.  However, the plaintiffs point out that the petition was amended *again* to include his name.  *See* Dkt. 49 & Ex. 1.  As Diaz points out, an "'amended pleading supersedes and supplants all previous pleadings.'"  Dkt. 62 (quoting *Amerigroup Tex., Inc. v. True View Surgery Ctr., L.P.*, 490 S.W.3d 562, 570 (Tex. App.—Houston [14th Dist.] 2016, no pet.)).  While Diaz argues that a plaintiff loses the right to complain on appeal if a plaintiff abandoned claims, here the plaintiffs amended their petition well before appeal, and the state court allowed the amendment.

The plaintiffs' motion to supplement the record with Exhibits 1 and 2 is GRANTED.

### III.  LEGAL STANDARD FOR MOTION TO DISMISS

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007).  In considering a Rule 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual allegations contained in the complaint as true.  *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).  The court

does not look beyond the face of the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6).  *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).  "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*  The supporting facts must be plausible-enough to raise a reasonable expectation that discovery will reveal further supporting evidence. *Id.* at 556.

Christopher Diaz contends that a plaintiff who is suing a governmental official in his or her individual capacity must satisfy a heightened pleading standard.  Dkt. 29.  Specifically, he contends the plaintiffs must allege facts of specific conduct and direct actions that gave rise to a Constitutional deprivation. *Id.*  According to the Fifth Circuit, a district court must apply Rule 8(a)(2)'s standard to the complaint but may, in response to a motion to dismiss for qualified immunity, "'insist that a plaintiff file a reply tailored to [the defendant's] answer [or motion to dismiss] pleading the defense of qualified immunity.'" *Anderson*, 845 F.3d at 590.  The court must first examine the plaintiffs' pleading to determine if it asserts facts that, if true overcome the qualified immunity defense. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (citing *Ashcraft v. Iqbal*, 556 U.S. 662, 678-79, 129 S. Ct. 1937 (2009)).  The court may require limited discovery if further factual clarification is needed to rule on the immunity claim. *Id.*

## IV. ANALYSIS

Christopher Diaz seeks dismissal of the claims against him under Rule 12(b)(6) because the plaintiffs have failed to state a First Amendment claim.  Dkt. 29.  Alternatively, he moves for dismissal because he is immune from suit and because res judicata bars several of the plaintiffs'

7

claims. *Id.* The court will first consider whether the plaintiffs asserted a First Amendment claim against Christopher Diaz and then turn to Diaz's alternative arguments.

## A.   Violation of First Amendment Rights

Section 1983 prohibits "persons" acting under the color of law from depriving another of any "rights, privileges, and immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. The plaintiffs here contend that they were retaliated against as public employees for exercising their right to free speech. In establishing a First Amendment employment retaliation claim related to speech, a plaintiff-employee must show: "'(1) he [or she] suffered an adverse employment action; (2) he [or she] spoke as a citizen on a matter of public concern; (3) his [or her] interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action.'" *Anderson*, 845 F.3d at 590 (quoting *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007) (citations omitted)); *see also Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731 (1968). If the plaintiffs prove all four prongs, the defendant-employer may still escape liability by a showing that it would have taken the same adverse employment action even in the absence of conduct protected by the First Amendment. *Murphy v. Butler*, 512 F. Supp. 2d 975, 980 (S.D. Tex. 2007) (citing *Hitt v. Connell*, 301 F.3d 240, 249 (5th Cir. 2002) (citations omitted)).

### 1.   Adverse Employment Action

Christopher Diaz seems to suggest that the plaintiffs have not suffered an adverse employment action. See Dkt. 29. Adverse employment actions include "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (quoting *Pierce v. Tex. Dep't of Criminal Justice*, 37 F.3d 1146, 1149 (5th Cir. 1994)). Additionally, transfers may constitute adverse employment actions so long as they are

sufficiently punitive, or if the new job is significantly less prestigious and less interesting than the old one. *Id.* The plaintiffs have indicated Luman, Verbosky, Williams, and Arellano suffered straightforward termination. Dkts. 9, 55. The plaintiffs have pled that other plaintiffs suffered demotions, involuntary transfers, and constructive discharges, which is sufficient to constitute adverse employment actions, and Diaz has not set forth arguments to challenge the allegations of an adverse employment action as to any particular plaintiff. *See* Dkts. 9, 55; *see also* Dkt. 29. The court thus finds that the plaintiffs have pled sufficient facts to establish they each suffered an adverse employment action.

### 2.    Protected Conduct

The plaintiffs set forth three categories of conduct that they contend is speech protected by the First Amendment: "(1) participation in the Texas Rangers' investigation; (2) participation in an internal investigation; and (3) refusal to support or withdrawing support for Diaz's re-election including supporting Diaz's political opponent." Dkt. 29. The court will first examine the claims of the plaintiffs who were allegedly involved in the first two categories of speech before moving to the last category, which includes all the plaintiffs.

Christopher Diaz argues that the plaintiffs have not stated a claim on a number of bases including, most fundamentally, that the plaintiffs were not engaged in protected speech when participating in an Internal Affairs Division ("IAD") and Texas Rangers' investigation. Dkt. 29. Although Christopher Diaz does not deny that speech regarding alleged municipal corruption is a matter of public concern, he argues that the plaintiffs' speech was itself ordinarily within the scope of their official duties, pointing to their job descriptions, and that they therefore were not speaking as citizens, as opposed to public employees, for First Amendment purposes. *Id.* Furthermore, Christopher Diaz points to specific acts taken by an employee that have been deemed to be

9

unprotected speech by the Fifth Circuit including: (1) internal complaints made up the chain of command about conditions in the workplace; (2) assisting in an employer's investigation into workplace theft; and (3) communicating with outside agencies. *Id.* Christopher Diaz more specifically points to occasions in which the Fifth Circuit evaluated whether a police chief was acting under his official duties when he reported alleged misconduct to outside agencies or prosecuting authorities. *Id.*; *see Gibson v. Fitzpatrick*, 773 F.3d 661 (5th Cir. 2014); *Rogers v. City of Yoakum*, 660 F. App'x. 279 (5th Cir. 2016) (per curiam) (unpublished).

The plaintiffs oppose the use of "generic job descriptions" to indicate what duties were within the scope of their professional duties and cite to *Garcetti v. Ceballos* to support their contention that formal job descriptions often bear little resemblance to the duties the employee is actually expected to perform. Dkt. 37. The plaintiffs additionally point to Fifth Circuit precedent that relies on the Supreme Court's relatively recent decision in *Lane* setting forth the relevant question of "whether the speech at issue [was] ordinarily within the scope of an employee's duties." *Id.* (emphasis added) (quoting *Howell v. Town of Ball*, 827 F.3d 515, 524 (5th Cir. 2016)); *see also Lane v. Franks*, 573 U.S. 228, 134 S. Ct. 2369 (2014). The plaintiffs rely on the modifier "ordinarily" to refute Diaz's contention that participating in the Texas Rangers' investigation was within the scope of their duties. Dkt. 37. Additionally, the plaintiffs point out that they took their complaints outside the chain of command, did not inform Diaz, did not serve Diaz, and were not subject to his control when participating in the investigations.[2] *Id.*

The Supreme Court has established a two-step analysis known as *Pickering-Connick*

---

[2] The plaintiffs also argue that the subject matter of their speech involves a matter of public concern, though the defendant does not rebut this notion and rather argues that although the speech may be of public concern, the plaintiffs were speaking as employees at the time and therefore the speech is not protected.

balancing for determining whether a public employee is engaging in protected speech.  To receive First Amendment protection, the speech must be made as a citizen on a matter of public concern and, if so, the interests of the public employee as a citizen, in commenting upon matters of public concern, must outweigh the public employer's interest in promoting the efficiency of public services performed through its employees.  *Anderson*, 845 F.3d at 592 (citing *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568, 88 S. Ct. 1731 (1968)).  In *Garcetti*, the Court shifted its threshold consideration to the role of the speaker when the speaker engaged in the speech at issue.  *Id.*  Therefore, before balancing the interests, it must be determined whether the employee was speaking as a citizen rather than as an employee.  Public employees making statements pursuant to their official duties are not speaking as citizens for First Amendment purposes.  *Garcetti*, 547 U.S. at 421 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."); *see Howell*, 827 F.3d at 523 ("[T]he First Amendment does not protect speech made in furtherance of a public employee's official duties, regardless of whether that speech addresses a matter of public concern.").

While the Supreme Court has not articulated a comprehensive framework for defining the scope of an employee's duties, it has held that job descriptions are not dispositive, the fact that the speech concerns the subject matter of employment is not dispositive, and whether the expression occurs in the workplace is not dispositive.  *Id.* at 420–21, 424–25.  The critical question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Lane*, 573 U.S. at 232 (quoting *Garcetti*, 547 U.S. at 421).  Speech deemed to be made pursuant to a public employee's official duties is not protected, "even when it irrefutably addresses a matter of public concern."  *Anderson*, 845 F.3d at 592.  This inquiry is dispositive and

highly fact specific, and as a result the plaintiffs must be evaluated separately to determine the viability of their First Amendment claims.

Luman, Verbosky, Vara-Leija, Williams, Clark, Rodriguez, and Carrion contend that Diaz retaliated against them after they were interviewed by Texas Ranger Daron Parker and participated in the Texas Ranger investigation into alleged misappropriated Hurricane Harvey donations by the Diaz campaign. Dkts. 9, 55. Pacifico alleges that Diaz retaliated against him for participating in an IAD investigation relating to Duran. *Id.*

### i.   *Corporal Reed Clark and Deputy Ricardo "Pico" Rodriguez*

Christopher Diaz argues that by speaking with the Texas Rangers, the plaintiffs complied with their official duties to "make a statement or furnish materials relevant to a departmental investigation" and "to cooperate in the investigation of complaints [of employee misconduct]," while maintaining the chain of command. Dkt. 29. Diaz cites to sections of the Harris County Constable Precinct Two Standard Operating Procedures to support these contentions. *Id.* (citing Ex. 5). However, the sections to which Diaz refers in his briefing are not provided in the cited exhibit; instead, the only guidance on investigations into employee misconduct found by the court is on page 11 of Exhibit 5, and it is in regard to departmental investigations into alleged misconduct brought by virtue of a complaint.[3] Dkt. 29, Ex. 5. The plaintiffs contend that Diaz has merely set forth general job duties which are insufficient to establish participation in the investigations was part of their "ordinary duties." Dkt. 37 (noting the Fifth Circuit deems general duties of all police officers

---

[3] Diaz cites to sections within his 77-page exhibit but fails to include those specific sections. A court has no obligation to sift through the record in search of evidence to support a party's opposition to summary judgment. *Adams v. Traveler's Indemnity Co.*, 465 F.3d 156, 164 (5th Cir. 2008). Similarly, the court has no such duty to sift through the record in search of evidence to support a party's motion to dismiss. *See Gulf Coast Music, L.L.C. v. Ace Records Ltd.*, No. CIV. A. 98-3508, 1999 WL 169473, at n.3 (E.D. La. Mar. 24, 1999).

to be inadequate because broad general duties "fail to describe with sufficient detail the day-to-day duties of a public employee's job" (quoting *Howell*, 827 F.3d at 524)).

According to the complaint, Clark and Rodriquez were part of the newly created "community outreach division" and were responsible for securing donations for the Diaz campaign and "organizing events, fundraisers, silent auctions, and block walking." Dkts. 9, 55. It is in this capacity that Clark and Rodriguez obtained information about their immediate supervisor which led to an expression of concern to Luman and subsequently the Texas Rangers. *See* Dkts. 9, 55. However, it is well established that speech concerning information acquired through employment does not necessarily transform that speech into employee, rather than citizen, speech. *Lane,* 573 U.S. at 232.

This is not a situation in which employees are being asked, as part of their official duties, to participate in an investigation by the department in which a complaint has been received regarding employee misconduct. The employees were not directed by superiors to engage in the investigation, and instead voluntarily participated after they had initiated and expressed concern over Bellotte's conduct. Furthermore, Bellotte was Clark and Rodriguez's supervisor, and by expressing their concerns to Luman, they went against Precinct Two policy by reporting outside of the chain of command. *See* Dkt. 29, Ex. 5[4]; Dkt. 37; *see also Anderson*, 845 F.3d at 602 (finding that an allegation that speech made outside of a chain of command and outside of job duties does not implicate Lane's "ordinariness rule"). Christopher Diaz refers to decisions involving complaints about conditions in the workplace and assisting in an employer's investigation (*see* Dkt. 29), but he fails to show how plaintiffs' involvement in an outside investigation pertaining to malfeasance is at

---

[4] The court takes judicial notice of the exhibits that are public records. *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 640 n.2 (5th Cir. 2005).

all comparable.  The plaintiffs have alleged facts sufficient to support the claim that Rodriguez and Clark were speaking as citizens when participating in the Texas Rangers' investigation.

### ii.      *Chief Clerk Mary Ann Carrion*

It is not clear from the plaintiffs' second amended complaint precisely how Carrion, whose title was "Chief Clerk," got involved with the investigation.  *See* Dkts. 9, 55.  The complaint merely states that Carrion gave a true account of her interactions with Bellotte.  Dkts. 9, 55.  Without an indication of what prompted Carrion to engage in the Texas Ranger investigation, it is difficult to determine if she was speaking as a citizen rather than an employee when reporting her interactions with Bellotte to the Texas Rangers.  Because the plaintiffs do not allege facts that Carrion was acting as an ordinary citizen as opposed to an employee when participating in the Texas Rangers' investigation, they fail to state a claim that Carrion's First Amendment rights were violated with regard to her participation in the investigation.

### iii.      *Senior Sergeant Sara "Cindy" Vara-Leija*

Similar to Carrion, the plaintiffs do not set forth facts sufficient to allow the court to conclude that Vara-Leija was participating in the Texas Ranger investigation in any role besides that of an employee.  Nothing in the complaint provides or even implies the reason for Vara-Leija's participation in the investigation other than she was part of the department.  Without more, the fact that Vara-Leija took part in an interview with Texas Ranger Parker concerning Bellotte does not indicate to the court that she spoke as anything other than an employee.  Thus, the plaintiffs fail to state a claim that Vara-Leija's First Amendment rights were violated due to her participation in the Texas Rangers' investigation.

14

    *iv.  Chief Deputy Jerry Luman, Assistant Chief Norman Verbosky, and Lieutenant David Williams*

   The participation of Luman, Verbosky, and Williams in the Texas Rangers' investigation requires a close analysis regarding whether they spoke as citizens rather than employees due to their management positions in the department.  Diaz argues that as chief deputy and assistant chief deputy, Luman and Verbosky were commanding officers who served as liaisons between the Constable's Office, Houston Police Department, the Harris County Sherriff's Department, and other designated law enforcement agencies and, therefore, they were speaking as "employees" during the Texas Rangers' investigation. Dkt. 29.  The plaintiffs contend that while acting as liaison with various law enforcement agencies was part of Luman's and Verbosky's duties, these duties did not involve public corruption. Dkt. 37.  Furthermore, the plaintiffs claim that the issues involved in the investigation did not pertain to the proper and ordinary functioning of Precinct Two.  *Id.*

   Christopher Diaz argues that as lieutenant in the operations division, Williams was the commander of internal affairs and was responsible for investigating complaints and ensuring compliance with all policy directives of the department.  Dkt. 29.  The plaintiffs argue that the issues addressed in the Texas Rangers' investigation do not relate to the proper and ordinary functioning of Precinct Two in regard to the ordinary compliance and investigative duties of Williams.  Dkt. 37.

   Although not clear from the second amended complaint itself, the Texas Rangers' report provides some information about how the investigation started.[5]  Luman, Verbosky, and Williams sought advice from Assistant County Attorney Nick Lykos after finding discrepancies in Bellotte's

---

[5]   The court may consider the Texas Rangers' investigation report because it is central to the plaintiffs' claims.  *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) ("The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.").

time and attendance records during the course of preparing a Freedom of Information Act response. Dkt. 37, Ex. 1.  Lykos subsequently contacted Texas Ranger Parker, and interviews with Luman, Verbosky, and Williams occurred soon thereafter.  *Id.*  The Fifth Circuit has held that "in some circumstances, reporting municipal crimes to an outside law enforcement agency may be outside a police officer's 'ordinary' duties, thus entitling it to First Amendment protection under *Lane*." *Howell*, 827 F.3d at 524; *see Gibson*, 773 F.3d at 670.  No singular factor is dispositive; rather the court must seek to make a practical determination as to whether the report was within the employee's duties.

Luman, Verbosky, and Williams were in managerial positions at the top of the chain of command, with only Diaz himself presiding over Luman.  In *Gibson*, the court found that where an employee was reporting the misconduct of a supervisor and the most appropriate entity to report the conduct to was an outside entity, his speech was not protected.  *Gibson*, 773 F.3d at 670. Furthermore, the court found where there was arguably no other person to whom the employee could confidentially report the information, the employee had not engaged in protected speech.  *Id.*  If they thought that Diaz was somehow involved with Bellotte and any of her misconduct, the most appropriate course of action would have been to report it to an agency outside of the department because of Diaz's position as Constable.  Luman, Verbosky, and Williams were all above Bellotte in the chain of command with supervisory duties over their subordinates.  The exact conduct of the plaintiffs may not be part of their ordinary, day-to-day duties per se, and a lack of control by their employer may lend support to the fact that they were not speaking as employees at the time of the report.  *See Anderson*, 845 F.3d at 596 ("Whether the employer was entitled to control the employee's speech determines whether that speech was made pursuant to the employee's official duties.").  However, without further allegations from the plaintiffs, it is not plausible that Luman,

Verbosky, and Williams were speaking as citizens when reporting the conduct of a subordinate considering part of their official duties were to supervise and implement department policies. Thus, the plaintiffs fail to state a claim that Luman's, Verbsky's, and Williams's First Amendment rights were violated due to their participation in the Texas Rangers' investigation.

### v.    Deputy Dwayne Pacifico

Christopher Diaz argues that Pacifico's claims similarly fail because he was speaking as an employee. Dkt. 29. Pacifico participated in an internal investigation relating to the use of a suspended driver's license by Duran, a supporter of the Diaz campaign. Dkt. 37. Diaz claims that this cannot be protected speech because Pacifico was ordered by his commanding officer, Luman, to take part in the departmental investigation. Dkt. 29. The plaintiffs fail to set forth sufficient facts for the court to conclude that Pacifico spoke as anything other than an employee cooperating with an internal investigation. In fact, the plaintiffs do not even plead facts to support a claim that Pacifico made any speech at all besides the conclusory statement that he "participated in [the] investigation." Dkt. 37. Accordingly, the plaintiffs fail to state a claim that Pacifico's First Amendment rights were violated due to his participation in the Texas Rangers' investigation.

### vi.    All Plaintiffs – Political Association or Patronage

All of the plaintiffs allege that Christopher Diaz retaliated against them because they did not support his campaign in various ways including (1) supporting an opposing candidate; (2) not supporting him or his campaign; (3) refusing to participate in campaign functions; (4) withdrawing monetary contributions to the campaign; or (5) participating in investigations about problems with the Diaz campaign.[6] *See* Dkts. 9, 55. The plaintiffs assert that these claims relate to their political

---

[6] Diaz agrees that all of the plaintiffs have alleged that they withdrew their support for his reelection, but he argues that they have not shown that Diaz knew about it. Dkt. 29 at 16.

patronage.  Dkt. 37.  Diaz argues that "there is no 'generalized right of social association' under the First Amendment" and these facts to not rise to a "protected activity."  Dkt. 29 (citing *City of Dallas v. Stranglin*, 490 U.S. 19, 24 (1989)).  However, under the U.S. Supreme Court's *Elrod-Branti* Doctrine, the First Amendment "forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved."  *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 64, 110 S. Ct. 2729 (1990) (citing *Elrod v. Burns*, 427 U.S. 347, 96 S. Ct. 2673 (1976); and *Branti v. Finkel*, 445 U.S. 507, 100 S. Ct. 1287 (1980)).  Thus, "conditioning [employment] on political beliefs and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so."  *Id.* at 78.  The Court deems patronage practices that involve promotions, transfers, recalls, and hiring decisions of low-level public employees unconstitutional if the practices are "based on party affiliation and support."  *Id.* at 65.

The Fifth Circuit has applied the *Elrod-Branti* Doctrine when employment decisions are based on support and loyalty to a particular candidate as opposed to a political party.  *See Jordan v. Ector Cty.*, 516 F.3d 290, 295-96 & n.17 (5th Cir. 2008) (discussing and collecting Fifth Circuit cases).  In establishing a Constitutional violation, the plaintiffs must demonstrate that the termination was politically motivated.  *Correa v. Fischer*, 982 F.2d 931 (5th Cir. 1993).  "Cases finding impermissible patronage terminations involve either an employee's allegiance to a political party, a political candidate, or a political belief."  *Id.*

The plaintiffs here suggest a number of specific acts stemming from their lack of support for Diaz and his campaign caused Diaz to retaliate against them.  Dkts. 9, 55.  Generally, those acts included refusal to attend campaign events, support of an opposing candidate, and failure to contribute monetarily to the campaign.  Dkts. 9, 55.  Additionally, the plaintiffs suggest that

18

participation in the aforementioned investigations "impeded the operation of the Diaz campaign" and that each discharge thus was politically motivated.  Dkts. 9, 55.  Christopher Diaz does not provide any argument to dispute the theory that the patronage activities are protected activity.  *See* Dkt. 29 (arguing about causation).  Thus, in light of the Fifth Circuit's patronage jurisprudence and viewing the facts in the complaint in the light most favorable to the plaintiffs, the court finds that the plaintiffs have plausibly pled sufficient facts to support to support their claim that they engaged in a protected activity when they supported an opposing candidate, did not support Diaz or his campaign, refused to participate in campaign functions, or withdrew monetary contributions to the campaign.

### 3. *Pickering-Connick* Balancing

To establish the third prong of a First Amendment retaliation claim by a public employee, the plaintiffs must show that the employees' interest in the speech outweighs the government's interest in the efficient provision of public services.  This balancing of the interests of the employee as a citizen commenting on a matter of public concern and of the employer in promoting the efficiency of the public service performed through its employees is known as *Pickering-Connick* balancing.  *Jordan*, 516 F.3d at 299 (citing *Pickering*, 391 U.S. 563; *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684 (1983)).  In dealing with variations among First Amendment cases, courts have concluded that "factual scenarios in which government employers discharge employees based upon their political affiliation, their exercise of their right to free expression, or some combination thereof, 'locate themselves on a spectrum,'" and the spectrum guides the application of *Pickering-Connick* balancing.  *Id.* at 296 (citing *Brady v. Fort Bend Cty.*, 145 F.3d 691, 702 (5th Cir. 1998)); *see also McBee v. Jim Hogg Cty.*, 730 F.2d 1009, 1016-17 (5th Cir. 1984) (en banc).

> At one end of the spectrum were *Elrod* [*v. Burns*, 427 U.S. 347, 96 S.Ct. 2673 (1976),] and *Branti*, [*v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287 (1980),] where little weighing was necessary because "no countervailing considerations" appeared against the employees' right to believe as they chose. At the other end lay *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir.1970), and *Duke v. North Texas State Univ.*, 469 F.2d 829 (5th Cir.1972), "where instructors had incited student disturbances that were sufficiently serious to call in question the ability of academic authorities to maintain order on campus."

*Click v. Copeland*, 970 F.2d 106, 112 (5th Cir. 1992) (quoting *McBee*, 730 F.2d 1009 (5th Cir. 1984)). *McBee* requires the court "to balance the First Amendment values implicated by those activities against the possible disruptive effect on governmental provision of services within the specific context of each case." *McBee*, 730 F.2d at 1016-17. The *Click* court listed factors-no single one of which is dispositive-to aid in the balancing: (1) whether the employee's actions involve public concerns; (2) whether close working relationships are essential to fulfilling the employee's public responsibilities; (3) the time, place, and manner of the employee's activity; (4) whether the activity can be considered hostile, abuse, or insubordinate; and (5) whether the activity impairs discipline by superiors or harmony among coworkers. *Click*, 970 F.2d at 112.

In *Lane*, the Supreme Court recognized its precedents dating back to *Pickering* in which the Court "recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 232. The Fifth Circuit has recognized the importance of speech concerning bringing official misconduct to light, especially when it concerns the operation of a police department. *Davis v. Ector Cty.*, 40 F.3d 777, 782 (5th Cir. 1995) ("There is perhaps no subset of 'matters of public concern' more important than bringing official misconduct to light." (sexual harassment of public employees)); *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and

20

therefor deserves constitutional protection, especially when it concerns the operation of a police department.").

The speech of Rodriguez and Clark, who were involved in the Texas Rangers' investigation, falls somewhere in the middle of the spectrum. Rodriguez and Clark learned by virtue of their positions the potential misconduct of their superior and expressed their concern to Luman, leading them to eventually participate in the Texas Rangers' investigation. Dkts. 9, 55. Their speech is clearly a matter of public concern, especially considering the fact that the alleged misconduct concerned misappropriated donations that had been obtained by the department for victims of Hurricane Harvey. Diaz does not provide any arguments to suggest Rodriguez's and Clark's interests in speaking were outweighed by the possible disruption their speech could cause on the effective functioning of the department. However, to briefly consider the other *McBee* factors, Rodriguez and Clark did not impair the harmony of the workplace, nor did their speech involve hostile or insubordinate activity. Furthermore, the actual interview with the Texas Rangers took place outside of the workplace and did not cause any sort of disruption to suggest the speech was infringing on governmental interests.

The court must also consider the plaintiffs' claims involving political affiliation, or lack thereof, on the *Pickering-Connick* spectrum. These claims fall within a different part of the spectrum. Scenarios in which an employee is dismissed solely because of the employee's political affiliation fall on the extreme end of the spectrum and prevail with little if any weighing unless political affiliation is a necessary requirement of the employee's job.[7] *Correa*, 982 F.2d at 933; *see*

---

[7]  "It is indisputable that the termination of employees for political reasons is presumptively violative of the First Amendment." *Correa*, 982 F.2d at 933. However, the Supreme Court has held that "the government's interest in efficient administration may outweigh that of an employee's First Amendment rights in certain circumstances." *Garza v. Escobar*, 386 F. Supp. 3d 794, 806 (S.D. Tex. 2019) (citing *Elrod*, 427 U.S. at 367). In instances where political affiliation is a necessary

*also O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 719, 116 S. Ct. 2353 (1996) ("[T]he raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed than asking whether the requirement was appropriate for the employment in question."). Stated differently, a dismissal for political affiliation is a violation of the First Amendment under the *Elrod-Branti* Doctrine except where the employee's affiliation is a necessary requirement of the position. *See Wiggins v. Lowndes Cty.*, 363 F.3d 387, 390 (5th Cir. 2004). Here, at least at this stage of the litigation, the plaintiffs' interests in political association outweigh the government's interest in efficient administration because Diaz has not argued the plaintiffs fall into the *Elrod-Branti* exception.

### 4.    Causal Relationship

Christopher Diaz argues that even if the plaintiffs engaged in protected speech or association, their claims still fail because they have not alleged facts to show a plausible causal connection between the protected conduct and actionable conduct by Diaz. Dkt. 29. Specifically, Diaz contends that the plaintiffs have not provided facts to suggest that Diaz even had knowledge of their protected speech or patronage. *Id.* The plaintiffs maintain that they have pled a sequence of events to establish causation. Dkt. 37. Furthermore, the plaintiffs rely on *Mt. Healthy* in asserting that Diaz has failed to provide a reason for the adverse employment actions at issue and argue they have met the causation burden at this stage of the suit. *Id.* Christopher Diaz argues that the plaintiffs have not alleged facts showing their protected conduct was the but-for cause of a constructive discharge. Dkt. 29.

---

requirement of the job, then the government's interests more easily outweigh the political interests of the employee as a private citizen.

The plaintiffs carry the ultimate burden of proving their protected conduct was a "substantial factor" or "motivating factor" in the employer's decision to take adverse employment action against them.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568 (1977).  Upon meeting this burden, the burden shifts to the defendant to show by a preponderance of the evidence that he would have reached the same decision even in the absence of the protected conduct.  *Id.*  At this stage in the proceedings, the plaintiff must only plead sufficient facts to make their claim that their protected conduct was a substantial or motivating factor for the adverse employment action plausible.

Close timing between the protected conduct and adverse action may be sufficient to establish the causal connection required to make out a prima facie retaliation case.  *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019).  In cases without close timing, the Fifth Circuit has "allowed plaintiffs to show causation by relying on 'a chronology of events from which retaliation may plausibly be inferred.'"  *Id.* at 338 (because a 19-month gap did not allow the court to infer a retaliatory motive, the plaintiff had the burden to bridge the gap with a chronology of events that would permit such an inference); *see also Jordan*, 516 F.3d at 301 (the defendant's conduct left a "trail of breadcrumbs, albeit circumstantial," that would allow for the inference that there was a pattern of hostility towards the plaintiff).

Here, the plaintiffs do not allege a single isolated event which they attribute to the alleged retaliation.  Rather, they allege facts and specific dates to establish a timeline of events and conversations which, taken as true, create a plausible causal connection between the protected activity and adverse employment actions.  Among other facts, the plaintiffs contend that Christopher Diaz knew of their lack of support for his campaign by virtue of sign-in sheets at campaign events, financial documents, and the plaintiffs' conversations with Diaz or those in positions working closely

with him.  Dkts. 9, 55 ("Employees were required to sign in for the event . . . so that Diaz could monitor employee attendance."); Dkt. 37; *see Anderson*, 845 F.3d at 596 ("[Plaintiff] is not required to allege how [defendant] knew, only that he knew.").

The plaintiffs have also alleged a number of statements made by Diaz and Hernandez which allow the court to infer that Diaz was aware of who did and did not support his campaign.  These alleged statements generally expressed Diaz's displeasure with those who were "disloyal" to him and were made both directly to plaintiffs and indirectly during speeches in which certain individuals believed he was calling them out.  *E.g.*, Dkt. 9 at 12 or Dkt. 55 at 14 (explaining how Reed and Rodriguez interpreted comments as targeting them); Dkt. 9 at 16 or Dkt. 55 at 18 (discussing language in Verbosky's termination letter and Arellano's experience at a Diaz campaign event); Dkt. 9 at 13, 26 or Dkt. 55 at 15–16, 29 (noting Anderson's and Vara-Leija's experiences at campaign events).

Additionally, Diaz was the final decisionmaker in regard to the hiring and firing of employees within Precinct Two, and the plaintiffs have alleged facts that illustrate peculiar changes within the department during the gap between their alleged protected activity and adverse employment actions. Some of these changes include: (1) Hernandez being promoted from reserve deputy to chief deputy within months, which the plaintiffs allege is unprecedented in the history of Harris County;[8] (2) Luman being terminated and replaced by Hernandez while an IAD investigation was still ongoing

---

[8]  Plaintiffs allege Hernandez's quick advancement in the department was related to his loyalty to Diaz and his campaign, as well as the substantial amount of money he was donating while others were not.  Hernandez is alleged to have given $1,980.67 to the Diaz campaign in 2019.  Dkts. 9, 55.

24

concerning alleged misconduct involving Hernandez;[9] (3) Williams being demoted and transferred multiple times within a short period of time.[10]  Dkts. 9, 55.

Diaz claims that Luman and Arellano have failed to allege facts showing that their discharge was for anything other than misconduct.  Dkt. 29.  However, as the plaintiffs have pointed out, improper motive does not have to be the final link in the chain of causation.  *See Prof'l Ass'n of Coll. Educators v. El Paso Cmty. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984).  The causation issue is purely factual.  "[I]f an improper motive sets in motion the events that lead to termination that would not otherwise occur, 'intermediate step[s] in the chain of causation' do not necessarily defeat the plaintiff's claim."  *Id.* (citing *Bowen v. Watkins*, 669 F.2d 979, 986 (5th Cir. 1982)).  Even if some conduct on behalf of Luman and Arellano contributed to their termination, it is plausible, taking the allegations as true, that the underlying animosity they argue Diaz held was a motivating factor in their termination.  For example, the plaintiffs have provided facts pertaining to the circumstances surrounding the investigation into Luman which suggest other factors may have influenced his

---

[9]  The plaintiffs allege that Luman did not contribute to the Diaz campaign and participated in the Texas Rangers' investigation before being placed on indefinite suspension by Diaz for alleged derogatory statements to Hernandez.  Diaz launched an IAD investigation, but the plaintiffs allege the investigation failed to take into account that Hernandez was biased because he was a supporter of Diaz, and he was given Luman's job before the investigation had even concluded.  Hernandez had previously replaced Verbosky, but after his promotion to chief deputy, Diaz promoted Paul Martinez to Verbosky's position.  Martinez donated $1,750.00 to the Diaz campaign in 2019, and his advancement from reserve deputy to a captain is alleged to be unprecedented in the history of Harris County.  Dkts. 9, 55.

[10]  According to the complaint, Williams controlled the IAD department and facilitated investigations into alleged officer misconduct.  After the Texas Rangers' investigation concluded, Williams informed Diaz he would be required to investigate Bellotte if she were rehired.  Williams was stripped of his IAD department duties and was transferred and demoted to the evening shift.  This evening shift lieutenant position did not exist previously and was specifically created for Williams.  The next month, Williams was again transferred and demoted to a task force position previously held by a deputy.  About a week later, Williams was transferred back to the evening shift and ordered to be placed back into uniform.  Dkts. 9, 55.

25

termination.  *See* Dkts. 9, 55 (the person that reported Luman's alleged misconduct was also the one that replaced him and moved into his office before the investigation concluded).  The court thus finds that the plaintiffs have plausibly set forth the causation element.

**B.      Qualified Immunity**

When an action is brought against an official in the official's individual capacity, "'it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.'"  *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099 (1985)).  The official may assert qualified immunity, which "shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."  *Id.* at 395 (quoting *Wallace v. Cty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005)).  "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense."  *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (per curiam).  At the motion to dismiss stage, the court must evaluate the conduct as alleged in the complaint for objective legal reasonableness.  *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834 (1996)).  Courts must determine (1) if the plaintiff alleged a violation of a clearly established Constitutional right, and (2) whether the alleged conduct was objectively reasonable under clearly established law that existed at the time of the incident.  *Id.*  Judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808 (2009).

Plaintiffs have alleged facts to demonstrate the plausibility of their claim that the exercise of their First Amendment rights was the motivating factor for the subsequent adverse employment

actions.   However, because Diaz has invoked qualified immunity, the court must inquire as to whether the right was "clearly established."  On this point, Diaz argues that the plaintiffs' assertions of clearly established law are "conclusory."  Dkt. 29.  The plaintiffs respond by setting forth various holdings of the Fifth Circuit that support the contention that retaliation for First Amendment rights in similar circumstances was "clearly established law."  See Dkt. 37.

In determining whether the law was clearly established at the time of the incident, the central concept is that of "fair warning," meaning that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 845 F.3d at 600 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987))*; see Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) ("The *sine qua non* of the clearly-established inquiry is 'fair warning.'").  Even if there are factual distinctions between precedents relied on and the facts of the case before the court, so long as the relevant precedent gave reasonable warning that the conduct at issue violated a Constitutional right, the law is clearly established.  *Anderson*, 845 F.3d at 600 (citing *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004)).

"By at least 2014, it was clearly established that an employee's speech made 'externally' concerning 'an event that was not within [his or her] job requirements' was entitled to First Amendment protection."  *Id.* at 601 (quoting *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 472-73 (5th Cir. 2014)).  However, that is not to say that, by 2014, the Fifth Circuit's law applying *Garcetti* spoke loudly to every factual circumstance.  *Id.*  "*Garcetti* and [the Fifth Circuit's] pre-*Lane* jurisprudence established that when employees speak outside of their chain of command and outside of their job duties they are entitled to First Amendment protection."  *Id.* at 602.  The Supreme Court later recognized in *Lane* that not all cases would fit within this rule and in some cases employees might have a general duty to speak, but their speech pursuant to that general duty is nonetheless

protected by the First Amendment because it is not part of their "ordinary" official duties. *Id. Lane* further demonstrated that following *Garcetti* some First Amendment retaliation cases would still result in qualified immunity because "*Garcetti* did not plainly establish all First Amendment retaliation law." *Id.* at 601. The Fifth Circuit examined whether *Lane* was clearly established in Howell in 2016. *Id.* It found that a law enforcement officer's involvement in an outside law enforcement investigation was outside the scope of his duties as a police officer and therefore it was protected speech. *Howell*, 827 F.3d at 525. However, for purposes of qualified immunity, the law was not "clearly established" because *Howell*'s termination had occurred in 2011 when *Garcetti* had not been applied to similar facts and the Supreme Court's clarification in *Lane* did not yet exist. *Id.*; *see also Harmon v. Dallas Cty.*, 927 F.3d 884, 893 (5th Cir. 2019) (per curiam) (relying on *Howell* as controlling but finding that the defendant was entitled to qualified immunity because the incident occurred only a month prior to *Howell*'s termination). Here, the alleged conduct occurred in 2019, well after the *Lane* decision.

In regard to the plaintiffs' association claims, the Fifth Circuit found in 1988 that a "reasonable sheriff would have known that he could not discharge a nonpolicy making employee because of that employee's political activity." *Matherne v. Wilson*, 851 F.2d 752 (5th Cir. 1988). It was "clearly established" in 2004 "that it was unconstitutional for a constable to terminate the employment of an employee in retaliation for that employee's support of a different candidate for constable." *Murphy*, 512 F. Supp. 2d at 989 (citing *Click*, 970 F.2d at 109).

Thus, at the time of the plaintiffs' alleged incidents, it was clearly established law that it was a violation of an employee's First Amendment rights to (1) take adverse employment action against employees participating in an outside investigation for alleged misconduct or (2) for their political support or affiliation with a particular candidate. Supreme Court jurisprudence and the precedent

28

of the Fifth Circuit gave reasonable warning to Diaz that his alleged conduct would give rise to a Constitutional violation. Under the facts alleged in the petition, Christopher Diaz's actions were not reasonable in light of clearly established law. Accordingly, the motion to dismiss based on qualified immunity is DENIED.

## C.    *Res Judicata*

Christopher Diaz further argues for dismissal of some of the plaintiffs' claims because he alleges that they are barred by *res judicata*. Dkt. 29. "A federal court asked to give *res judicata* effect to a state court judgment must apply the *res judicata* principles of the law of the state whose decision is set up as a bar to further litigation." *E. D. Sys. Corp. v. Sw. Bell Tel. Co.*, 674 F.2d 453, 457 (5th Cir. 1982). Under Texas law, the party seeking to have an action dismissed on the basis of *res judicata* must establish three elements: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of the parties or those in privity with them; and (3) a second action based on the same claims that were raised or could have been raised in the first action." *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007). The parties dispute only the first element.

### 1.    TWA Plaintiffs

Christopher Diaz argues the state court's dismissal order of Luman, Verbosky, Williams, and Pacifico's claims functions as a final judgment on the merits by a court of competent jurisdiction. Dkt. 29. He contends that the TWA Plaintiffs' claims should be dismissed because the TWA lawsuit involved the same parties and the plaintiffs could have raised their Section 1983 claims during that suit. *Id.* The plaintiffs argue that the partial dismissal was not a final order and the claims have not been "fully and fairly litigated." Dkt. 37. Additionally, the plaintiffs point out that the state court proceedings are still active. *Id.* After the partial dismissal with prejudice was granted, the TWA

Plaintiffs amended their petition, but omitted Diaz's name. Dkt. 47. Diaz argues that when the TWA Plaintiffs amended their petition, they waived the right to appeal the prior dismissal order and therefore, the dismissal order is a final judgment for purposes of *res judicata*. Dkt. 47; *see* Dkt. 62. The plaintiffs respond that the omission of defendant's name from the amended petition was inadvertent and have since amended the petition to include his name. Dkt. 49. Furthermore, the state court has since vacated the previous order dismissing Diaz with prejudice and signed a first amended order dismissing Diaz "without prejudice." Dkt. 56. The plaintiffs argue the dismissal without prejudice is not a final judgment and the motion to dismiss based on *res judicata* should be denied. *See id.*

Under Texas law, if a suit is dismissed without prejudice or the plaintiff takes a voluntary nonsuit, subsequent actions are not impeded by *res judicata*. *E.g.*, *Welch v. Hrabar*, 110 S.W.3d 601, 608 (Tex. App.-Houston [14th Dist.] 2003, pet. denied); *Bell v. Moores*, 832 S.W.2d 749, 754 (Tex. App. -Houston [14th Dist.] 1992, writ denied). The TWA Plaintiffs obtained a partial dismissal without prejudice and therefore their claims are not precluded by *res judicata*.

### 2.    Arellano

Christopher Diaz argues the TWC's decision regarding Arellano's claim for unemployment benefits constitutes a final judgment on the merits of the exact claims that are brought in the instant lawsuit. Dkt. 29. Specifically, Diaz argues that the TWC acted in its judicial capacity when it resolved disputed issues of fact before it and provided the parties an adequate opportunity to litigate the matter. *Id.* The plaintiffs argue that the Fifth Circuit has held that an administrative decision limited to specific issues with a different legal standard is not entitled to preclusive effect in *Bradberry v. Jefferson Cty.*, 732 F.3d 540 (5th Cir. 2013). Dkt. 37.

While the TWC may have acted in a judicial capacity during Arellano's proceedings, it certainly cannot be said that the agency resolved disputed issues of fact and issued a final judgment. The TWC examined an isolated issue of "whether the claimant separated from the last work as a result of discharge based on work-connected misconduct or a voluntary quit without good work-connected cause."[11] Dkt. 29, Ex. 4. The determination of this single issue by the TWC did not decide the key questions of fact in dispute in Arellano's present claim for First Amendment retaliation. Diaz also fails to mention that Arellano subsequently went before an ALJ and received a finding of "no misconduct" and a decision that her F-5 Report be changed to reflect an honorable discharge. *See* Dkt. 37, Ex. 3. Arellano subsequently appealed the TWC decision, filing a motion for rehearing based on the new evidence. *Id.* The appeal is still pending, and disputes of fact still remain. *Id.* The TWC proceedings are active and do not preclude Arellano's claims.

## V. CONCLUSION

The plaintiffs' motion to supplement the record (Dkt. 56) is GRANTED.

Christopher Diaz's motion to dismiss (Dkt. 29) is GRANTED IN PART AND DENIED IN PART. In regard to the first two categories of protected activity claimed by the plaintiffs, all have failed to state a claim upon which relief can be granted with the exception of plaintiffs Rodriguez and Clark. Thus, Luman, Verbosky, Williams, Vara-Leija, Carrion, and Pacifico's claims based on participating in the Texas Rangers' investigation and internal investigation are DISMISSED. The plaintiffs have plausibly stated their First Amendment claims on the basis of patronage or association under the third category of claimed protected speech. Moreover, Christopher Diaz is not entitled to

---

[11] It should also be noted that under TWC Appeal Tribunal precedent, a single incident is sufficient for a finding that the claimant was discharged as a result of misconduct.

qualified immunity on these claims at this stage of the litigation, and *res judicata* does not preclude the Constitutional claims before this court.  Accordingly, the motion to dismiss the claims based on political patronage or association is DENIED.

Signed at Houston, Texas on July 9, 2020.

_____
Gray H. Miller
Senior United States District Judge