United States District Court
Southern District of Texas
**ENTERED**
September 01, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JERRY LUMAN, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H- 19-4920 |
| | § | |
| CHRISTOPHER DIAZ, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

**Table of Contents**

**I. INTRODUCTION** ............................................................................................. 2

**II. BACKGROUND** .............................................................................................. 3

   **A.**   **Relevant Procedural History** ................................................................ 3

   **B.**   **Diaz's Motions for Summary Judgment** ............................................ 4

   **C.**   **The Plaintiffs' Motion for Partial Summary Judgment** ................... 5

**III. MOTION TO STRIKE DIAZ'S POST-DEPOSITION DECLARATION** ......... 7

**IV. LEGAL STANDARD FOR SUMMARY JUDGMENT** ................................... 10

**V. DIAZ'S MOTIONS FOR SUMMARY JUDGMENT** ...................................... 11

   **A.**   **Qualified Immunity** ............................................................................ 11

   **B.**   **The Clearly Established Law** ............................................................. 14

      **1.**   **Adverse Employment Action** ...................................................... 16

      **2.**   **Speaking As a Citizen on a Matter of Public Concern** ............. 20

      **3.**   ***Pickering-Connick* Balancing** ..................................................... 30

      **4.**   **Causation/*Mount Healthy* Defense** .............................................. 34

   **C.**   **Individual Plaintiffs** .......................................................................... 35

      **1.**   **Marcus Anderson (Motion, Dkt. 104, Response, Dkt. 128, Reply, Dkt. 153)** .......... 36

      **2.**   **Claudia Arellano (Motion, Dkt. 105, Response, Dkt. 129, Reply, Dkt. 151)** ........... 50

      **3.**   **Ana Herrera (Motion, Dkt. 108, Response, Dkt. 132, Reply, Dkt. 174)** ................. 64

      **4.**   **Javier Zavala (Motion, Dkt. 116, Response, Dkt. 141, Reply, Dkt. 152)** ............... 70

      **5.**   **Reed Clark (Motion, Dkt. 107, Response, Dkt. 131, Reply, Dkt. 182)** ..................... 78

6.   **Ricardo Rodriguez (Motion, Dkt. 113, Response, Dkt. 136, Reply, Dkt. 183)** ........ 93

7.   **Emily Rivera (Motion, Dkt. 112, Response, Dkt. 137, Reply, Dkt. 177)** .................. 99

8.   **Dwayne Pacifico (Motion, Dkt. 111, Response, Dkt. 135, Reply, Dkt. 176)** .......... 105

9.   **Sara Cynthia Vara-Leija (Mot., Dkt. 109, Response, Dkt. 133, Reply, Dkt. 175)** 109

10.   **Mary Ann Carrion (Motion, Dkt. 106, Response, Dkt. 130, Reply, Dkt. 173)** .. 112

11.   **Jerry Luman (Motion, Dkt. 110, Response, Dkt. 134, Reply, Dkt. 181)** ............ 116

12.   **Norman Verbosky (Motion, Dkt. 114, Response, Dkt. 138, Reply, Dkt. 178)** ... 121

13.   **David Williams (Motion, Dkt. 115, Response, Dkt. 140, Reply, Dkt. 184)** ........ 127

VI.  **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** ............................................................ 141

VII.  **CONCLUSION** ............................................................................................................ 144

## I. INTRODUCTION

Pending before the court are (1) the plaintiffs' motion for partial summary judgment (Dkt. 117); (2) defendant Christopher Diaz's motions for summary judgment on the § 1983 claims made by plaintiffs Marcus Anderson (Dkt. 104), Claudia Arellano (Dkt. 105), Mary Ann Carrion (Dkt. 106), Reed Clark (Dkt. 107), Ana Herrera (Dkt. 108), Sara Cynthia Vara-Leija (Dkt. 109), Jerry Luman (Dkt. 110), Dwayne Pacifico (Dkt. 111), Emily Rivera (Dkt. 112), Ricardo Rodriguez (Dkt. 113), Norman Verbosky (Dkt. 114), David Williams (Dkt. 115), and Javier Zavala (Dkt. 116); and (3) the plaintiffs' motions to strike Diaz's post-deposition declaration (Dkts. 128, 131, 132, 133, 134, 135, 138, 140), which are contained within their responses to Diaz's motions for summary judgment.   After considering the motions, responses, replies, record evidence, evidentiary objections, and the applicable law, the court is of the opinion that Diaz's motion for summary judgment on (1) Anderson's claim (Dkt. 104) should be DENIED; (2) Clark's claim (Dkt. 107) should be GRANTED IN PART AND DENIED IN PART; and (3) Arellano's claim (Dkt. 105), Herrera's claim (Dkt. 108), Zavala's claim (Dkt. 116), Rodriguez's claim (Dkt. 113), Rivera's claim (Dkt. 112), Pacifico's claim (Dkt. 111), Vara-Leija's claim (Dkt. 109), Carrion's claim (Dkt. 106), Luman's claim (Dkt. 110), Verbosky's claim (Dkt. 114), and Williams's claim

2

(Dkt. 115) should be GRANTED.  Additionally, the motions to strike evidence (Dkts. 128, 131, 132, 133, 134, 135, 138, 140) should be GRANTED IN PART AND DENIED IN PART, and the plaintiffs' motion for partial summary judgment (Dkt. 117) should be DENIED.

## II. BACKGROUND

The plaintiffs bring claims against Christopher Diaz pursuant to 42 U.S.C. § 1983 for violations of their First Amendment rights.  Dkt. 55 (third amended complaint).  During the relevant time period, Diaz was the elected constable of Harris County Precinct Two.  *Id.*  The plaintiffs all worked for Precinct Two, and the events leading to this lawsuit unfolded as Diaz started to ramp up his campaign to be reelected in 2020.  *See id.*  The summary judgment evidence indicates that each of the thirteen plaintiffs decided not to support the campaign, and each plaintiff's employment status changed in some way thereafter.  *See* Dkts.128–38, 140–41 (plaintiffs' responses) & Exs.  The plaintiffs contend that Diaz retaliated against them because they either stated in some way that they did not support his reelection campaign or refused to "speak" by refusing to support Diaz's campaign when he compelled them to do so.  *See* Dkts.128–38, 140–41.

### A.    Relevant Procedural History

The thirteen plaintiffs filed their claims against Christopher Diaz, Ana Diaz, Harris County, and Jacinto City on December 18, 2019.  Dkt. 1.  They have since amended the complaint three times.  Dkts. 3, 9, 55.

On April 16, 2020, the court granted a motion to dismiss filed by Harris County, dismissing all the claims the plaintiffs asserted against Harris County with prejudice.  Dkt. 41.  On July 9, 2020, the court granted in part and denied in part Christopher Diaz's motion to dismiss the plaintiffs' claims, dismissing claims made by Luman, Verbosky, Williams, Vara-Leija, Carrion,

and Pacifico that were based on participating in a Texas Rangers' investigation and internal investigation because these plaintiffs did not allege facts indicating that they were speaking as citizens rather than as part of their ordinary duties as employees.  Dkt. 63.  On August 18, 2020, the court granted a motion to dismiss the claims against Jacinto City and dismissed all of those claims with prejudice.  Dkt. 70.  On June 10, 2022, the court granted a motion for summary judgment filed by Ana Diaz.  Dkt. 195.

The claims against Christopher Diaz remain pending, but he has filed thirteen motions for summary judgment.  Dkts. 104–16.  Relevant to many of these motions, on June 6, 2022, the court granted in part a motion to exclude the expert testimony of Kenneth Brady, excluding any opinions that conflict with the deposition testimony of Christopher Diaz.  Dkt. 194.  On June 27, 2022, the court denied Diaz's motions to strike allegedly new claims asserted by the plaintiffs in their responses to his motions for summary judgment.  Dkt. 203.  On August 16, 2022, the court issued an order to show cause why the court should not grant judgment in favor of the plaintiffs because Diaz had not filed an answer.  Dkt. 204.  Diaz thereafter moved for leave to file his answer, and the court granted leave, though it did strike a newly added affirmative defense.  Dkts. 207, 212; *see* Dkt. 213 (answer).  On September 1, 2022, the court granted in part and denied in part Christopher Diaz's objections to the plaintiffs' summary judgment evidence.  Dkt. 214.

**B.   Diaz's Motions for Summary Judgment**

Diaz[1] contends in his thirteen separate motions for summary judgment that (1) the plaintiffs did not engage in activity that is protected by the First Amendment; (2) Diaz did not know the

---

[1] Because the court has dismissed the claims against Ana Diaz and this memorandum opinion and order addresses the claims asserted against Christopher Diaz, from this point on, the court will refer to Christopher Diaz as "Diaz" and, to the extent it discusses Ana Diaz, it will use her full name.

4

plaintiffs engaged in this activity; (3) Diaz did not take any adverse actions against the plaintiffs; or (4) even if the plaintiffs engaged in protected activity, he knew about it, and he took an adverse employment action against them as a result, there was not clearly established law that gave him fair notice that his actions violated the First Amendment, and he is thus protected by qualified immunity. Dkts. 104–16.  The plaintiffs filed responses and provided evidence and declarations that they assert raise questions of fact that must be decided by a jury. Dkts. 128–38, 140–41 & Exs.   Many of the plaintiffs moved to strike Diaz's February 15, 2022 declaration in their responses, asserting that it conflicts with his prior sworn deposition testimony. *See* Dkts. 128, 131–35, 138, 140.  Diaz then filed replies to each of the thirteen responses (Dkts. 151–53, 173–78, 181–84), and he also filed objections to the evidence provided by each of the plaintiffs, including objections to significant portions of each plaintiff's declaration (Dkts. 167–72, 185–91). The court addresses Diaz's voluminous objections in a separate memorandum opinion and order, and it has only relied on relevant evidence that it has not excluded when considering the motions addressed in this memorandum opinion and order.

**C.     The Plaintiffs' Motion for Partial Summary Judgment**

The plaintiffs filed a motion for partial summary judgment, which seeks summary judgment in their favor with regard to Diaz's defense that he would have taken the same action absent any protected conduct.  Dkt. 117.  The plaintiffs contend that Diaz cannot rebut the "presumption of discrimination" by offering evidence of a nondiscriminatory reason for his employment decisions because Diaz failed to remember during his deposition why he took alleged adverse employment actions against the plaintiffs. *Id.*

Diaz responds that he is not required to provide a legitimate nondiscriminatory reason for his employment decisions until the plaintiffs defeat the presumption of qualified immunity and

meet their prima facie burden on their First Amendment retaliation claims, and Diaz asserts, repeating the arguments in his motions for summary judgment, that the plaintiffs fail at both. Dkt. 125.  Diaz also asserts, pointing to his post-deposition declaration and the declaration of his expert Kenneth Brady, that he would have reached the same decisions in the absence of protected conduct.  *Id.*  Diaz additionally argues that the plaintiffs cannot defeat his qualified immunity, and the burden is on the plaintiffs to do so.  *Id.*

The plaintiffs reply Diaz should have known the reasons for the employment actions he took during his deposition, and his alleged "proof" that he had valid reasons was provided after the deposition where he said he did not remember and thus cannot be relied upon.  Dkt 149.

Before turning to the fourteen (Diaz's thirteen plus the plaintiffs') motions for summary judgment, the court will address the motions to strike Diaz's February 2022 declaration contained in the plaintiffs' responses to Diaz's motions for summary judgment, as Diaz relies on his declaration heavily to support his motions and to defend against the plaintiffs' motions.  Then, the court will set forth the general legal standard for motions for summary judgment, discuss the law relating to the qualified immunity, and outline the clearly established First Amendment law governing most of the issues presented in the parties' numerous and voluminous motions for summary judgment.  After setting forth the law, the court will set forth the facts established by the summary judgment evidence for each individual plaintiff and consider whether the plaintiff has raised an issue of material fact under clearly established law to overcome Diaz's qualified immunity defense and present the case to a jury.  Finally, the court will consider whether the plaintiffs are entitled to partial summary judgment.

### III.  MOTION TO STRIKE DIAZ'S POST-DEPOSITION DECLARATION

Several of the plaintiffs move to strike Diaz's February 2022 declaration in their responses to Diaz's motions for summary judgment.  *See* Dkts. 128, 131, 132, 133, 134, 135, 138, 140.  The plaintiffs also move to strike Diaz's declaration in their reply to Diaz's response to the plaintiffs' motion for partial summary judgment.  Dkt. 149.  Diaz filed a response to the motions contained in the responses to his motions for summary judgment.  Dkt. 199.  The plaintiffs assert that Diaz's post-deposition declaration, in which he had remarkable recall of past events, directly contradicts his deposition, and Diaz bears the burden of showing that the declaration is admissible.  Dkts 128, 131–35, 138, 140, 149.  Diaz responds that the plaintiffs fail to even identify the parts of the affidavit to which they are objecting.  Dkt. 199.  He also asserts that, regardless, Diaz's declaration does not impeach his sworn deposition testimony and supplements, rather than contradicts, his earlier statement.  *Id.*  He notes that plaintiffs' counsel did not use any exhibits to refresh Diaz's recollection during the deposition, which made recollection difficult.  *Id.*  Diaz contends that he was simply able to later recall details with the assistance of such documents.  *Id.*

"Under the sham affidavit doctrine, a district court may refuse to consider statements made in an affidavit that are 'so markedly inconsistent' with a prior statement as to 'constitute an obvious sham.'"  *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir. 2019) (quoting *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988)).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment."  *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (quoting *Perma Rsch. and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).  "However, not every discrepancy in an affidavit justifies disregarding it," and "the bar for applying the [sham affidavit] doctrine is a high one, typically

requiring affidavit testimony that is 'inherently inconsistent' with prior testimony." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (quoting *Winzer*, 916 F.3d at 472). "When an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996).

First, Diaz asserts that the plaintiffs have not met their burden in objecting to his declaration by pointing out which specific statements they object to, and the court is not required to hunt through the ten-page declaration to figure out what is contradictory to Diaz's deposition testimony. Dkt. 199. However, throughout the briefing on the motions this memorandum opinion and order addresses, the plaintiffs point to Diaz's deposition testimony where he states he did not know why he took employment actions against certain plaintiffs, and Diaz points to his declaration as providing the reasons for these actions. The court must look at all of this evidence to determine whether Diaz is entitled to summary judgment, whether the claims should be dismissed because Diaz is entitled to qualified immunity, or whether the plaintiffs are entitled to partial summary judgment. Thus, the court does not have to do any additional sifting to figure out if the statements made in Diaz's declaration clearly conflict with his deposition testimony. For example, in the plaintiffs' motion for partial summary judgment, the plaintiffs point out that Diaz responded that he did not know or could not remember every adverse action that Reid Clark experienced, and they cite specifically to page and line numbers in the deposition. *See* Dkt. 117 at 6. In Diaz's response, he asserts, without actually citing to the docket number much less the page number, that "[h]ad Plaintiffs actually opened their eyes to Constable Diaz's declaration and the declaration of law enforcement expert Kenneth Brady, Plaintiffs would have seen the evidence demonstrating Constable Diaz made the majority of the employment decisions at issue as part of department-

wide changes to restructure Precinct Two in order to address the department's needs for officers in different shifts."  Dkt. 125 at 17.  While Diaz does not provide a citation to his ten-page declaration, the court can easily determine where in the declaration the statements relating to each plaintiff are by the way it is organized—it has headings for the statements relating to each individual plaintiff.  Thus, to the extent Diaz invites the court to not consider the objection to Diaz's post-deposition declaration because the plaintiffs did not provide citations to the specific paragraphs of Diaz's declaration that conflict with his deposition testimony that he does not remember why he took employment actions, the court declines the invitation.  The court became quite familiar with every paragraph in Diaz's declaration during the course of reviewing evidence for the motions for summary judgment.

Next, Diaz argues that his declaration is simply a supplement to the deposition testimony and that Diaz was able to supplement his testimony after his recollection was refreshed.  He also complains that the plaintiffs did not use any documents to refresh Diaz's recollection during the deposition.  However, by the plaintiffs' count, Diaz stated he did not know 317 times during his deposition and that he could not remember 196 times.  Dkt. 117.  As the plaintiffs point out, Diaz did not even remember how long he had lived in his current residence or what law enforcement experience he had prior to being elected constable.  *Id.* (citing Dkt. 117-1 at 10–11).  He also responded "I don't know" when he was asked if he had a problem with his memory.  *See id.* (citing Dkt. 117-1 at 37–38).  While the court agrees that at times a declaration can supplement information that a deponent may simply not recollect during a deposition, it is improper to simply fail to answer questions at a deposition, thus not providing the deposing party an opportunity to explore your responses, and then come up with answers in a declaration after the fact.  The court understands Diaz's complaint that the plaintiffs did not provide documents to jog Diaz's memory,

but in most cases the plaintiffs did not receive any written notification when they were transferred or other employment actions were taken, so there were no documents to show. Diaz does not argue that he had inadequate time to prepare for the deposition, and certainly he knew what each plaintiff's complaint was in advance and could have prepared for the deposition.

Diaz relies on one of this court's recent orders denying a motion to strike under the sham affidavit doctrine: *Savoia-McHugh v. McGrary*, No. H-20-3387, 2022 WL 1997191, at *4 (S.D. Tex. June 6, 2022). In *Savoia-McHugh*, the court found that a statement in a declaration was not inherently inconsistent with the prior deposition testimony. 2022 WL 1997191, at *4. In the deposition, the witness had stated that she did not recall communicating with the defendant prior to a certain date, and in her declaration, she remembered that she had spoken with him on the telephone earlier. *Id.* The court determined, based on the facts of that case, that the declaration was not an "'obvious sham.'" *Id.* (quoting *Winzer*, 916 F.3d at 472)). That situation is significantly different than a defendant who does not know or cannot remember more than 400 times in one deposition and then has reasons for most of the formerly forgotten or unknown material in a later-filed declaration.

The plaintiffs' objection to Diaz's declaration is SUSTAINED to the extent the statements clearly conflict with his deposition testimony. They are also SUSTAINED to the extent Diaz provides reasons for employment actions that he states he does not know or does not remember during his deposition. The court will discuss these specific instances of clear conflict as they relate to each plaintiff when it discusses the facts relating to each plaintiff below.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

## V.  DIAZ'S MOTIONS FOR SUMMARY JUDGMENT

The court first considers Diaz's motions for summary judgment, which rely, in general, on assertions that (1) he did not take any adverse employment actions against the plaintiffs; (2) the plaintiffs did not engage in any speech that is protected by the First Amendment; (3) any employment actions Diaz did take were not caused by any constitutionally protected speech; and (4) even if the plaintiffs engaged in constitutionally protected speech and Diaz took adverse employment actions against them in retaliation, Diaz is immune from suit because there was no clearly established Supreme Court authority making it clear that Diaz's conduct was unconstitutional.  The plaintiffs disagree with every assertion and provide declarations, deposition testimony, and other evidence to support their contentions that there are issues of material fact as to each plaintiff that require a jury to determine if Diaz violated their constitutional rights in violation of clearly established law.

### A.    Qualified Immunity

Diaz raises a defense of qualified immunity.  "The Supreme Court has identified three purposes served by qualified immunity: (1) preventing unwarranted timidity in the exercise of

official duties; (2) ensuring that highly skilled and qualified candidates are not deterred from public service by threat of liability; and (3) protecting public employees—and their work—from all of the distraction that litigation entails." *Perniciaro v. Lea*, 901 F.3d 241, 253 (5th Cir. 2018) (citations omitted). If a defendant raises a qualified immunity defense, the plaintiff bears the burden of demonstrating that "(1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011).

"'Clearly established' means that, at the time of the [official's] conduct, the law was sufficiently clear that every reasonable [official] would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). "[E]xisting law must have placed the constitutionality of the [official's] conduct 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074 (2011)). The law must be settled, meaning "it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589–90 (cleaned up). The "clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). "The rule's contours must be so well defined that it is 'clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151 (2002)). Thus, it must be so clear that "every reasonable official would interpret it" to preclude the conduct at issue. *Id.* This standard thus protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986); *see Wesby*, 138 S. Ct. at 589 (quoting this portion of *Malley*).

Diaz argues in his motions that the only cases the court may consider to determine if the law is clearly established are U.S. Supreme Court cases, relying on *Wesby* and *City of Tahlequah*

12

*v. Bond*, 142 S. Ct. 9, 12 (2021) (per curiam).[2]  *See, e.g.*, Dkt. 153 at 5 & n.1.  The *Wesby* Court extensively discussed the contours of "clearly established."   The Court noted, in the Fourth Amendment alleged unlawful arrest context, that "[w]hile there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" 138 S. Ct. at 590.  It instructed that "a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause."  *Id.* (cleaned up).  The Court pointed out that relying on a single U.S. Court of Appeals opinion was not sufficient to be "clearly established law," and noted that it had "not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity."  *Id.* at 590 n.8.  It expressed "no view of that question" in the *Wesby* opinion.  *Id.* at 591 & n.8.

In *City of Tahlequah*, the U.S. Supreme Court held that the Tenth Circuit erred in concluding that four of its cases were clearly established law precluding the conduct at issue.  142 S. Ct. at 12.  The Court did not rule that the Tenth Circuit could not rely on its own precedent, only that the precedent it relied on either was too factually divergent from the case the court was considering, "merely noted in dicta" that certain conduct was unconstitutional, was decided *after* the conduct at issue, or was an unpublished decision that included facts that were not connected to the facts in the case at hand.  *Id.* at 12.  The Court held that the Tenth Circuit had not "identified a single precedent finding a [constitutional] violation under similar circumstances."  *Id.*  Thus, it did

---

[2] Diaz also relies on *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (en banc), to support his assertion that clearly established law may only come from U.S. Supreme Court decisions.  *E.g.*, Dkt. 153 at 5.  In *Morgan*, the Fifth Circuit noted that to determine if a law is "clearly established" it "must be able to point to controlling authority—or a 'robust "consensus of persuasive authority"'—that defines the contours of the right with a high degree of particularity."  659 F.3d at 371–72 (citations omitted).  It then pointed out that if "the federal circuit courts are split on the issue" and there is no controlling (U.S. Supreme Court) authority, then it cannot be considered "clearly established."  *Id.*  Diaz has not provided the court with any cases indicating there is a circuit split relating to the issues in this case.

not hold that *only* its precedent controlled; it held, as it has held before, that the body of law relied upon cannot be defined "at too high a level of generality." *Id.* at 11 (citing *al-Kidd*, 563 U.S. at 742).

Because the U.S. Supreme Court has not indicated that "clearly established law" must come solely from U.S. Supreme Court cases, and it has indicated that a body of relevant case law meets the requirement, the court will consider all of the cases cited by the parties that were controlling authority in this circuit at the time of the alleged constitutional violations that constitute a "body of relevant caselaw" to determine if clearly established law prohibited Diaz from taking the employment actions he took.

**B.     The Clearly Established Law**

The plaintiffs assert their claims against Diaz under 42 U.S.C. § 1983 for violations of their First Amendment rights.  Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  In a § 1983 lawsuit brought against an individual defendant in his personal capacity, "'it is enough to show that the official, acting under the color of state law, caused the deprivation of a federal right.'"  *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009). Here, the right the plaintiffs contend that Diaz violated is contained in the First Amendment of the U.S. Constitution.  Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  What the founders meant by "freedom of speech"

14

has been a topic of debate since the ink dried on the Bill of Rights, and whether the plaintiffs'
speech, or lack thereof, is the type of speech that courts consider protected and one that government
officials know is protected are the main issues to be decided by the court in this memorandum
opinion and order.

The plaintiffs claim, specifically, that Diaz violated their First Amendment rights by taking
adverse employment actions against them in retaliation for their exercise of their First Amendment
rights.  In establishing a First Amendment employment retaliation claim related to speech, a
plaintiff-employee must show: "'(1) [the plaintiff] suffered an adverse employment action; (2) [the
plaintiff] spoke as a citizen on a matter of public concern; (3) [the plaintiffs'] interest in the speech
outweighs the government's interest in the efficient provision of public services; and (4) the speech
precipitated the adverse employment action.'" *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir.
2016) (quoting *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007) (citations omitted));
*see also Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006) ("[T]he First Amendment
protects a public employee's right, in certain circumstances, to speak as a citizen addressing
matters of public concern."); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731 (1968)
("The problem in any case is to arrive at a balance between the interests of the [public employee],
as a citizen, in commenting on matters of public concern and the interest of the State, as an
employer, in promoting efficiency of the public services it performs through its employees.").

If the plaintiffs prove all four prongs, the defendant-employer may escape liability by a
showing that the defendant would have taken the same adverse employment action even in the
absence of conduct protected by the First Amendment.  *Murphy v. Butler*, 512 F. Supp. 2d 975,
980 (S.D. Tex. 2007) (Miller, J.) (citing *Hitt v. Connell*, 301 F.3d 240, 249 (5th Cir. 2002) (relying
on *Gerhart v. Hayes*, 217 F.3d 320, 321 (5th Cir. 2000), which cited *Mt. Healthy City Sch. Dist.*

15

*Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568 (1977))); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citing older cases for this burden-shifting approach).  This is known as the "*Mount Healthy* defense."  *See Rushing v. Miss. Dep't of CPS*, No. 20-60105, 2022 WL 873835, at *5 (5th Cir. Mar. 24, 2022) (unpublished).

### 1. Adverse Employment Action

The first prong requires the plaintiffs to show they suffered an adverse employment action. Under Fifth Circuit law, adverse employment actions include "discharges, demotions, refusals to hire, refusals to promote, and reprimands."  *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (quoting *Pierce v. Tex. Dep't of Crim. Just.*, 37 F.3d 1146, 1149 (5th Cir. 1994)). Additionally, transfers may constitute adverse employment actions so long as they are sufficiently punitive, or if the new job is significantly less prestigious and less interesting than the old one.  *Id.* However, a transfer does not rise to an adverse employment action simply because the plaintiff does not like the new job or subjectively considers it less desirable.  *Serna v. San Antonio*, 244 F.3d 479, 483 (5th Cir. 2001).  Instead, "a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused harm to the plaintiff, 'sufficiently serious to constitute a constitutional injury.'"  *Id.* (quoting *Breaux*, 205 F.3d at 152).  The plaintiff must be able to "show that he [or she or they] has suffered some serious, objective, and tangible harm as a result of [the] transfer."  *Id.*

The court now turns to the clearly established law relating to the majority of adverse employment actions alleged in this case—transfers to less desirable positions and constructive discharge.

### (a) Transfers to a Less Desirable Position

The Fifth Circuit's opinion in *Click v. Copeland* provides significant guidance regarding what is needed for a transfer to rise to the level of an adverse employment decision in the law-enforcement context.  In *Click*, the Fifth Circuit considered a case in which two sheriff's deputies contended that the sheriff transferred them to "less desirable positions" after they announced their candidacies for sheriff.  970 F.2d 106, 108 (5th Cir. 1992).  Larry Click was a civil warrants officer, and Tom Falcon was the chief criminal district court bailiff.  *Id.*  The sheriff, Harlon Copeland, transferred both deputies to positions as jail guards in the detention center.  *Id.*  Neither deputy received a decrease in pay, but both subjectively considered the transfer to be a demotion.  *Id.*  Copeland argued that the transfer could not be a demotion because there was no decrease in pay and one of the deputies actually received a raise.  *Id.* at 110.

The Fifth Circuit pointed out that "[m]oney alone does not buy happiness," and noted that the evidence at trial supported the view that "jobs in the jail are not as interesting or prestigious as jobs in the law enforcement section."  *Id.* (noting that the assistant director of security at the jail said "few people transferred voluntarily from law enforcement to detention positions" and people generally viewed transfers the opposite way to be promotions, another director had offered similar testimony, and Copeland himself "testified as to the general preference for law enforcement positions").  The Fifth Circuit additionally noted that the transfers resulted in loss of seniority, and "the jury was entitled to find that this loss affected opportunities for promotion."  *Id.*  The Fifth Circuit held that the "law was established clearly in this circuit in January 1988 that a reasonable officer should have known that if he retaliated against an employee for exercising his First Amendment rights, he could not escape liability by demoting and transferring the employee rather than discharging him."  *Id.* at 111.  In the instant case, the court will consider whether the summary

judgment evidence supports the plaintiffs' contentions that there is an issue of material fact under this clearly established law that the transfers were an adverse employment action.

### (b) Constructive Discharge

Several plaintiffs assert that they meet the adverse employment action prong because they were constructively discharged. "Constructive discharge occurs when an employee has quit her [or his or their] job under circumstances that are treated as an involuntary termination of employment." *Haley v. All. Compressor, LLC*, 391 F.3d 644, 649 (5th Cir. 2004). To prove constructive discharge, the plaintiffs must show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Landgraf v. USI Film Prods.*, 968 F.2d 427, 429 (5th Cir.1992) (cleaned up). Fear of future retaliation alone is insufficient to prove constructive discharge. *Id.* Factors courts in the Fifth Circuit typically consider when determining if an employee felt forced to resign include the following:

> (1) [D]emotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger [or less experienced/qualified] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Haley*, 391 F.3d at 649–50 (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)); *see also Hunt v. Rapides Healthcare Sys., Inc.*, 277 F.3d 757, 771–72 (5th Cir. 2001) (abrogated on other grounds) (relying on these same factors and citing *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)).[3] Additionally, the Fifth Circuit has held that a reasonable

---

[3] While these factors have been listed by numerous Fifth Circuit panels, modern courts within the Fifth Circuit most commonly refer to them as the "*Brown* factors," so this court will do the same.

employee who is dissatisfied would pursue internal grievance procedures before feeling compelled to resign.  *Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir. 1990); *see also Haley*, 391 F.3d at 652 (citing *Boze* favorably for this proposition).

Some examples of cases in which the Fifth Circuit has considered claims of constructive discharge may be helpful in determining whether the situations asserted by the plaintiffs in this case raise an issue of material fact under the clearly established law.

In *Hunt v. Rapides Healthcare Systems, Inc.*, the plaintiff lost compensation and benefits by being switched to part-time status, but she "did not allege that she was harassed, badgered, or required to perform menial or demeaning tasks."  277 F.3d 757.  The Fifth Circuit determined that even though the employee had testified that she felt demeaned by the change in her shift, "constructive discharge cannot be based upon the employee's subjective preference for one position over another," and the employee had not raised an issue of material fact supporting her contention she was constructively discharged.  *Id.* at 772.

In *Benningfield v. City of Houston*, the Fifth Circuit held that a plaintiff who feared future retaliation for filing discrimination and hostile work environment claims did not show that a reasonable person in her shoes would have felt compelled to resign.  157 F.3d 369, 378 (5th Cir. 1998).

In *Landgraf v. USI Film Products*, a sexual harassment case, the plaintiff asserted that she was constructively discharged.  968 F.2d at 430.  It was undisputed that the plaintiff suffered sexual harassment at her job, but the Fifth Circuit found that she had not provided sufficient evidence to support a finding of constructive discharge because the evidence demonstrated that the reason she resigned was that she could not get along with her coworkers.  *Id.* at 430–31.

In *Jett v. Dallas Independent School District*, the plaintiff, who had been an athletic director and head football coach at a Dallas area high school, was transferred to another school to be a history teacher and a freshman football and track coach.   798 F.2d 748, 751–52.   The court acknowledged that even if the plaintiff suffered humiliation and embarrassment due to the change in positions, it was "not significant enough to support a constructive termination."   *Id.* at 755.

On the other end of the spectrum, an employee whose pay was cut and responsibilities reduced, who had to train his younger successor and no longer had supervisory responsibilities, and who believed that a demotion was the "harbinger of dismissal," produced enough evidence for the Fifth Circuit to affirm a jury finding of constructive discharge.   *Stephens v. C.I.T. Grp./Equip. Fin.*, 955 F.2d 1023, 1027–28 (5th Cir. 1992).

Clearly, the burden is high in constructive discharge cases, but not insurmountable.

### 2.        Speaking As a Citizen on a Matter of Public Concern

The third prong requires the court to balance the interests of the public employee and employer, but before the court engages in any balancing, the court must "engage in a threshold inquiry regarding whether the public employee spoke as a citizen at all."   *Anderson*, 845 F.3d at 592.   "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"   *Lane v. Franks*, 574 U.S. 228, 235–36, 134 S. Ct. 2369 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S. Ct. 1304 (1957)).   Courts, however, must distinguish between employee speech and citizen speech, as public employees who speak "pursuant to their official duties" "are not speaking as citizens for First Amendment purposes."   *Garcetti*, 547 U.S. at 421 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have

enjoyed as a private citizen."); *see Howell v. Town of Ball*, 827 F.3d 515, 523 (5th Cir. 2016) ("[T]he First Amendment does not protect speech made in furtherance of a public employee's official duties, regardless of whether that speech addresses a matter of public concern.").  "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his [or her or their] public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 574 U.S. at 240.  The "critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*  This is because while a public employee "by necessity must accept certain limitations on his or her [or their] freedom," "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti*, 547 U.S. at 417–18.  If the employee speaks pursuant to his, her, or their ordinary duties, "the public employer's interest automatically outweighs the employee's, which is therefore unprotected." *Anderson*, 845 F.3d at 593.

While the U.S. Supreme Court has not articulated a comprehensive framework for defining the scope of an employee's ordinary duties, it has held that job descriptions are not dispositive, the fact that the speech concerns the subject matter of employment is not dispositive, and whether the expression occurs in the workplace is not dispositive.  *Garcetti*, 547 U.S. at 420–21, 424–25.  The Fifth Circuit has instructed that a "public employee does not speak pursuant to his [or her or their] official duties" (1) "merely because [the employee] speaks while *at* work"; (2) "merely because [the employee] speaks *about* work"; or (3) "when there *is* an analogue to speech by citizens who are not public employees."  *Anderson*, 845 F.3d at 593–94.  However, in *Garcetti*, the U.S. Supreme Court made clear that "[w]hen a public employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to speech by citizens who are not government employees," and the *Lane* Court added that non-protected speech must be pursuant to "ordinary"

employment responsibilities.  *Lane*, 574 U.S. at 240; *Garcetti*, 547 U.S. at 424.  Thus, speech deemed to be made pursuant to a public employee's ordinary official duties is not protected, "even when it irrefutably addresses a matter of public concern." *Anderson*, 845 F.3d at 592.  This inquiry is dispositive and highly fact specific.

"Whether a statement is made as an employee or citizen is a question of law," and "whether a statement addresses a matter of public concern is a question of law that must be resolved by the court." *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 736 (5th Cir. 2015).

a)      **Patronage Cases**

Most of the speech the plaintiffs assert is protected relates to political patronage—specifically, their decisions not to support Diaz's reelection bid even though Diaz allegedly required or compelled them to do so.  Under the U.S. Supreme Court's *Elrod-Branti* doctrine, the First Amendment "forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64, 110 S. Ct. 2729 (1990) (citing *Elrod v. Burns*, 427 U.S. 347, 96 S. Ct. 2673 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S. Ct. 1287 (1980)).  Thus, "conditioning [employment] on political beliefs and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Id.* at 78.  The Court deems patronage practices that involve promotions, transfers, recalls, and hiring decisions of low-level public employees unconstitutional if the practices are "based on party affiliation and support." *Id.* at 65.  However, "a Policymaking, confidential employee can be discharged from a job that he [or she or they] is satisfactorily performing upon the sole ground of his [or her or their] political beliefs," *Stegmaier v. Trammell*, 597 F.2d 1027, 1034 (5th Cir. 1979) (collecting cases interpreting *Elrod*), so long as

22

"party affiliation is an appropriate requirement" for the public office in question, *Branti*, 445 U.S. at 518.  The court considers the law relating to balancing these interests in section IV.B.3, *infra*.

Many U.S. Supreme Court patronage cases involve loyalty to a particular political party. *E.g.*, *Elrod*, 427 U.S. at 351 (plaintiffs discharged for not being Democrats); *Branti*, 445 U.S. at 508 (plaintiff discharged because they were Republicans); *Rutan*, 497 U.S. at 64 (employment decisions based on support of the Republican party).  It is, however, well established in the Fifth Circuit that "the *Elrod-Branti* doctrine applies when an employment decision is based upon support of and loyalty to a particular *candidate* as distinguished from a political party."  *McBee v. Jim Hogg Cnty.*, 703 F.2d 834, 838 n.1 (1983) (emphasis added), *vacated on other grounds*, 730 F.2d 1009 (1984) (en banc); *see Jordan v. Ector Cnty.*, 516 F.3d 290, 295-96 & n.17 (5th Cir. 2008) (discussing and collecting Fifth Circuit cases); *Matherne v. Wilson*, 851 F.2d 752 (5th Cir. 1988).  *But see Correa v. Fischer*, 982 F.2d 931, 935 (5th Cir. 1993) (distinguishing *McBee*, *Matherne*, and other similar cases because they all involved "terminations of employees who supported a particular candidate in an electoral battle" from the *Correa* fact pattern, which involved a personal rather than political rivalry).  In establishing a constitutional violation, the plaintiffs must demonstrate that the termination was politically motivated.  *Correa*, 982 F.2d at 933.  "Cases finding impermissible patronage terminations involve either an employee's allegiance to a political party, a political candidate, or a political belief."  *Id.* at 934.

### b)      Silence in the Face of Compelled Speech

The plaintiffs contend that Diaz compelled his employees to support his political campaign, and most of the plaintiffs claim that they at one point supported Diaz and then each withdrew support by discontinuing financial contributions and not attending campaign events.  Diaz contends that the plaintiffs' quiet decisions to discontinue supporting his campaign cannot qualify

as protected speech.  The plaintiffs, however, assert that their silence in the face of compelled speech is protected.  They also mostly assert that they demonstrated their lack of support in some outward way, though the extent to which their evidence supports that they did so varies from plaintiff to plaintiff and will be explored in detail in Part V.C, *infra*.  For now, the court considers the clearly established law relating to silence in the face of compelled speech.

Well-established First Amendment jurisprudence indicates that speech "extends to many activities that are by their very nature non-verbal: an artist's canvas, a musician's instrumental composition, and a protestor's silent picket of an offending entity are all examples of protected, non-verbal 'speech.'" *Steadman v. Tex. Rangers*, 179 F.3d 360, 367 (5th Cir. 1999) (citing various U.S. Supreme Court First Amendment cases).  That being said, not all silence is entitled to First Amendment protection.  Under well-established Fifth Circuit law, "there must be some outward manifestations of the allegedly protected First Amendment activity."  *Jordan*, 516 F.3d at 298.

Additionally, the First Amendment protects against compelled speech.  There "is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."  *Riley v. Nat'l Federation of the Blind of N.C.*, 487 U.S. 781, 796–97, 108 S. Ct. 2667 (1988).

In *Janus v. American Federation of State, County, and Municipal Employees*, a case relied upon by the plaintiffs, the U.S. Supreme Court considered whether forcing public employees to pay fees to a union when they choose not to join "violates the free speech rights of nonmembers by compelling them to subsidize private speech on matters of public concern."  138 S. Ct. 2448 (2018).  This case came out on June 27, 2018, which is before a meeting during which Diaz used

some campaign rhetoric at a meeting at a place called Spanky's in the fall of 2018 that many of the plaintiffs cite as an example of how Diaz compelled them to support his campaign. *See, e.g.*, Dkt. 128-1 (discussing the meeting at Spanky's). In *Janus*, the Court squarely overruled a 1977 case, *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S. Ct. 1782 (1977), which had upheld the constitutionality of a similar arrangement in which non-union members were required to pay a fee. *Id.* at 2463. The Court reiterated that it had "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Id.* (collecting numerous Supreme Court cases). It also discussed its precedent that clearly held the "right to eschew association for expressive purposes is . . . . protected." *Id.* (collecting cases). It noted that "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases[, *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 63 S. Ct. 1178 (1943),] said that a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence.'" *Id.* at 2464. It then reasoned that "[c]ompelling a person to *subsidize* the speech of other private speakers raises similar First Amendment concerns." *Id.* (collecting cases).

Another relevant U.S. Supreme Court case that addressed compelled speech is *O'Hare v. Northlake*, 518 U.S. 712, 116 S. Ct. 2353 (1996). The Court started by pointing out that under its established precedent, including *Elrod* and *Branti*, "[g]overnment officials may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare*, 518 U.S. at 714. The plaintiff in *O'Hare* was a contractor who provided towing services for the city of Northlake, Illinois. *Id.* at 715. After the mayor of Northlake's campaign committee asked the

owner of the towing service for a campaign contribution, he refused to contribute and started displaying a sign in support of the mayor's opponent at his place of business. *Id.* The tow truck company was then removed from the rotation list for tow services for the city. *Id.* The Court assumed without deciding that the removal was in retaliation for the owner's stance on the campaign and turned to whether the *Elrod-Branti* doctrine applies to independent contractors. *Id.* at 716. It ultimately determined that the "State may not condition public employment on an employee's exercise of his or her First Amendment rights, and those rights included the right not to financially support a particular candidate. *Id.* at 717 (collecting numerous Supreme Court cases).

The Fifth Circuit has addressed similar questions relating to silence, failure to support candidates, and compelled speech. In *Jones v. Collins*, 132 F.3d 1048 (5th Cir. 1998), the Fifth Circuit considered a case in which a former principal was transferred to an assistant principal position at another school based on the recommendation of the superintendent of the school district. While the instant case involves law enforcement, not schools, this case is relevant to an issue that arises in several of the cases—whether Diaz *knew* about the alleged protected activity. The former principal, Ethel Jones, had been advised by the superintendent, Gary Collins, that the school she was principal of may be the site of an alternative education program. 132 F.3d at 1050. Members of the community came to the next school board meeting to protest the alternative education program being placed in their children's school. *Id.* Collins asserted he told nobody but Jones, and he believed Jones had leaked the information. *Id.* Jones denied doing so. *Id.* In Jones's evaluation that year, Collins documented his concerns but recommended that Jones's contract be renewed. *Id.* at 1050–51. The following year, Collins rated Jones unsatisfactory in many categories and recommended that the district not renew her contract. *Id.* at 1051. One of

the cited reasons was "inciting unrest in the community regarding district policy." *Id.* Jones's contract for that year and the following school year allowed her to be transferred between administrative positions so long as her salary was not reduced. *Id.* Collins attempted to transfer Jones to a teaching position but was advised that this would be a violation of the contract; he transferred her to the assistant principal position instead. *Id.*

Jones sued, alleging, among other things, that the transfer was retaliation for exercise of her First Amendment right to free speech. *Id.* Collins moved for summary judgment on the First Amendment claim and his qualified immunity defense, and the district court denied it. *Id.* Collins appealed the qualified immunity holding. *Id.* The Fifth Circuit found it important that Jones had asserted that "she never spoke out—positively or negatively—regarding the prospect of placing the alternative education program on [her] campus." *Id.* It noted that even though Collins transferred Jones based on a mistaken belief, an "asserted 'bad motive' on the part of Collins cannot of itself form the basis of a First Amendment violation." *Id.* The court clarified, importantly for the case at hand, that "silence in the fact of an illegitimate demand for speech is subject to First Amendment protection," but that "this principle is inapplicable" when there is no demand for speech. *Id.* The court found that retaliation based on Collins's *perception* of First Amendment activity, when Jones herself asserted that she never commented publicly about the alternative education program being placed at her school, is not a constitutional violation. *Id.* at 1053. This is similar to the facts in many of the instant cases, as Diaz asserts he did not demand speech, and some of the plaintiffs state that they did not actually tell anyone about their decisions not to support Diaz.

In *Steadman v. Texas Rangers*, the Fifth Circuit again considered whether silence is protected under a different factual scenario. In *Steadman*, a female applicant to the Texas Rangers

asserted that she was not hired because of her political beliefs, expressions, and associations, pointing to a remark made by the Chief after the selection process that applicant was a "woman's libber." 179 F.3d at 364. The Chief argued that the plaintiff had not spoken out about her status as a person who believed in equal rights for all, so there was no protected speech. *Id.* at 366–67. The Fifth Circuit noted that "the Supreme Court has never required that an individual 'speak out' . . . to find shelter in the First Amendment." *Id.* at 367 (citing *Rutan*, *Branti*, *Elrod*). The court found, however, that by "never saying *anything*, [the plaintiff] [could] only rely on the Supreme Court's political association jurisprudence to anchor her First Amendment claim," and since she never provided any evidence "showing an outward sign of her membership in a feminist organization or support—even tactit support—of a feminist agenda," the Chief's "bad motive alone [was] insufficient under [Fifth Circuit] case law to establish a First Amendment claim." *Id.* at 368. This case provides substantial guidance to the issues at hand because Diaz likewise contends that most of the plaintiffs did not even tacitly indicate that they were no longer supporting his campaign.

The issues raised in *Steadman* are explored further in *Jordan v. Ector County*, which is an example of a plaintiff who had a sufficient outward demonstration of First Amendment activity. Plaintiff Donna Jordan, who was fired by Ector County District Clerk Janis Morgan, sued Morgan and others under § 1983, asserting that she was fired in retaliation for exercising her First Amendment rights. 516 F.3d at 293. Jordan and Morgan had both run for District Clerk in 2002, and Morgan won. *Id.* As soon as Morgan took office, she demoted Jordan from Chief Deputy to Assistant Deputy. *Id.* In 2005, after two incidents that caused a judge to complain to Morgan about Jordan, Morgan fired Jordan. *Id.* At the time Jordan was fired, the 2006 Clerk's election was coming up, and though Jordan had not officially said she was running again, the other people

in the office assumed Jordan would run again.  Morgan testified that "she thought it would be 'easier' to run against a disgruntled former employee." *Id.*  The case went to trial before a jury, and the jury found in Jordan's favor and awarded $64,000 in damages. *Id.* at 294.  The defendants appealed. *Id.*

On appeal, the defendants argued that Jordan did not show that she was engaged in a protected activity or that there was a causal connection between her activity and the employment action. *Id.* at 295.  Specifically, they contended that "Jordan is not seeking to defend recognized First Amendment rights but rather is masquerading a 'fundamental right to candidacy' claim in First Amendment clothing." *Id.*  The Fifth Circuit noted that the Supreme Court "has consistently held that the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Id.* (cleaned up) (citing and quoting *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 702 (5th Cir. 1998) (quoting *Rutan*, 497 U.S. at 64)).  The court opined that the unexpressed desire to run for office in 2006, standing alone, did not trigger First Amendment protection. *Id.* at 296.  It agreed that silence is, at times, protected, but "there must be some outward manifestations of the allegedly protected First Amendment activity." *Id.*

The court found that there was, however, outward manifestation leading to protected speech based on the following facts: Jordan had run against Morgan in 2002, Jordan alleged she was fired "because of her campaign for office as a whole . . . and was Morgan's political rival," "[b]y running against Morgan, Jordan was explicitly not demonstrating 'support' and 'loyalty' to Morgan," and Jordan's responses to whether she was running in 2006 were ambiguous. *Id.* at 297–

98.  The court determined that these circumstances as a whole placed her "within the reach of the First Amendment."  *Id.* at 298.

The court was quick to point out that it was not protecting "beliefs, affiliations, or speech that have not been expressed, communicated, or manifested," but rather that it is important to consider each case on its particular facts.  *Id.* at 299.  The court then engaged in *Pickering-Connick* balancing to determine if the defendants' interest in the efficiency of government service outweighed Jordan's interest as a citizen commenting on matters of public concern, noting that any evidence of disruption was scant.  *Id.*  The court determined there was sufficient evidence to conclude that Jordan's protected activity was a substantial or motivating reason for the adverse employment actions, and it affirmed the jury's decision.  *Id.* at 300–01.  This case is helpful in gauging what type of evidence is needed to support a finding that the plaintiff had some outward manifestation leading to protected speech.

### 3.     *Pickering-Connick* Balancing

The third prong requires the plaintiff to show that the employee's speech outweighs the government's interest in the efficient provision of public services.  The U.S. Supreme Court has established a two-step analysis known as *Pickering-Connick* balancing for determining whether a public employee is engaging in protected speech.  To receive First Amendment protection, the speech must be made as a citizen on a matter of public concern and, if so, the interests of the public employee as a citizen, in commenting upon matters of public concern, must outweigh the public employer's interest in promoting the efficiency of public services performed through its employees.  *Anderson*, 845 F.3d at 592 (citing *Pickering*, 391 U.S. at 568).  The Fifth Circuit's "decisions have melded the Supreme Court's discussion of" the principles of balancing the employee's rights with the needs of the employer discussed in *Branti* "with the broader but similar

*Pickering-Connick* test," resulting in the Fifth Circuit placing "cases involving only political association, only speech, or a combination of the two on a spectrum." *Maldonado v. Rodriguez*, 932 F.3d 388, 392 (5th Cir. 2019) (citing *Kinsey v. Salado Indep. Sch. Dist.*, 950 F.2d 988, 993–94 (5th Cir. 1992) (en banc)).  On one end of the spectrum, nonpolicymaking, nonconfidential employees who suffer an adverse employment action because of their political views require "'little, if any weighing'" of their rights against the employer's needs, "'and the employee's rights will usually prevail.'"  *Id.* (quoting *Gentry v. Lowndes Cnty., Miss.*, 337 F.3d 481, 484 (5th Cir. 2003).  However, if an employee is in a "'confidential or policymaking role, the employer's interests easily outweigh the employee's First Amendment rights.'"  *Id.* (quoting *Gentry*, 337 F.3d at 486).

Courts balancing the plaintiff's interest in the protected activity "against the alleged disruption caused by that activity" to fulfilling responsibilities to the public consider the following non-exclusive factors enunciated in *Connick*:

> (1) the degree to which the employee's protected activity involved a matter of public concern, and the gravity of that concern, (2) whether close working relationships are essential to fulfilling the responsibilities of the public office and the extent to which the employee's protected activities may have affected those relationships, (3) the time, place, and manner of the employee's activities, and (4) the context in which the employee's activities were carried out.

*Vojvodich v. Lopez*, 48 F.3d 879 (5th Cir. 1995) (relying on *Connick*, 461 U.S. at 151–53).

Diaz asserts that some of the plaintiffs' claims fail because their jobs required them to be in confidential or policymaking relationships with Diaz that required loyalty.  The court will thus review the main cases the parties rely on when discussing these issues, since they are relevant to several of the motions considered below.

In *Vojvodich v. Lopez*, a Bexar County Deputy Sheriff, Mark Vojvodich, who worked as commander of the Narcotics Unit of the Bexar County Sheriff's Office, was active in various Republican organizations and had participated in the campaign of Sheriff Harlon Copeland when he was running against Democrat opponent Ralph Lopez.  48 F.3d at 882.  Lopez was elected on January 1, 1993.  *Id.*  Vojvodich contended that even though he had supported Lopez's opponent, he loyally served in the position of narcotics commander when Lopez took over.  *Id.* at 883.  Lopez, however, as part of his evaluation of all of the units in the office, determined that the narcotics unit was not productive.  *Id.*  Lopez transferred Vojvodich to the communications/dispatch division. *Id.*  Lopez asserted that this position had equal prestige to narcotics, but Vojvodich, who asserts he was unaware that the new sheriff had a problem with his performance in narcotics, viewed the transfer as a demotion and career setback.  *Id.* & n.2.  Vojvodich also sought a transfer to the Night Chief position, which was a non-exempt captain-level position, but Lopez did not promote Vojvodich and, in fact, eliminated the Night Chief position.  *Id.*  Vojvodich filed suit, asserting that Lopez transferred him out of narcotics and denied the promotion to Night Chief because he was a Republican and had supported Lopez's opponent in the election.  *Id.*

Lopez moved for summary judgment in the district court, arguing that (1) he was entitled to qualified immunity; (2) Vojvodich was a "policymaker" and could thus be demoted for political activities; and (3) Vojvodich did not produce any evidence that his transfer was the result of his First Amendment activities.  *Id.*  The district court granted summary judgment because Vojvodich occupied a policymaking position and did not address the other claims.  *Id.*  Vojvodich appealed. *Id.* at 884.

The Fifth Circuit determined that the district court erred in determining that Vojvodich's "First Amendment interests were necessarily outweighed by Sheriff Lopez's interests as a matter

of law simply because it classified Vojvodich as a policymaker." *Id.* It instructed that the "fact that a public employee holds a policymaking position is relevant to the required balancing of interests, it is not the ultimate determination." *Id.* It pointed out that under *Branti*, the "'ultimate inquiry is . . . whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved,'" and "'party affiliation is not necessarily relevant to every policymaking or confidential position.'" *Id.* (quoting *Branti*, 445 U.S. at 518). The court noted that—after the plaintiff shows his or her activity is protected under the First Amendment—it is the employer's duty to demonstrate that "its interest in promoting the efficiency of the services provided by its employees outweighs the employee's interest in engaging in the protected activity." *Id.* at 885. "Public concern" must be "weighed against disruption." *Id.* (quoting *Click*, 970 F.2d at 112). The Fifth Circuit found that Lopez had not alleged that Vojvodich's political activities had *any* effect on the operations of the department. *Id.* at 886. Lopez, in fact, had insisted the political activities were irrelevant and that his decisions were not based on politics. *Id.*

Finally, in *Stegmaier v. Trammell* (1979), the Fifth Circuit examined what it means to be in a "policymaking position." 597 F.2d at 1034–38. It instructed that it is important to analyze the "nature of the employee's responsibilities," and "titles alone do not provide the answer." *Id.* at 1035 (cleaned up). "[D]oubt should be resolved in favor of the public employee subjected to patronage dismissal." *Id.* "Policymakers . . . may be identified as public employees whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy, and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors." *Id.* The *Stegmaier* court determined that the alleged policymaker in that case, a deputy circuit clerk in

33

Alabama's judicial system, was not a policymaker for patronage dismissal purposes. *Id.* The duties of the clerk included things such as preparing and submitting budget recommendations for state appropriations, making recommendations for the improvement of the operations of the judicial system, and assisting the chief judge. *Id.* at 1036. The Fifth Circuit reviewed all of the statutory duties of the clerk and determined that the clerk essentially had no authority to make policy decisions. *Id.* at 1038. However, the court affirmed the district court's dismissal of the case, finding that the clerk fell within a "confidential employee exception to *Elrod v. Burns*, noting that the circuit clerk must be able to "select a deputy in whom he has total trust and confidence and from whom he can expect, without question, undivided loyalty." *Id.* at 1040.

The year after the Fifth Circuit considered these issues in *Stegmaier*, the U.S. Supreme Court offered some clarification in *Branti*. The Court agreed that "it is not always easy to determine whether a position is one in which political affiliation is a legitimate factor to be considered." *Branti*, 445 U.S. at 518. It noted that "party affiliation is not necessarily relevant to every policymaking or confidential position." *Id.* It summarized "the ultimate inquiry" as "not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.*

### 4.    Causation/*Mount Healthy* Defense

Plaintiffs asserting retaliation claims for exercising their First Amendment rights "must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves*, 139 S. Ct. at 1722 (quoting *Hartman v. Moore*, 547 U.S. 250, 259, 126 S. Ct. 1695 (2006)). In *Mount Healthy*, the U.S. Supreme Court ruled that the plaintiff first has a burden to demonstrate that the protected conduct "was a 'substantial factor' or

to put it in other words, that it was a 'motivating factor' in the . . . decision." *Mt. Healthy*, 429 U.S. at 287 (footnote omitted).  In employment cases, if there is evidence of motive and an adverse employment action, this is often "sufficient for a circumstantial demonstration that one caused the other"; the burden then shifts "to the defendant to show that [the defendant] would have taken the challenged action even without the impermissible motive"—the *Mount Healthy* defense.  *Nieves*, 139 S. Ct. at 1722 (cleaned up) (quoting *Hartman*, 547 U.S. at 260); *see Rushing*, 2022 WL 873835, at *5 (noting that if a defendant claims that it would have reached the same decision in the absence of protected conduct it "is known as the '*Mount Healthy*' defense").  According to the U.S. Supreme Court, "[i]f there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind. . . . It may be dishonorable to act with an unconstitutional motive and perhaps in some instance be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman*, 547 U.S. at 260 (citing *Mt. Healthy*, 429 U.S. at 285–87, and *Crawford-El v. Britton*, 523 U.S. 574, 593, 118 S. Ct. 1584 (1998)).  The defendant's burden must be met with a preponderance of the evidence.  *Mt. Healthy*, 429 U.S. at 287.

Against this backdrop of clearly established law, the court now turns the facts relevant to each plaintiff's claims.

## C.    Individual Plaintiffs

The individual plaintiffs each filed a declaration in support of their claims.  *E.g.*, Dkt. 128-1.  Diaz asserts that the declarations are all self-serving and thus not proper summary judgment evidence.  *E.g.*, Dkts. 151, 153.  "Simply being 'self-serving,' however, does not prevent a party's assertions from creating a dispute of fact."  *Bargher v. White*, 928 F.3d 439, 445 (5th Cir. 2019).

Being self-serving *and* conclusory, however, puts a plaintiff on "unsteady ground." *DIRECTTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005).  The defendant has already objected to conclusory statements in the objections, and the court has ruled on those objections separately. Dkt. 214.  The court will rely on non-excluded portions of the plaintiffs' declarations, other evidence provided by the plaintiffs that the court has not excluded based on Diaz's objections, Diaz's deposition testimony, non-excluded portions of Diaz's expert's declaration (Brady), Diaz's post-deposition declaration to the extent it does not clearly conflict with his deposition, and other record evidence provided by Diaz.  For each individual plaintiff, the court will first set forth the facts as demonstrated by this evidence pertaining to that plaintiff's claim, keeping in mind that it must view the evidence in the light most favorable to the plaintiffs without making any credibility determinations.  *See Env't Conservation Org.*, 529 F.3d at 524; *Moore v. City of Dallas*, 233 F.3d 871, 874 (5th Cir. 2000).  It will then consider the arguments relating to whether there is enough evidence to establish an issue of material fact as to each contested element of the plaintiff's claim and whether the law supporting any issues of material fact is clearly established.

### 1.  Marcus Anderson (Motion, Dkt. 104, Response, Dkt. 128, Reply, Dkt. 153)

Marcus Anderson started working for Precinct Two in 1999.  Dkt. 128-1 (Anderson Dec.). In 2015, he was promoted to sergeant, and the promotion included a car allowance, which he used to purchase a vehicle that was used for work purposes only.  *Id.*  Anderson attended a campaign meeting for Diaz at Spanky's in Pasadena in September 2018.  *Id.*  Anderson had contributed to Diaz's campaign in the past, but he contends in his declaration that he decided to withdraw his support in 2018.  *Id.*  The summary judgment evidence indicates that Diaz asked those attending the campaign event at Spanky's to raise their hands if they supported him and then proceeded to tell them that if they could not donate money they should "borrow from 401Ks; get a loan from

banks; ask friends for the money; ask neighbors for the money; and offer neighbors a ride to the bank to get money." *Id.*  Anderson asserts that he told Diaz at the Spanky's event that he could not help with the next fundraiser, which was to be held at Top Golf, because he was taking his family to Disney World for vacation, and Diaz told him: "'[Y]ou have money to go on a vacation, but you don't have money for my golf tournament.  It must be nice to have money to go on vacation.'"  *Id.*  Diaz asserted during his deposition that he does not recall Anderson saying anything to him about Disney.  Dkt. 117-1 at 142.  Anderson asserts in his declaration that three days after the conversation with Diaz at Spanky's, Anderson was reassigned to a position in which he would drive a patrol car and thus no longer receive a car allowance.  Dkt. 128-1.  According to then-Chief Clerk Mary Ann Carrion, who is also a plaintiff in this case, Diaz ordered that Anderson's car allowance be taken away.  Dkt. 130-1.

In early December, Anderson contends that he was asked to provide meat, as he had done in the past, and smoke it for another Diaz fundraiser; he asserts that he refused to pay for the meat but did indicate that he would help cook it.  Dkt. 128-1.  The next day, Diaz ordered that Anderson be assigned to the position of night-shift sergeant.  *Id.*; Dkt. 128-5 (Luman Dec.) ("Diaz met with me and Lt. David Williams and ordered us to demote Sgt. Anderson to less desirable duties in the Patrol Division on night shift.").  Anderson told his direct supervisor on the night shift that he could not see at night and thus could not effectively operate a patrol vehicle at night.  Dkt. 128-1.  According to Anderson's supervisor, when he informed Diaz that Anderson had night vision issues, Diaz said Anderson needed to find a new job.  Dkt. 128-5 at 2.  Anderson had had a recent medical examination, but it did not include an eye test.  Dkt. 128-1.  Diaz asserts in his declaration that he had no knowledge of Anderson's night-vision issues but knew that Anderson had passed his physical examination right before he was reassigned.  Dkt. 104-2.

Anderson's job responsibilities changed with the change in positions. Anderson no longer had weekends off, and he went from supervising fourteen people to supervising two people. Dkt. 128-1. Around this same time, Anderson claims he found blank applications to other agencies on his desk.[4] *Id.*

Anderson asserts in his declaration that he and two other plaintiffs (Vara-Leija and Clark) set up a meeting to inform Nick Lykos and the county investigator about these events, but this meeting did not end up resolving any issues. *Id.* He contends that he could not file a formal grievance because no grievance coordinator was designated for Precinct Two until August 26, 2019. *Id; see* Dkt. 128-4.

On December 20, 2018, Anderson resigned. Dkt. 128-1. He contends that the "conditions become so intolerable" and "no help was forthcoming on [his] complaints." *Id.* Anderson testified that he was transferred because he discontinued contributing money and time to Diaz's reelection campaign and that his resignation was a constructive discharge. Dkt. 104-1 (Anderson Dep.) at 36, 48.

Anderson sued Diaz for retaliating against him for exercising his First Amendment rights. Dkt. 55. Anderson asserts, specifically, that Diaz transferred him to night shift patrol in retaliation for Anderson's withdrawal of support of Diaz's campaign and that Anderson was then constructively discharged. Dkt. 128. Diaz moves for summary judgment on Anderson's claim, arguing that (1) Anderson's reassignment is not an actionable adverse employment action; (2) Anderson resigned of his own volition and was not constructively discharged; (3) Anderson did not engage in constitutionally protected speech; (4) even if the court finds that Anderson's quiet

---

[4] Reed Clark states in his declaration that Diaz and Bellotte tried to get him to put blank applications to other agencies on Anderson's desk. Dkt. 128-9.

non-support of Diaz is constitutionally protected, Anderson cannot show that Diaz knew about it or that Diaz would not have reached the same decision absent the protected speech; and (5) the clearly established law did not prohibit Diaz's actions, so he is protected by qualified immunity. Dkt. 104.

(a)      **Adverse Employment Action: Transfer**

Diaz argues that Anderson has no evidence to support that his transfer was an adverse employment action under clearly established Fifth Circuit law. Dkt. 104. Anderson contends his transfer to night patrol was a demotion. Dkt. 128. While Diaz acknowledges that sometimes a transfer can constitute an adverse employment action under Fifth Circuit law, he points out that the transfer must have caused "'sufficiently serious [harm] to constitute constitutional injury.'" Dkt. 104 (citing *Serna*, 244 F.3d at 483). Diaz asserts that any harm Anderson suffered from the transfer does not rise to that level because Anderson's salary, rank, and benefits remained the same after the reassignment. *Id.* (citing Anderson Dep., Dkt. 104-1 at 118–19 (noting that he considered it a demotion because "[a]ny time you get a pay cut in a job, I would consider that – and any reasonable person would consider that a demotion"[5] but agreeing that he did not lose his rank as a sergeant)).

Anderson believed that being moved to the night shift was a demotion because he was in charge of fewer employees (14 people on the day shift and 2 on the night shift), had less desirable duties, and no longer had weekends off, which impacted the amount of time he was able to spend with his family. Dkts. 128, 128-1. And, while his pay was not reduced, Anderson considered his loss of a car allowance to be a reduction in pay. Dkt. 128. Anderson concedes that his car

---

[5] The pay cut Anderson was referring to in his deposition is being "stripped of [his] car allowance." Dkt. 104-1 at 118.

allowance had not been taken away yet when he resigned, but he points out that the Chief Clerk had received an order from Diaz to take the car allowance away—it just had not been processed prior to Anderson's resignation.   Dkt. 130-1 (Carrion Dec. (noting that Diaz ordered that Anderson's car allowance be taken away)).   As far as the duties, Anderson's previous assignment was an administrative position, and according to Lt. Mike Kritzler,[6] who was the patrol division commander, usually new and inexperienced officers were assigned to the patrol division, which involved risk of bodily injury, inconvenient duty hours and days off, and wearing an uncomfortable uniform with protective gear and weapons.   Dkt. 128-3 (Kritzler Dec.).   The uniformed patrol division is rigid and structured, repetitive, tightly controlled, and varied and fast paced, and it has inconvenient duty hours and days off with work that is uncontrolled and dangerous.   *Id.*  Moreover, the "uncontrolled nature of a Patrol Division's calls-for-service in the field naturally increase the uniformed police officer's chances of death or serious bodily injury."   *Id.*

The court finds that there are questions of material fact requiring a jury to determine whether Anderson's transfer from an administrative position to night shift was a demotion.   Even though Anderson's actual salary was not reduced, "money alone does not buy happiness."   *Click*, 970 F.2d at 108.   Anderson has shown that the transfer resulted in him working nights with a risk of bodily injury, loss of weekends off, eventual loss of his car allowance, and supervising significantly fewer employees.   A reasonable jury viewing the transfer objectively could conclude that the transfer caused harm rising to constitutional injury.   *See Breaux*, 205 F.3d at 157 ("Transfers can constitute adverse employment actions if they are sufficiently punitive, . . .  or if

---

[6] Diaz generally asserts objections in all of the motions for summary judgment to reliance on Kritzler's declaration because Kritzler was not designated as an expert.  The court has ruled on Diaz's objections to Kritzler's declaration separately and determined that Kritzler may testify to the extent he is testifying from personal knowledge.  Dkt. 214.

the new job is markedly less prestigious and less interesting than the old one."). The court also finds that the clearly established law at the time of Anderson's transfer was that a public official cannot "escape liability by demoting and transferring the employee [to a less interesting and prestigious position] rather than discharging him." *Click*, 970 F.2d at 110.

### (b)   Adverse Employment Action: Constructive Discharge

Diaz argues that Anderson was not constructively discharged, noting that Anderson only reported to night shift for two weeks before his resignation and did not attempt to resolve his concerns via a grievance. Dkt. 104. Anderson claims that he was constructively discharged because he had no choice but to quit. Dkt. 104-1 at 75; Dkt. 128. Anderson contends that Diaz's rhetoric at campaign events, including demanding loyalty and advising that employees who were not loyal were "'not going anywhere'" combined with the transfer to night shift amounted to an ultimatum. Dkt. 128 (quoting Dkt. 129-1 (Arellano Dec.) wherein Arellano indicates that Diaz said: "[I]f you're not loyal, you're never going to go anywhere"). He asserts that after he was transferred to night shift, a shift he had not worked since 2006, he told his supervisor he could not see well at night, but his shift was not changed. Dkt. 128-1. Additionally, Luman testified that he told Diaz about Anderson's night vision issues and Diaz said that Anderson needed to look for a new job. Dkt. 128-5 (Luman Dec.) at 2. Diaz acknowledges that Anderson said he had bad night vision, but according to Diaz, Anderson did not request reasonable accommodations and recently had passed his physical. Dkt. 104 (citing Dkt. 104-1 at 83, 84, 160–61). Anderson claims that the physical that Diaz points to did not include a vision test. *See* Dkt. 128-1. Anderson also asserts that he found a blank job application on his desk, and he claims he did not file a grievance because there was no grievance coordinator at the precinct at the time. *Id.*

The question is whether Anderson has presented a question of material fact under clearly established law to support his contention that a reasonable employee would have felt compelled to resign.  He provides evidence that he was transferred to a less desirable position, was going to lose his car allowance, had advised his superior that he could not safely perform the new position because he could not see to drive at night but was told that Diaz had said he would need to find a new job, and found a blank job application on his desk.  Dkts. 128-1, 128-5.  He also contends that he tried to complain to Harris County to no avail.  *See* Dkt. 128-1.

While the burden to show constructive discharge is heavy, Anderson provides some evidence supporting almost all of the *Brown* factors outlined in *Haley*.  *See* 391 F.3d at 649–50; *see also* Part V.B.1, *supra*.  He does not show that he filed a grievance, but he provides evidence that he attempted to complain and that filing a grievance may not have been an option.  *See* Dkt. 128-1 (discussing a meeting with Nick Lykos about "the events that were taking place").  The court finds, therefore, that whether Anderson was constructively discharged is also a question for the jury.  Since *Haley* was published in 2004 and relied on factors discussed by the Fifth Circuit much earlier, the *Brown* factors are available in a body of law that was clearly established at the time these events took place.

### (c)    Protected Speech

Diaz next argues that Anderson did not engage in any speech, much less speech on a matter of public concern.  Dkt. 104.  Diaz notes that Anderson's "speech" is essentially "supposed, quiet non-support for Diaz."  *Id.*  Anderson agreed during his deposition that he never told Diaz he would stop participating in or contributing to *future* events, he merely failed to participate or donate to two events.  *Id.* (citing Anderson Dep. at 93 (Q: "During that same conversation [at Spanky's] did you tell Constable Diaz that you would not be contributing your time or effort to his campaign

in the future?" A: "No. I would have been fired then."). Diaz contends that because Anderson admits he engaged in no speech or conduct, the court does not even reach the *Pickering-Connick* balancing test. *Id.* (citing *Reyes v. Salazar*, No. SA:18-CV-470-JKP, 2020 WL 4018597 (W.D. Tex. July 15, 2020) (holding that the plaintiff "did not argue nor present any evidence which would raise a genuine dispute whether his campaign contribution was anything more than discreet" and instead was a "'quiet supporter'" who did not provide any evidence that "he engaged in any outward sign of his political alignment"), and relying on *Jordan*, 516 F.3d at 298).

Anderson contends that his failure to support Diaz is a refusal to speak after being compelled and is thus protected speech. Dkt. 128. Anderson—and all the plaintiffs—assert that refusing to speak is protected under an *Elrod/Branti* patronage dismissal analysis, citing *Haddock v. Tarrant County*, 852 F. App'x 826, 832 (5th Cir. 2021) ("Our precedent firmly establishes that *Elrod/Branti* applies to refusal to speak."). The *Haddock* court relied on *Stegmaier v. Trammell*, a case from 1979, in its determination that it was firmly established that *Elrod/Branti* applies to a refusal to speak. *Id.* (citing *Stegmaier*, 597 F.2d at 1040) (also relying on *Rutan*, 497 U.S. 62; *Branti*, 445 U.S. 507; *Riley*, 487 U.S. 781; *Jones*, 132 F.3d at 1054). Anderson agrees that the Fifth Circuit requires "some 'tacit support' for the political" beliefs in refusal-to-speak cases. *Id.* But he asserts that in his case he demonstrated, viewing the "circumstances as a whole" as required by *Jordan v. Ector*, 516 F.3d at 298, his lack of support in "some outward way"; specifically, he told Diaz at Spanky's that he was not participating in the Top Golf event and was going to go to Disney World, and he told Jessica Duran (Diaz's assistant) that he was not contributing to the campaign or donating meat anymore. *Id.* (citing 128-1 (Anderson Dec.) ("I was told by Diaz's assistant, Ms. Duran, that Diaz wanted a barbecue menu . . . and that he wanted me to take care of smoking the barbecue. . . . I notified Ms. Duran that I was not going to do that anymore.").

43

In reply, Diaz acknowledges that Anderson claims he told Diaz he would not be participating in the Top Golf event, but he reiterates that Anderson did not tell Diaz he would not participate or contribute to *future* events. Dkt. 153. Diaz asserts that any other evidence that Diaz may have known that Anderson withdrew his support is insufficient to defeat summary judgment. *Id.* For example, while Anderson claims he stopped financially supporting Diaz's campaign, Diaz asserts this is not evidence of Anderson outwardly engaging in any conduct but rather quietly deciding not to donate. *Id.* Moreover, Diaz contends that silence in the face of compelled speech is only actionable if there is an actual demand for speech, and Anderson did not point to any evidence showing there was a demand for speech. *Id.* (relying on *Jones*, 132 F.3d at 1054). Diaz asserts that there is no evidence that he compelled support for the campaign, citing his own declaration in which he swears that he never factored any employee's contributions or participation into any employment decisions and that he did not factor Anderson's contributions into his decision to assign him to night shift and in fact did not know Anderson has discontinued his support.[7] *Id.* (citing Dkt. 104-2).

Diaz relies primarily on *Reyes v. Salazar*. In *Reyes*, a federal district court in San Antonio considered defendants Bexar County and Javier Salazar's motion for summary judgment on plaintiff Henry Reyes's claim that Salazar terminated Reyes's employment as a member of the Bexar County Sheriff's Command Staff when Salazar was elected to replace incumbent Sheriff Susan Pamerleau. 2020 WL 4018597, at *1. Reyes's command staff position with Pamerleau was

---

[7] This is consistent with Diaz's deposition testimony. Diaz testified that he did not require Anderson to be politically loyal or donate to the campaign, and that he did not make any employment decisions with regards to Anderson based on his campaign contributions. Dkt. 117-1 at 83, 87. He also testified that he was unaware of Anderson ever telling him he was withdrawing support from the campaign. *Id.* at 141. Of course, Diaz also could not remember if he transferred Anderson or ordered him placed on the night shift. *Id.* at 143–45.

as deputy chief-assistant jail administrator. *Id.* Reyes applied for a position on Salazar's command staff and was interviewed by the transition team but not recommended to Salazar for an interview. *Id.* He was not chosen and received a letter that he would not be retained as an employee when Salazar took over. *Id.* After his interview and before he received notification that he was not selected, Pamerleau assigned him, at his request, to the position of detention lieutenant, which is a position he had previously held. *Id.* This was a "civil service protected position." *Id.* Salazar filed suit and obtained a temporary restraining order preventing Reyes from being placed in the civil service protected position. *Id.* Reye's employment with Bexar County expired when Pamerleau's term ended. *Id.* Reyes sued, and the defendants moved for summary judgment. *Id.* at *2.

The court found that "the circumstantial evidence could be interpreted as a showing that Salazar terminated Reyes because Salazar perceived Reyes as 'disloyal,'" but terminating Reyes for perceived disloyalty is not a First Amendment violation. *Id.* at *9 (relying on *Correa*, 982 F.2d at 933–35). The court noted that instead the termination must be "politically motivated," and a finding that it was politically motivated "require[d] far reaching inference and [drew] from too much circumstance and conjecture." *Id.* The court found that there was "no display or outright knowledge of adverse political alignment." *Id.* The court determined, thus, that summary judgment was appropriate because there was insufficient evidence to support an element of Reyes's prima facie burden. *Id.* The court therefore did not reach balancing the interests under *Pickering/Connick*. *Id.* at *7.

Here, the summary judgment evidence demonstrates that Diaz compelled Anderson to support his campaign. Anderson told Diaz at Spanky's that he was not doing the Top Golf event because he was taking his family to Disney World, and Diaz commented back that Anderson had

45

money to go on vacation but not for the golf tournament and how it "must be nice to have money to go on vacation." Dkt. 128-1. Diaz did a roll call at that meeting of everyone who supported him and encouraged the attendees to borrow money if they did not have the funds to support him. *Id.* There is also evidence that Anderson demonstrated that he was not supporting Diaz any longer in some outward way. For the barbecue event, Diaz's assistant, Jessica Duran, advised Anderson that "Diaz wanted a barbecue menu for [the barbecue fundraiser], inclusive of brisket and ribs, and that he wanted [Anderson] to take care of smoking the barbecue." *Id.* Anderson told Duran and others in the room that he "would not be giving any more money to Diaz for anything, and that [his] family wouldn't be attending the party." *Id.* While Diaz says that he did not know about Anderson's decision to stop supporting his campaign, Dkt. 104-2 (Diaz Dec.), that indicates this is a credibility question for a jury.

Diaz argues that a finding that Anderson withdrew his political alignment with Diaz requires inferences similar to those that the *Reyes* court found too far-reaching. Anderson asserts that his statement about Top Golf was made directly to Diaz, which indeed would have been a one-time failure to support not necessarily tied to Diaz's politics, and certainly the statements about not giving any money or providing meat for the barbecue were not made directly to Diaz. However, a reasonable juror could conclude that Diaz was requiring that Anderson support his campaign, particularly in light of his statements directly to Anderson combined with other campaign rhetoric directed towards employees, and Anderson demonstrated his lack of support in some outward way. For the barbecue event, Anderson specifically made remarks to Diaz's assistant—who had relayed the information about Diaz wanting Anderson to provide the meat to Anderson—that he was no longer donating money and would not be providing meat. It is not a far-reaching inference to conclude that Diaz learned from his assistant that Anderson had decided

46

not to support the campaign.  It is, in fact, a reasonable inference.  The court finds that there is a question of material fact as to whether Anderson engaged in protected conduct because there were sufficient outward signs that Diaz would have known that Anderson had decided to no longer support the campaign.  Additionally, the law was clearly established that refusing to speak when compelled to do so was protected activity.  *Jordan*, 516 F.3d at 298.

The court need not reach *Pickering/Connick* balancing because Diaz does not argue that Anderson had a confidential or policymaking role that required him to be politically aligned with Diaz and rests on his assertion that Anderson engaged in no speech or conduct.  Dkt. 104. Accordingly, the court finds that, to the extent the questions of material fact are resolved in Anderson's favor, he was speaking as a citizen on a matter of public concern.

### (d)     Causal Connection/Diaz's Defense

Diaz contends that Anderson cannot present an issue of material fact demonstrating that Diaz was aware of the "speech" or acted based on the speech. Dkt. 104.  Diaz asserts that Anderson cannot point to any document, fact, written communication, or information showing that Diaz reassigned him to a different shift *because of* his lack of support of Diaz's campaign.  *Id.*  In his declaration, Diaz states that he did not even know that Anderson withdrew his support of the Diaz campaign, and his deposition testimony is consistent with this statement.  Dkt. 104-2; Dkt. 117-1 at 141 (Q: "Were you aware at any time of Marcus Anderson telling you that he was withdrawing support from the Diaz campaign?" A: "No.").  Diaz argues that Anderson even admitted he did not tell Diaz about refusing to participate in future campaigns, Dkt. 104- 1 at 93, 127, 130, and even Luman stated that Diaz never told him that he was upset with Anderson for Anderson's lack of political support, Dkt. 104-4 at 230.  *Id.*  Diaz additionally contends that even if there were such

evidence, Diaz is not liable if he would have taken the same action absent the protected speech. *Id.* (relying on *Beattie*, 254 F.3d at 603).

Anderson notes that Diaz was present at both the Top Golf and barbecue events and knew Anderson did not attend.  Dkt. 128.  Moreover, given the close timing to Anderson's refusal to participate and the transfer to night shift, he asserts the jury could find that Anderson's absence caused Diaz to transfer Anderson.  *Id.* (citing the court's July 9, 2020 opinion in this case, which cited *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019) to support its conclusion that close timing aids in establishing a causal connection).  Additionally, Anderson points out that Luman told him Diaz was upset, and even though Luman now states that Diaz never actually *said* that to him, Luman's conveyance of the idea to Anderson could certainly be construed as Luman understanding this to be the case.  *Id.*  Moreover, Diaz did not provide any other reason to Anderson or his supervisors at the time.  *Id.* (noting that neither Luman nor the patrol division commander, Kritzler, were given a reason).  Anderson also points to letter written by Hernandez to Diaz about the "volatile" office environment and how Anderson was part of a "coup," but the court notes that these letters were written well after Anderson left and thus not of significant probative value in showing Diaz's motivation at the time of the alleged adverse employment actions.  *See* Dkt. 128 & Dkts. 130-4, 130-5, 130-6 (Pls'. Exs. 23, 24, 24A).

Under clearly established law, motive and an adverse employment action are often "sufficient for a circumstantial demonstration that one caused the other."  *Hartman*, 547 U.S. at 260.  The rhetoric Diaz used at his campaign events, which were attended by Anderson, the roll call at the events, and his comments directly to Anderson when he said he could not attend one event due to a vacation, are evidence that Diaz demanded that his employees be loyal to the campaign.  Diaz knew that Anderson refused to participate in the Top Golf event, and there is

48

evidence through which the jury could reasonably infer that Diaz knew that Anderson stopped contributing to the campaign and refused to continue to buy meat for the barbecue as he had done in the past.  This is motive.  Additionally, even though Luman has admitted that Diaz did not directly tell him that he was upset with Anderson, Luman did tell Anderson that Diaz was upset with him.  Dkt. 104-4 at 229–30.  This demonstrates that Luman also believed Diaz knew about the lack of support, and it supports Anderson's contention that Diaz realized Anderson was not providing the support and loyalty he previously had provided.  This motive, plus Diaz changing Anderson's employment conditions almost immediately after the withdrawal of support, is sufficient under clearly established law (*Hartman*) to shift the burden to Diaz.

Diaz argues that he would have taken the same employment action anyway.  Dkt. 104.  He asserts in his declaration that he reassigned several officers to the night shift towards the end of 2018 because he recognized there were not enough deputies and supervisors on night and evening shifts.[8]  Dkt. 104-2.  His expert agrees that they needed more supervisors on this shift to balance the schedule.  Dkt. 104-7.  However, Anderson provides evidence indicating that there was not actually an issue with supervision on the night shift.  Kritzler asserts that he was not aware that there were any issues with a lack of supervisors for the evening shift.  Dkt. 128-32 (Kritzler Dec.).  Additionally, Jason Curry, who was an evening patrol shift supervisor during both Diaz's tenure and the newly elected constable, asserts that after Vara-Leija left the precinct in August 2019, no

---

[8] During his deposition, Diaz said, "I can't remember" when asked if he ordered or recalled if Anderson be placed on the night shift.  When asked if he ever talked to his command staff about his reasons for placing Anderson on the night shift, Diaz responded that he could not remember if Anderson went on night shift.  Dkt. 117-1 at 143, 145.  In paragraph 27 of his declaration, Diaz discusses assigning Anderson to night shift and why he specifically transferred Anderson. Dkt. 104-1.  To the extent Diaz states in his post-deposition declaration that he specifically remembers why he transferred Anderson to night shift, it is a direct contradiction with his deposition, and the court will not consider these statements as evidence.  Anderson's motion to strike as clearly contradictory is GRANTED.

other supervisors were assigned to the night shift.  Dkt. 128-6.  This conflicting testimony about whether there was actually a need for additional supervision on the night patrol shift at the time of Anderson's transfer means there is an issue of material fact as to Diaz's defense.

The court finds that there are issues of material fact as to all of the elements of Anderson's claim under clearly established law.  Accordingly, Diaz's motion for summary judgment on Anderson's claims is **DENIED.**

### 2.   Claudia Arellano (Motion, Dkt. 105, Response, Dkt. 129, Reply, Dkt. 151)

Claudia Arellano started working for Precinct Two in 2014 as a patrol officer working day shift.  Dkt. 129-1 (Arellano Dec.).  In 2016, she transferred to the civil division, which she asserts was preferable to patrol because she had weekends off, holidays off, regular hours, and could manage her own schedule.  *Id.*  In January 2018, she started reducing her donations of money and items to Diaz's campaign because she was getting married in February 2019.  *Id.*

In March 2019, as part of her job, Arellano executed a writ of possession to evict a tenant, but the writ has been placed with the department prematurely.  *Id.*  Arellano was notified that it had been premature by a court clerk three days later, and she reported this incident to her supervisor, Eric Slaughter, immediately.  *Id.*  She and Slaughter were able to smooth over the situation with the tenant.  *Id.*  Diaz states in his declaration that "Arellano attempted to blame other employees for her mistakes."[9]  Dkt. 105-2.

---

[9] Diaz provides additional information in his declaration about Arellano's alleged wrongful eviction mistake and how it eventually led to her termination following an IAD investigation. Dkt. 105-2.  However, in his deposition, he testified that he did not remember why he terminated Arellano's employment.  Dkt. 117-2 at 162.  It would be unfair for the court to consider the reasons provided in Diaz's post-declaration declaration to grant summary judgment in his favor when the plaintiffs did not have the opportunity to cross examine him about the alleged reasons during the deposition.  Accordingly, the plaintiffs' motion to strike the declaration as to the reasons Diaz terminated Arellano's employment is GRANTED.

On April 2, 2019, Slaughter had a meeting with the employees in the civil division. Dkt. 129-1.  According to Arellano, Slaughter advised the personnel, on behalf of Diaz, that they were not to speak to or associate with Jerry Garcia (Diaz's opponent) while on duty or at the monthly Harris County auction.[10]  *Id.*  He said that those who did would be "punished."  *Id.*  Slaughter then pointed to reassignments that were listed on a computer screen, and he advised that Hernandez would be at the auction to watch what was happening.  *Id.*  Arellano contends that Slaughter was looking directly at her when he advised that he knew Garcia used to be her supervisor and was their friend, but he is the opponent now.  *Id.*  At the auction, Arellano waved to Jerry Garcia, and she said during her deposition that she was seen waving.  Dkt. 105-1 at 66. She filed a second declaration stating that she "acknowledge[d] and briefly converse[d] with Jerry Garcia at the auctions."  Dkt. 129-2.

According to Arellano, Diaz and his wife, Hernandez, and Luman attended a meeting at the Tepatitalan Mexican Grill on April 9, 2019, with many deputies and civilian employees. Dkt. 129-1.  Arellano states that employees were required to sign in, and Diaz took a roll call of the Precinct Two employees who were there participating in the campaign event.  *Id.*  Arellano reports that when Diaz spoke to the group he said, "If you're with this campaign, I want you here tonight.  If you're not, get the hell out of here.  I'm telling you because I don't need nobody on the fence."  *Id.*  He also told those in attendance that they had "to be loyal . . . to [his] campaign" and if they were "not loyal, you aint no good to us.  Please.  Don't waste your time here."  *Id.*

After more similar discussion during this event, Arellano claims that Diaz addressed Arellano, noted that their kids had grown up across the street from one another, and then he "got

---

[10] Arellano's co-worker, Sheila Felicia, who is not a plaintiff, corroborates that Slaughter told the members of the office not to speak or associate with Garcia, who was also their former sergeant and co-worker.  Dkt. 129-6.

into [Arellano's] face" and started talking more about loyalty.  She reports that he said, "if you're

not loyal, you're never going to go anywhere.  When you're on ship, you need to stay on the ship."

*Id.*  During his deposition, Diaz testified that he does not recall if he asked Arellano if she was

loyal or any discussion about being on the fence or not going anywhere if "you're not with us."

Dkt. 117-1 at 164.  In fact, when asked if he remembered "anything that [he] – that was said at any

Diaz campaign fundraising event," he said, "Go Constable Diaz."  *Id.*  When asked, "Anything

else?" he said, "No."  *Id.* at 164–65.

Arellano claims that Diaz asked her to put a sign up for Ramon Garza, a political candidate

in a different race, in her yard as the meeting at Tepatitalan Mexican Grill was breaking up.  *Id.*

Arellano told Diaz that she would put up the sign, but she did not end up doing so.  Dkt. 129-1.

On April 12, 2019—three days after the Tepatitalan Mexican Grill meeting—Hernandez

wrote a letter to Diaz entitled "Observations and Concerns."  Dkt. 130-4.  In the letter, which

discusses various perceived problems in the Precinct, Hernandez stated that "[t]here are individuals

in positions of leadership/command, who are inhibiting progress or intentionally working against

the Constable directly/indirectly, to undermine or sabotage his departmental goals/agenda."  *Id.*

While Hernandez did not list all of the people to whom he was referring in this letter, he listed the

people that he was referring to during a subsequent investigation by the State Office of

Administrative Hearings (SOAH), and Arellano was listed as part of the group that Hernandez

stated had its own agenda.  Dkt. 130-5.

On April 15, shortly after the "Observations and Concerns" letter, Kritzler told Arellano

that she was being moved from the civil division to evening patrol duty effective April 20, 2019.

Dkt. 129-1.  This left Arellano with a child-care dilemma.  *Id.*  Arellano states in her second

declaration that the time shift "really upset [her] and she "struggled to maintain [her] composure" because she was "worried about how she could provide day care for her children."  Dkt. 129-2.

In the interim, she received a text stating that she needed to attend an internal affairs division ("IAD") investigation meeting; the investigation ended up being about an anonymous letter regarding Slaughter's statements about staying away from Garcia.  Dkt. 129-1.  During the meeting, Arellano was questioned about her loyalty and whether she was friends with Garcia.  *Id.*

On April 18, 2019, Arellano met with Hernandez, who told her that the reason she was being transferred to the patrol division was because of the March 2019 eviction incident.  *Id.*  That evening, Arellano decided to put an "Elect Lt. Jerry Garcia" sign on her fence.  *Id.*  On April 26, which is less than ten days later, Arellano was on Family Medical Leave Act ("FMLA") leave, and an employee working in the IAD came to Arellano's house and had her sign a section 614.023 notice[11] relating to the erroneous eviction from March.  *Id.*  On May 9, Arellano was still on FMLA leave, but the IAD investigator ordered her to appear at an interview on May 15, 2019.  *Id.*  Towards the end of the May 15 interview, the IAD investigator told Arellano the complaint was criminal in nature and was based on a complaint of official oppression coming from Diaz.  *Id.*

On May 30, 2019, Arellano reported to work in the patrol division after her FMLA leave, and Hernandez terminated her employment.  *Id.*  The termination was allegedly due to the erroneous eviction incident, which Arellano contends had already been dealt with.  *Id.*  She

---

[11] Under section 614.023 of the Texas Government Code, if a complaint is filed against a law enforcement officer and other specifically delineated types of state employees, the "officer or employee" shall be given a copy of the signed complaint "within a reasonable time after the complaint is filed."  Tex. Gov't Code § 614.023(a).  The statute further states that "[d]isciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee."  § 614.023(b).  The employee may not be fired or indefinitely suspended based on the complaint unless it is investigated and "there is evidence to prove the allegation of misconduct."  § 614.023(c).

received a termination letter from Diaz, but she contends that it did not provide any facts to support the termination. *Id.* Arellano subsequently learned she had been "dishonorably discharged." *Id.* She sought an administrative hearing, and the SOAH judge ordered that the discharge be changed to "honorable."[12] *Id.*; *see* Dkt. 129-5 (finding that Arellano's "mistake was reasonable given the Department's insufficient training").

Arellano sued Diaz for retaliating against her for exercising her First Amendment rights. Dkt. 55. She contends that the transfer to patrol was a demotion and that she was demoted and fired because Diaz believed she supported Jerry Garcia rather than Diaz in the constable campaign, because she placed a Jerry Garcia sign in her yard, and because Diaz had identified her as a disloyal employee as far back as October 2018 when she stopped donating to his campaign. Dkt. 129. Diaz moves for summary judgment on Arellano's claims, asserting that he is entitled to qualified immunity because (1) he did not violate a constitutional right because Arellano cannot meet any of the prongs of her prima facie burden; and (2) even if Arellano has enough evidence to survive summary judgment on violation of a constitutional right, it was not clearly established at the time of the alleged misconduct. Dkt. 105.

### (a) Adverse Employment Action

Arellano argues that being transferred to patrol division qualified as an adverse employment action and her termination is indisputably an adverse employment action. Dkt. 129. Arellano asserts in her declaration that she was transferred from the civil division to patrol division after refusing to place the sign for another candidate in her yard that Diaz had requested, and that her employment was terminated shortly after she placed a sign supporting Diaz's opponent on her

---

[12] Diaz was questioned about the SOAH overturning the IAD investigation findings relating to Arellano in his deposition, and he responded by asking what SOAH is. Dkt. 117-1 at 210–11.

fence.  Dkt. 129-1.  Diaz argues that the transfer was not an adverse employment action because Arellano never reported to patrol and even if she had reported to patrol, she actually received a raise for the reassignment, and the reassignment would not have affected her number of days off and rank.  Dkt. 105 (citing Dkt. 105-1 (Arellano Dep.) at 71, 158, 96, 97).

Arellano points out that she never reported to patrol because she was on FMLA leave and then was terminated before she could start work on patrol.  Dkt. 129.  She asserts that she was on FMLA for a serious medical condition associated with the events unfolding at work.  Dkt. 129-1.  She relies on Kritzler's declaration to demonstrate the negative aspects of patrol as compared to her job in the civil division, pointing out that an office environment does not have the same risk of serious bodily injury or death as a deputy patrolling the streets in the evening.  *Id.*  Additionally, her shift was changed from day to evening, which forced her to find new daycare options.  *Id.*

Diaz asserts that the only competent summary judgment evidence is that Arellano never reported and thus suffered no harm.  Dkt. 151.

First, the court finds that Arellano's termination is an adverse employment action under clearly established law.  *Breaux*, 205 F.3d at 157.  Whether Arellano can show that her termination was caused by her protected speech will be considered *infra*.

The court now turns to Arellano's assertion that the transfer to the patrol division was an adverse employment action.  That is a more complicated question.  Similar to Anderson, Arellano was being transferred from the civil division to a shift on the patrol division that was not during regular business hours.  Like Anderson, her pay was not reduced, though Anderson lost his car allowance, and there is no indication that Arellano had a car allowance or lost any pay; in fact, she received a slight raise.  Anderson also was supervising fewer employees with his transfer, and Arellano was not in a supervisory position.  Arellano testified that she did not lose rank or pay and

that she still had the same number of days off.  Dkt. 105-1 at 96, 97.  Of course, she contends that the transfer would have caused problems with day care and also caused her personal distress.  Dkt. 129-1.  She also asserts that she was on FMLA leave and did not report to the position because of a serious medical problem related to work.  *Id.*

As noted above with regard to Anderson, there are a lot of differences between a daytime position in an office and the patrol division, such as the patrol division being more dangerous, requiring a uniform, being tightly controlled, and having inconvenient duty hours and days off.  *See* Dkt. 128-3.  In the civil division, Arellano had "regular hours, regular days off (Saturday and Sunday), holidays off, and opportunities to manage [her] own schedule."  Dkt. 129-1 (Arellano Dec.).

A "transfer, even without an accompanying cut in pay and other tangible benefits, may constitute an adverse employment action," but the plaintiff must show more than just that the plaintiff was "transferred from a job he [or she or they] likes to one that he [or she or they] considers less desirable."  *Serna*, 244 F.3d at 483.  Arellano's subjective viewpoint that it was a demotion is insufficient; rather, she must show that she "suffered some serious, objective, and tangible harm" due to the transfer.  *Id.*  "[I]t is insufficient for a plaintiff to show merely that [the plaintiff] has been transferred to a job [the plaintiff] likes to one that [the plaintiff] considers less desirable.  Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused harm to the plaintiff, 'sufficiently serious to constitute a constitutional injury.'"  *Id.*

Arellano has shown that at least one other officer considered the transfer to be a demotion, and, in fact, all of the plaintiffs in this case who were transferred from the civil division to the patrol division have stated in their declarations that they considered it a demotion.  While the court

believes, notwithstanding the aspects that are different than Anderson's case, that this adds up to a question of material fact as to constitutionally serious harm if Arellano had actually had to work the shift, Diaz points out that Arellano was fired as soon as she showed up for her first shift and never actually worked in the new position.  Arellano also contends she did not report because she was on FMLA leave due to a medical condition related to the transfer.  The Fifth Circuit has been clear that "the personal preferences and subjective perceptions of the plaintiff are insufficient." *See Serna*, 244 F.3d at 483; *Forsyth*, 91 F.3d at 774.  In light of this clearly established precedent, the court finds that Arellano's evidence that her health condition was a result of her transfer, which is simply her own conclusory contention, is too tenuous of a connection to constitute a serious, objective, and tangible injury, particularly since this health issue would have been caused by her subjective response to the transfer.  Because Arellano did not ever actually work in the position prior to being terminated, the court finds that she has not shown suffered serious, objective, and tangible harm as a result of the transfer under clearly established law.  Accordingly, while the termination of her employment constitutes an adverse employment action, the transfer does not.

### (b) Engaging in Protected Activity

Diaz asserts that he is entitled to summary judgment because Arellano cannot show she engaged in any constitutionally protected speech or activity.  Dkt. 105.  Arellano argues that Diaz violated her constitutional right to free speech because "'silence in the face of an illegitimate demand for speech is subject to First Amendment protection.'"  Dkt. 129 (quoting *Jones*, 132 F.3d at 1054).  She contends that Diaz transferred and demoted her shortly after Diaz spoke directly to her about loyalty at a campaign event on April 9, 2019, after she refused to put up a sign in her yard for Ramon Garza that Diaz had asked her to put up at that same event, and after her supervisor told her she could not support Diaz's opponent, Jerry Garcia.  Dkt. 129 (citing Pls.' Ex. 17

(Dkts. 129-3 & 129-4)).  At the April 9 event, Diaz questioned whether Arellano was loyal to his campaign in front of other deputies and employees and said, "'if you're not loyal, you're never going to go anywhere.'"  *Id.* (citing Ex. 3-A).  She did not put up the sign Diaz had requested at the time, and after she was informed of the transfer, she put a sign in her yard supporting Garcia. Dkt. 129-1.  Arellano contends that Diaz knew this because his house is on the same street as hers. Dkt. 129; *see* Dkt. 129-1.  Approximately one month later, her employment was terminated.  *Id.* Arellano also asserts that she discontinued supporting Diaz financially in October 2018, and she provides campaign finance reports signed by Diaz to demonstrate that he knew she was not supporting him.  *Id.*

Diaz argues in reply that Arellano provides no evidence other than her self-serving affidavit to support her claim that she placed a Jerry Garcia sign outside of her house.  Dkt. 151.  As far as her discontinuing donating to the campaign, while acknowledging that Arellano provides the campaign finance reports, Diaz argues that this is quiet non-support of the campaign and does not demonstrate that she outwardly engaged in any conduct to demonstrate her non-support.  *Id.*  Diaz also asserts that Arellano does not provide any admissible evidence that Diaz compelled support of his campaign.  *Id.*

Arellano's declaration outlining what Diaz said during campaign meetings is sufficient evidence to demonstrate there is an issue of material fact as to whether Diaz compelled support of his campaign.  Additionally, not only does Arellano state that she placed a sign supporting Jerry Garcia in her yard, but Diaz himself provided testimony during his deposition that a jury could find supports Arellano's assertion that she placed the sign on her fence:

> Q: Are you aware if Claudia Arellano posted a campaign sign of
> Jerry Garcia at her home residence?
> A: Uh , yes. I – I do. I'm sorry. Yes, sir.

Dkt. 117-1 at 114.

> Q: Do you recall if Claudia Arellano had displayed an electric [sic.]
> Garcia sign on her fence outside of her home? . . .
> A: I know – I know where she lived at, and I knew there was a sign
> on there, but I didn't know if she put it up there. It could have been
> anybody.

Dkt. 117-1 at 165.  Certainly, it could have been Arellano's husband who put up the sign, but there is sufficient evidence for a jury to determine if Arellano's testimony that she put up the sign is truthful.

There is sufficient evidence that Diaz compelled support of his campaign and that Arellano, by placing a sign for his opponent on her fence—on the same street as Diaz, outwardly demonstrated that she did not support the campaign prior to her employment being terminated. *See Jordan*, 516 F.3d at 298 (finding that silence can be protected but "there must be some outward manifestation of that allegedly protected First Amendment activity"); *see also Garcetti*, 547 U.S. at 421–24 (distinguishing employee speech pursuant to official duties, which is not protected, and speech employees engage in that is analogous to private citizen speech); *O'Hare*, 518 U.S. at 714 (city's tow truck contractor refusing to contribute and displaying sign of the mayor's opponent is protected).  Additionally, failing to place the sign in her yard that Diaz had requested prior to her being transferred from the civil division to patrol duty is an outward demonstration that she was not providing the loyalty that Diaz had expressly requested in the campaign meeting.  *Cf. Jordan*, 516 F.3d at 298.

The court finds that Arellano has submitted sufficient evidence to demonstrate an issue of material fact that she engaged in protected speech under clearly established law.  *See Jordan*, 516 F.3d at 295–96 & n.17.

### (c)  Casual Connection/*Mount Healthy*

Diaz asserts that, regardless, Arellano cannot establish a causal connection between her allegedly protected speech and the alleged adverse employment action.  Dkt. 105.  Diaz contends that the evidence shows that Arellano was transferred and ultimately fired for failing to uphold her duties as a Texas deputy constable.  *Id.*  Diaz asserts that, moreover, Arellano never told anyone that she decided to stop contributing to the Diaz campaign, and he was unaware she was not supporting him and started supporting Garcia.  *Id.*  Diaz provides evidence indicating that, notwithstanding the plaintiffs' evidence, Hernandez never told Diaz that Arellano was involved in a coup to support Garcia.  Dkt. 105 (citing Dkt. 105-5 (Hernandez Dep. at 208)).  He contends, therefore, that not only can Arellano not show a constitutional violation, but she cannot show that these facts fit within any clearly established precedent that would have given Diaz fair notice that the employment actions were unconstitutional.  *Id.*  Finally, Diaz contends that Arellano's employment was terminated because of the erroneous eviction.  *Id.*

Arellano points out that Diaz lived across the street from her and knew she posted the Jerry Garcia sign at her house.  Dkt. 129.  She argues that the fact that Diaz did not initiate an IAD investigation until after she had placed the Jerry Garcia sign in her yard "highly suggests the possibility that the sign was a 'motivating factor'" in her termination.  *Id.*  Additionally, she asserts that Diaz's purported reason for the termination—the error on the eviction—should not be credited because there is no reason she should have been disciplined for the same error twice.  *Id.*  Arellano also points to two letters between Hernandez and Diaz about employees who were supporting Garcia or undermining Diaz, and a later clarification from Hernandez indicating that Arellano is one of the people he was referring to, as additional motivation for Diaz to transfer her and ultimately terminate Arellano's employment.  *Id.* (citing Dkt. 130-4, 130-5, 130-6).  And, Arellano

notes that Diaz testified that he could not remember why he terminated Arellano's employment or why he transferred her.  *Id.* (citing Dkt. 117-1 at 162, 165).  She contends that any statements to the contrary in his post-deposition declaration are inadmissible.  *Id.*  Finally, with regard to the alleged reason for her termination, Arellano notes that Sheila Felicia testified that Hernandez appeared at the disciplinary review board that considered what action to take regarding Arellano's eviction mistake, and Hernandez encouraged the members of the review board to vote to terminate Arellano.  *Id.* (referring to Dkt. 129-6).  Felicia voted to temporarily suspend Arellano, and the review board recommended a suspension.  Dkts. 129-6 (Felicia Dec.); 128-5 (Luman Dec.).

In reply, Diaz asserts that Arellano was reassigned because of the investigation relating to the wrongful eviction of a citizen, and the outcome of that investigation resulted in her employment being terminated.  Dkt. 151 (citing Dkt. 105-1 at 99, Dkt. 105-2 ¶ 59).

Here, there was clearly protected speech since Arellano put up a sign for Diaz's political opponent in her yard, and there was a clear adverse employment action after that—she was fired. The evidence of motive is as follows: (1) Arellano contends that she discontinued financially supporting Diaz's campaign, and he would have known that because he signed the campaign finance reports;[13] (2) Hernandez had communicated with Diaz prior to Arellano's transfer and ultimate termination that there were people supporting Garcia, and since Hernandez believed Arellano was in that group, a reasonable jury could believe that he identified her to Diaz, even though Hernandez denies that he informed Diaz; (3) Arellano did not put the political sign in her yard that Diaz requested prior to her transfer, and he would have known she did not since he lived on the same street; (4) prior to the transfer, Diaz "got in [Arellano's] face" when talking about how

---

[13] Q: "Did you sign those campaign finance reports?" A: "Yes." Q: "Are those campaign – are those campaign finance reports, are they accurate?" A: "To the best of my knowledge." . . . Q: "Have you ever reviewed those campaign finance reports?" A: "No." Dkt. 117-1 at 15-16.

employees that were not loyal were going nowhere; and (5) Arellano put a sign for Diaz's political opponent on her fence immediately after the transfer but before she was terminated. That motive plus the adverse employment action is sufficient to shift the burden to Diaz. *Nieves*, 139 S. Ct. at 1722.

Diaz asserts in his motion for summary judgment that he transferred Arellano while the investigation into the erroneous eviction was going on and that he eventually fired her because of the erroneous eviction. Dkt. 105. Diaz testified that he fired Arellano and that it was not due to her contributions, or lack thereof, to his campaign. Dkt. 117-1 at 93. However, he did not remember why he fired her and did not even remember that she was transferred. *Id.* at 162. He did assert that it was the right decision.[14] *Id.* at 212. He did not know if she had appeared before a disciplinary review board prior to being fired. *Id.* at 208.

Despite Diaz's lack of recollection regarding his purported reason, there is other evidence supporting Diaz's purported legitimate reason for terminating Arellano's employment. Arellano readily admits to the "error," though she asserts she was "punished" in other ways. The review board recommended a suspension. *See* Dkts. 129-6, 128-5. Thus, the members of the committee clearly felt it was an error that needed to be addressed. *Id.* And, Hernandez testified that he recommended that Diaz terminate Arellano's employment. Dkt. 105-5 at 162. He testified that he recommended termination because

> It was a serious infraction. I believe Harris County Attorney's office, we had to track down the complainant or the person that got evicted wrongfully. And she [Arellano] signed off, I believe, some kind of waiver form of the Harris County Attorney's office. And so, it was a serious violation, something that was a liability for the constable and Harris County as a whole.

---

[14] Any statements in Diaz's declaration providing the reason for terminating Arellano's employment clearly contradict this deposition testimony, and Arellano's motion to strike these statements, *see* Part III, *supra*, is GRANTED.

*Id.*  Notwithstanding the plaintiffs' contentions regarding Diaz's and Hernandez's close relationship, it is clear that both the review board and a member of Diaz's command staff recommended the employment action.

Diaz's expert, Brady, also supports Diaz's purported legitimate reason, noting that Hernandez recommended firing Arellano because he had "lost confidence in Deputy Arellano's ability to perform her job." Dkt. 105-6 ¶ 16. Brady states that it "is reasonable for an administrator to consider the recommendation of his command staff when making personnel decisions within the department."[15] *Id.* ¶ 20.

The court must determine whether, taking this evidence as a whole, it can determine as a matter of law that Diaz would have taken the challenged action even without the impermissible motive. *See Nieves*, 139 S. Ct. at 1722. As Judge Costa has noted, Diaz "faces [an] uphill climb at the summary judgment stage" to establish his *Mount* Healthy defense as a matter of law. *De La Garza v. Brumby*, No. 6:11-CV-37, 2013 WL 754260, at *6 (S.D. Tex. Feb. 27, 2013) (Costa, J.). Cases in which this defense is so established at this stage have generally involved direct evidence. *See id.* (collecting cases). Here, there is direct evidence supporting Diaz's reason for terminating Arellano's employment. While Arellano provides some evidence that indicates Diaz and those who supported him may have been motivated by Arellano's protected conduct, Diaz's evidence that others who in the normal course he would have relied upon (the review board and a member of his command staff) recommended the termination is sufficient to establish his defense as a matter of law. Arellano has not sufficiently established a question of material fact otherwise. While Arellano has shown that Diaz may have had "some retaliatory animus," "action colored by

---

[15] The court has excluded Brady's opinions that rely on Diaz's post-deposition declaration. Dkt. 194.

some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman*, 547 U.S. at 260.  Accordingly, Diaz's motion for summary judgment on Arellano's claim is **GRANTED**.

3.     **Ana Herrera (Motion, Dkt. 108, Response, Dkt. 132, Reply, Dkt. 174**)

Herrera was a deputy at Precinct Two from April 2013 until July 19, 2019.  Dkt. 130-3 (Herrera Dec.).  She started in 2013 as a reserve deputy, but she transferred to the contract patrol division in 2014 so that she could have consistent shift hours, days off, and officer status and pay. *Id.*  In 2015, she voluntarily transferred to the warrant division because it had greater flexibility, weekends and holidays off, no mandatory uniform, and a car allowance.  *Id.*  In this position, she executed Class C Misdemeanor Warrants issued by the Justice Courts of Precinct Two.  *Id.*

Herrera met with Lee Hernandez in January 2019 and told him she was interested in being promoted to sergeant.  *Id.*  She contends she met with Hernandez because he "had the Constable's ear."  *Id.*  She told Hernandez everything she had done to contribute to the Diaz campaign.  *Id.* However, Hernandez eventually advised that another person was being considered for the position whose contributions were large.  *Id.*  Blanca Martinez was promoted to the position Herrera desired.  *Id.*  Williams, who was on the command staff at the time, believed Herrera had far more experience than Martinez.  Dkt. 128-7 (Williams Dec.).

In March, Herrera told Hernandez she would not be volunteering for a Diaz campaign fundraiser because she was not doing anything for someone who did not appreciate her.  Dkt. 130-3.  Five days later, Luman advised Herrera she was being transferred to a school resource officer position.  *Id.*  She had been working in an administrative position as an IAD investigator, but the new position would be a reactive patrol-like function located at the schools within the precinct. *Id.*  Herrera asserts that this change would have been a demotion, as she would have lost her take-

home car and be required to wear a uniform, and she was not provided with a section 614.023 notice and had no disciplinary history at this date. *Id.* However, this transfer was canceled before Herrera even started because the school did not approve Herrera for this role. *Id.*

Thirteen days after Herrera advised that she was not going to help with the fundraiser, and five days after the transfer to the school resource officer position was canceled, Hernandez advised Herrera that she was being transferred to the evening shift. *Id.* Hernandez originally told Herrera that it was because of cross training, but when Herrera reminded him that she had already been on patrol, he said that it was because they did not have a female officer on evening shift. *Id.* Herrera told Hernandez that she interpreted this as an adverse employment action with fabricated excuses and explanations in direct retaliation for not participating in the campaign fundraising events. *Id.* Hernandez told Herrera her new job would begin on Saturday, March 30, 2019, but Herrera advised him that she had a pre-approved two-week vacation starting on that date. *Id.* She notes that again no section 614.023 notice was given to her, yet it was, in her opinion, a less desirable position because she lost her take-home car, had to wear a uniform, and could no longer work extra jobs. *Id.*

Herrera got sick when she was on vacation and then entered FMLA-leave status. *Id.* She remained out of the office on leave for several weeks. *Id.* On June 5, 2019, she sent a letter advising that she had submitted forms to retire, stating that her last day would be July 19, 2019. *Id.*

Herrera sued Diaz for retaliating against her for exercising her First Amendment rights. Dkt. 55. She contends that Diaz violated her right to freedom of belief, speech, and association by failing to promote, demoting, involuntarily transferring her, and later, constructively discharging her because she failed to support his re-election campaign. Dkt. 132. Diaz moves or summary

judgment on Herrera's claim, asserting that (1) Herrera did not engage in constitutionally protected speech; (2) Herrera did not suffer an adverse employment action because her alleged failure to promote and transfer claims are not actionable and she was not constructively discharged; (3) Herrera cannot establish a causal connection between the allegedly protected speech and any actionable adverse employment action because Diaz was not aware that she was not supporting him and would have reached the same decision anyway; and (4) the clearly established law did not prohibit Diaz's conduct.  Dkt. 108.

### (a)        Adverse Employment Action

Herrera argues that Diaz's failure to promote her and instead promote Blanca Martinez and the subsequent transfers or attempted transfers were adverse employment actions in retaliation for her not supporting Diaz's reelection campaign and that her retirement was a constructive discharge and thus also an adverse employment action.  Dkt. 132.  The court will address the alleged adverse employment actions *in seriatim*.

Diaz asserts that the failure to promote is not an adverse employment action because Diaz's decision to promote Martinez instead of Herrera was based on recommendation of his command staff.  Dkt. 108 (citing Dkt. 108-2 (Diaz Dec.) ¶¶ 50–51).  However, failure to promote is an adverse employment action under clearly established law, *Breaux*, 205 F.3d at 157.  The court will consider *why* Diaz did not promote Herrera in Part V.C.3, *infra*.

Diaz also asserts that the transfers were not an adverse employment actions.  Dkt. 108.  He contends that Herrera fails to show that her assignment to the school resource officer position and ultimate transfer to the evening shift caused her serious, objective, and tangible harm.  *Id.*  Herrera never reported to the school resource officer position, and her rank and salary remained the same when she was transferred to evening shift.  *Id.* (citing Dkt. 108-1 at 44–45, 61, 66–67, 71, 88,

66

Dkt. 108-8).  Moreover, according to Brady (Diaz's expert), reasonable police officers should not expert to remain in the same assignment during their time in the department.  *Id.* (citing Dkt. 108-3).

Herrera points to Luman's declaration as evidence that the transfers were adverse employment actions.  Luman states that he "was ordered to demote [Herrera] to less desirable duties" after she "declined to participate further in Diaz campaign events."  Dkt. 128-5.  Luman, claims that he was ordered by Diaz to transfer Herrera to the school resource officer position, and he testified that this position had "less desirable duties."  *Id.*

Additionally, Herrera points out that Kritzler, who was in charge of the patrol division at the time of the transfer to evening patrol, considered Herrera's transfer to the evening patrol position to be a demotion.  Dkt. 132 (citing Dkt. 128-3).  She was going from an office job to a patrol position where she would be exposed to more danger, have less control over her work assignments, and be responsible for responding to calls for service and making arrests.  *Id.* (citing Dkt. 128-3).

First, since Herrera did not ever report to the school resource officer position, the court makes no determination as to whether that would have been an adverse employment action.  It did not cause her serious, objective, and tangible harm.

The transfer to night patrol is more complicated and similar to Arellano's transfer.  *See* Part V.C.2, *supra*.  Diaz points out that Herrera never reported to the night patrol position either. Dkt. 174.  Herrera asserts that she was assigned this position, which had less desirable duties and was a demotion, and she immediately took a vacation and then FMLA leave due to a stress-related illness.  Dkt. 130-3.  Like with Arellano, the court finds that the connection between Herrera's stress-related illness and the transfer is too tenuous to constitute serious, objective, and tangible

harm and that her transfer to which she never reported thus is not an adverse employment action under clearly established law.  The court now turns to whether her resignation was a constructive discharge.

Diaz contends that Herrera voluntarily resigned and was not constructively discharged. Dkt. 108.  He argues that Herrera cannot show that her working conditions were so difficult or unpleasant that she was forced to resign.  *Id.*  He points out that Herrera testified that her working conditions were not intolerable. *Id.* (citing Dkt. 108-1 at 88).  Additionally, he argues that she does not meet the constructive discharge legal standard because she did not attempt to resolve any concerns before resigning; instead, she tendered her resignation without telling anyone at Precinct Two.  *Id.* (citing Dkt. 108-1 at 89).

Herrera contends that she was demoted, experienced a reduction in job responsibilities, and also received badgering, harassment, or humiliation by Diaz that was calculated to encourage her resignation.  Dkt. 132.  She points out that Arellano's declaration indicates that one of the people Slaughter pointed to on the computer screen when he indicated others were being punished was Ana Herrera.  *Id.* (citing Dkt. 129-1 (Arellano Dec.)).  Herrera also contends that she directly confronted Hernandez about her concerns regarding retaliation, and Hernandez just told her, "you know how the game is played here."  *Id.* (citing Dkt. 130-3).  She, like the other plaintiffs, notes that Precinct Two did not have a formal grievance coordinator until August 26, 2019.  *Id.*

First, while Herrera did testify that her working conditions were "not intolerable," the exact testimony is as follows: "I did not – I did not ever go to the transfer.  The working conditions before I was transferred were not intolerable."  Dkt. 108-1 at 88.  Thus, this statement is more of a red herring than a smoking gun.  The court thus turns to the *Brown* factors, *see* Part V.B.1, *supra*, to determine if there is enough evidence of intolerable conditions to create an issue of material fact

that Herrera was constructively discharged.  *See generally Haley*, 391 F.3d at 649–50.  The first

factor is "demotion," and there is some evidence supporting this factor.  The next factors are

reduction in salary, reduction in job responsibilities, menial and degrading work, and reassignment

to work under a younger or less experienced supervisor.  There is no evidence supporting these

factors except, perhaps, menial and degrading work, which is perhaps too strong a phrase to

describe the change in duties, but there is evidence suggesting that the duties were less desirable

in various ways.  The sixth and seventh factors are badgering, harassment, or humiliation

calculated to encourage resignation or offers of early retirement.  While Herrera contends that she

was badgered and harassed, pointing to Arellano's statement that Slaughter pointed Herrera out as

being somebody who was being punished, Dkt. 132, and Hernandez telling her she knows how the

game is played, this evidence does not strongly support this factor.  The court has found nothing

in the record showing that Herrera was aware of Slaughter pointing her transfer out in the meeting

with Arellano and others at the time or that Diaz had any hand in Slaughter's actions.  And, the

court will not consider Hernandez's response about her knowing how the game is played, as the

court excluded that comment as hearsay.  *See* Dkt. 214.  Finally, the court must consider whether

she took advantage of internal grievance procedures.  *Haley*, 391 F.3d at 652.  While Diaz asserts

that Herrera did not attempt to resolve her concerns through a grievance and instead quit without

telling anyone she was planning to do so, Herrera did advise her supervisor about her belief that

the transfers were retaliation for her decision not to participate in campaign fundraising events.

*See* Dkt. 130-3 at 2.  Thus, there is some evidence indicating that Herrera did try to complain in

the manner available to her at the time.

　　　While there is evidence supporting some of the *Brown* factors, it is, on balance, not

sufficient to meet Herrera's burden of showing that the conditions were so intolerable that a

reasonable person would have felt compelled to resign.  The court finds that on this record a reasonable jury could not find that Herrera was constructively discharged under clearly established law.  Accordingly, because Herrera did not suffer an adverse employment action under clearly established law, Diaz's motion for summary judgment on Herrera's claim is **GRANTED**.

      **4.**      **Javier Zavala (Motion, Dkt. 116, Response, Dkt. 141, Reply, Dkt. 152)**

Zavala joined Precinct Two from a campaign position, and it was his first law enforcement position.  Dkt. 141-1 (Zavala Dec.).  He was hired as a deputy, and within one year had been promoted to a day shift position over a number of other deputies with more service.  *Id.*  Zavala contends that things started to go wrong for him around the 2018 crawfish boil for Diaz's campaign.  *Id.*  At the crawfish boil, a local businessman purchased $1900 worth of items at the boil, but his credit card was declined.  *Id.*  Jessica Duran (Diaz's assistant) asked Zavala to cover the amount, and he did so.  *Id.*  The businessman only paid back $600 out of the $1900.  *Id.*  Additionally, Zavala had obtained a grill in the shape of a bull for the event and was supposed to split the cost with another person but ended up "on the hook for the whole expense."  *Id.*

On July 6, 2018, Diaz asked Zavala to donate sandwiches for a campaign event, and Zavala, given the funds he was out from the crawfish event, did not respond.  *Id.*  Zavala limited his involvement with the campaign to "chasing down sponsors for events" from July through December 2018.  *Id.*  He no longer participated in campaign planning.  *Id.*

In May 2019, Hernandez advised Zavala that a new position was being created in traffic enforcement, a position Zavala had been requesting for over a year prior to its creation.  *Id.*  However, when Hernandez mentioned "taking care of the boss," Zavala claims his response to Hernandez of "ok, yeah" was less than enthusiastic.  *Id.*  He was not chosen for the position.  *Id.*  Around this same time, he was also informed by Hernandez that his courtesy apartment would be

reevaluated in six months; if he lost the apartment, he would be forced to move. *Id.* Additionally, Paul Martinez told Zavala that he had to submit extra job requests for the provision of motorcycle escorts, and Martinez denied Zavala's requests because the time and date were not given. *Id.* Zavala contends that he could not provide the times and dates due to the nature of these extra employment opportunities. *Id.*

On June 6, 2019, Diaz had a Casino Night fundraiser, and a list on the door indicated that Zavala was to donate $250, which he did. *Id.* He thereafter stopped attending campaign events. *Id.*

In June 2019, Zavala was informed by Kritzler that Diaz had decided to transfer Zavala to a contract patrol position on the night shift. *Id.* Zavala considered this a demotion, and he was not provided with a section 614.023 notice. *Id.* During this time period, Zavala had been actively supporting Diaz's opponent on social media. *Id.*

On August 15, 2019, Zavala "resigned under duress." *Id.* He felt it was pointless to try to resolve issues via his chain of command because they were the "Diaz loyalists who were the problem." *Id.*

Zavala sued Diaz for retaliating against him for exercising his First Amendment rights. Dkt. 55. He alleges that Diaz violated his rights to freedom of belief, speech, and association by failing to promote, demoting, denying extra employment, and involuntarily transferring him because he did not support Diaz's reelection campaign and supported Diaz's opponent. Dkt. 141. Zavala also contends that he was constructively discharged. *Id.* Diaz moves for summary judgment on Zavala's claim, asserting that (1) Zavala did not engage in constitutionally protected speech or conduct; (2) Zavala's reassignment, extra employment denial, and failure to promote claims are not adverse employment actions; (3) Zavala resigned of his own volition and was not

constructively discharged; (4) Zavala cannot establish a causal connection because Diaz was unaware of his alleged protected activity and could not have been motivated by it; (5) Diaz would have taken the same action in the absence of protected activity; and (6) the clearly established law did not prohibit Diaz's actions.  Dkt. 116.

### (a) Adverse Employment Actions

Zavala asserts several alleged adverse employment actions.  First, he contends that his reassignment to the contract patrol position was an adverse employment action.  Dkt. 141.  Diaz asserts that Zavala cannot show how the reassignment caused him serious, objective, and tangible harm rising to a constitutional level because his salary, rank, and number of days off remained unchanged after the reassignment.  Dkt. 116. (citing Dkt. 116-1 at 78-79).  He argues that Zavala's subjective belief that the position was less desirable is insufficient.  *Id.*  He also points out, as he does with regard to several plaintiffs, that it is normal, as backed up by his expert, for police officers to change shifts and assignments regularly.  *Id.* (citing Dkt. 116-6).

In response, Zavala argues that he was reassigned from a day-shift proactive investigatory position to a night-shift reactive patrol position and that this was an adverse employment action. Dkt. 141.  He provides no evidentiary citations to support this argument.  *See id.*  In the background section of his brief, Zavala notes that Diaz could not recall transferring him from a "coveted position [to] night-shift [contract] patrol," so presumably Zavala is arguing that his previous position was coveted and his new position was not.  *See id.*  This is supported by deposition testimony cited by Diaz.  In his deposition, Zavala testified that the night shift contract position was an "entry-level position" and he had "already been in a – in a far superior position [in district patrol] for several years."  Dkt. 116-1 at 58, 67.  He testified that the district patrol unit is "a very sought after and coveted position."  *Id.* at 67.

72

In reply, Diaz points out that Zavala has not met his summary judgment burden because he has not provided any admissible evidence showing he suffered an ultimate employment action. Dkt. 152. The court agrees that Zavala has not met his burden of citing to evidence demonstrating that there is an issue of material fact supporting his claim that the reassignment is the type of adverse employment action that would form the basis of a retaliation claim under clearly established Fifth Circuit law.

Zavala also asserts that being denied the ability to work extra jobs was an adverse employment action. Diaz notes, however, that Zavala himself admitted that Martinez approved his extra employment request to be a courtesy officer; he merely required Zavala be re-evaluated in six months rather than a year. Dkt. 116 (citing Dkt. 116-1 at 119). With regard to a request to be a police escort, Martinez denied the request because, as Zavala noted during his deposition, Zavala did not provide information about the time, location, and name of company that was on the form. *Id.* (citing Dkt. 116-1 at 118). Diaz also points out that extra employment opportunities are not guaranteed and require supervisor approval. *Id.* (citing Dkts. 116-2, 116-6). Moreover, Diaz contends that under the Fifth Circuit's narrow view of "adverse employment action," denying extra employment opportunities that are not guaranteed anyway does not qualify as an "ultimate employment decision." *Id.*

In his response, Zavala asserts that he provided security at an apartment complex which provided him with an apartment. Dkt. 141. This was an extra job, and Martinez decided to revoke Zavala's courtesy apartment in February 2019. *Id.* However, when Zavala let him know he had already moved in, Martinez reconsidered and told him he would re-evaluate in six months. *Id.* Zavala also notes that Zavala was denied extra motorcycle escort jobs in July 2019 because he

could not explain to Martinez exactly when the work would be completed, which Zavala contends is impossible because these jobs come up at a moment's notice.  *Id.*

The court agrees with Diaz that these employment decisions are not the types of employment decisions that are considered adverse employment actions under clearly established Fifth Circuit law.  *See* Part V.B.1, *supra* (discussing what types of actions qualify).

Zavala also argues that the failure to promote him is an adverse employment action.  *Id.* Diaz argues that expressing an interest in a position does not entitle one to a promotion.  Dkt. 116. Diaz contends that it was within his discretion to promote employees he found suitable, and Zavala has no evidence to support that Diaz's promotion of a different officer was an adverse employment action.  *Id.*

Zavala again offers no evidentiary support of his argument that the failure to promote was an adverse employment action.  *See* Dkt. 141.  He does not even cite to his own deposition or declaration.  *See id.*  However, since failure to promote is on the list of the types of actions considered to be adverse employment actions in the Fifth Circuit, the court will consider whether Zavala has any evidence that his alleged protected activity caused Diaz to promote somebody else instead.

Finally, Zavala contends he was constructively discharged.  Diaz argues that Zavala voluntarily resigned and that nobody gave him an ultimatum to resign or forced him to write a resignation letter.  Dkt. 116 (citing Dkt. 116-1 at 130-31).  Zavala contends that he did not tell anyone for fear of retaliation, which Diaz points out is an insufficient reason for a constructive discharge claim.  *Id.* (citing *Bennington*, 157 F.3d at 378).  Diaz contends that Zavala cannot demonstrate that his working conditions were so difficult or unpleasant that a reasonable employee would feel compelled to resign, noting that Zavala did not request a transfer under the Precinct's

Standard Operating Procedures and did not attempt to resolve his concerns in other ways before voluntarily resigning. *Id.* (citing Dkt. 116-1 at 89; Dkt. 116-2).

Zavala responds that the denial of extra jobs, including the initial decision to not allow him to do the security job that enabled him to stay in his apartment and then deciding to reconsider it in six months and the refusal to let him work extra motorcycle escort jobs are examples of the types of badgering, harassment, or humiliation cited in the *Brown* factors. Dkt. 141. Additionally, Zavala contends he was demoted and experienced a reduction in job responsibilities and a loss of income due to the reduction in extra jobs, all of which are responsive to the *Brown* factors. *Id.*

There is evidence in the record supporting Zavala's argument that he meets some of the *Brown* factors. Zavala testified that he decided to resign due to the "series of events as they unfolded," including a phone call with Hernandez, being moved to contract, and "being retaliated against and having my extra jobs stripped away from me, on the verge of losing my home, you know, my living – my living space." Dkt 116-1 at 128-129. However, the evidence does not support that Zavala's apartment was "stripped away from him," and it is not clear that he was barred from motorcycle escort jobs either; rather, under the evidence provided, he just needed to give Martinez additional information the information.[16] Additionally, there is no indication that Zavala asked for another transfer or attempted to resolve his concerns in any other way prior to resigning. Moreover, Zavala's testimony indicates that his reason for resigning was fear of retaliation, and clearly established law in the Fifth Circuit indicates that harassment plus fear of retaliation in the future is insufficient to establish a constructive discharge claim. *Benningfield,*

---

[16] While the court understands Zavala's point that he was unable to give Martinez the dates because these opportunities typically come up at the last minute, it does not, at least on this evidentiary record, rise to harassment. Moreover, Zavala does not provide any evidence that Diaz was involved in the denials of these extra job opportunities.

157 F.3d at 378.  Zavala testified, when asked if he told anyone if he was considering resigning, that he did not "for fear of retaliation."  Dkt. 116-1 at 123.  When asked to clarify, he said that he was afraid "they would find any reason – just like they did with David, with Cindy, with Jerry, with Robosti – to open up an Internal Affairs investigation."  *Id.* at 124.  Zavala asserted that if an investigation were opened up, it would have inhibited him from going to another department.  *Id.*

The court finds that Zavala has failed to establish that there is a question of material fact supporting his claim that he was constructively discharged.

### (b) Causal Connection/*Mount Healthy*

Assuming without deciding that Zavala engaged in a protected activity, the court turns to whether there is a causal connection between Zavala's failure to promote claim, which is the only adverse employment action still at issue, and the alleged protected conduct.

As with the other plaintiffs, Diaz contends that Zavala has no evidence that Diaz knew about Zavala's decision to not support his campaign and to instead support Garcia.  Dkt. 116.  Diaz points out that Zavala himself testified that it was his goal for Diaz to *not* find out he decided to stop supporting him.  *Id.* (citing Dkt. 116-1 at 57).  Zavala testified that his goal was "to not make it known that [he] did not want to participate in campaign events going forward."  Dkt. 116-1 at 57.  Notwithstanding the double negative, counsel clarified with Zavala, and the gist of this testimony is that Zavala did not want anyone to know he was not participating.  *See id.*  Zavala testified that he supported Jerry Garcia from day one of Garcia's campaign but that he could not do so openly because it "would have been career suicide."  *Id.* at 85.  He noted that he did "like Garcia's posts from time to time, but he "tried to keep [his] support for him as quiet as possible."  *Id.* at 85-86.  Zavala said he was "not that foolish to think that . . . Chris Diaz would not retaliate against me for – for not supporting him and supporting another candidate."  *Id.* at 86.  Zavala

believed Diaz would have been monitoring Garcia's Facebook and would have known, but he has no evidence that Diaz did so, and he could not think of any other actions demonstrating Zavala's support for Garcia that Diaz would have known about. *Id.* at 89-90.

Zavala responds that when he asked to be promoted, Hernandez told him, "We need to take care of the boss, and we need to make sure he gets elected." Dkt. 141 (citing Dkt. 141-1). Zavala contends that his response, "ok, yea" was less than enthusiastic. *Id.* Zavala believes that Hernandez reported this back to Diaz and that this is the reason that Mitchell was promoted instead of Zavala. *Id.* (citing Dkt. 141-1). Zavala asserts that he "attempted to get back into Diaz's good graces – and attended the June 6, 2019 casino night fundraising event [and] even donated some money as well, but the damage had already been done." *Id.* (citing Dkt. 141-1).

The court finds that Zavala has not provided enough evidence that there is a causal connection between his alleged protected activity and the failure to promote. There is no discussion of why Zavala was more qualified and should have been promoted. Zavala does state in his declaration that he failed to respond to Diaz's request for a sandwich donation soon after he had to cover a significant expense related to a crawfish fundraiser, and perhaps was not enthusiastic when he answered in the affirmative about helping out when Hernandez allegedly pressed him, but the fact that Zavala testified that he was trying to hide his lack of support and that he later attended the casino night and donated $250 significantly diminishes any probative value that failing to respond to one request for sandwiches may have had. Moreover, Zavala does not refer to the sandwich incident in his response. The court finds that Zavala has not presented sufficient

evidence to demonstrate that there is an issue of material fact that he engaged in a protected activity that caused Diaz not to promote him.[17]

Diaz's motion for summary judgment on Zavala's claims is GRANTED.

### 5.    Reed Clark (Motion, Dkt. 107, Response, Dkt. 131, Reply, Dkt. 182)

Clark was a Precinct 2 deputy who was hired directly from his campaign position. Dkt. 128-9.  He worked for a short time in patrol and then was transferred to a newly created community outreach division.  *Id.*  His primary responsibilities were organizing events, fundraisers, silent auctions, and block walking.  *Id.*  He states that he spent a lot of time securing donations for Diaz.  *Id.*  Bellotte, who was a senior lieutenant running the community outreach division, had Clark deliver some supplies earmarked for Hurricane Harvey victims to her house, and Clark reported this to Luman, who was the chief; Luman reported it to the Texas Rangers.  *Id.* The Texas Rangers initiated a corruption probe, and Clark provided testimony that he contends was "unfavorable to Bellotte and Diaz" in response to questions by Texas Ranger Daron Parker in April 2018.  *Id.*  After Clark participated in the Texas Rangers investigation, he no longer received notifications about campaign events and was removed from the campaign's social media outlets. *Id.*

Lee Hernandez replaced Bellotte as head of the community outreach division after the Texas Rangers investigation, and on October 3, 2018, Clark advised Hernandez that he did not want to participate in the Diaz campaign.  *Id.*  Clark notes that he was aware that Diaz called those

---

[17] In an abundance of caution, the court notes that even if Zavala had demonstrated an issue of material fact that his transfer was an adverse employment action, his deposition testimony supports Diaz's asserted reason for reassignment for that action as well.  Diaz contends that he reassigned Zavala due to the needs of the precinct, and he notes that Zavala himself admitted during his deposition that the precinct needed more manpower on the night shift.  *Id.* (citing Dkt. 116-1 at 127-28; Dkt. 116-2).  Zavala testified that they "really needed more deputies on – on the night shift."  Dkt. 116-1 at 127.

who did not support the campaign "broke-dick deputies."  *Id.*  On the same day, Luman advised Clark that he would be placed on a different shift.  *Id.*  Luman states that Diaz ordered Clark's transfer to a less desirable position."  Dkt. 128-5.  On October 16, 2018, Clark was transferred from his administrative position to a reactive patrol assignment that was a contract patrol assignment, and he had to go from day shift to the night shift.  Dkt. 128-9.  During his deposition, Diaz did not recall reassigning Clark and did not know if his take-home car was removed.[18] Dkt. 117-1 at 132–33.

After the reassignment, Clark asserts that he told Diaz he would no longer be block walking or helping the campaign.  Dkt. 128-9.  During his deposition, Diaz denied ever meeting with Clark and hearing that he would no longer donate to the campaign.[19]  Dkt. 117-1 at 130.  Clark notes that he received a Certificate of Appreciation on November 20, 2018.  Dkt. 128-9.  On June 9, 2019, Clark tendered his resignation; he contends that he "was forced to resign" after experiencing "multiple adverse employment actions."  *Id.*

Clark sued Diaz for retaliating against him for exercising his First Amendment rights. Dkt. 55.  Clark argues that his demotion to contract patrol and transfer from day shift to night shift, which included being deprived of the ability to work extra jobs on the weekends, were adverse employment actions in retaliation for Clark's decision to not support Diaz politically and for his participation in the Texas Rangers investigation.   Dkt. 131.   Clark also contends he was constructively discharged.  *Id.*  Diaz moves for summary judgment on Clark's claim, arguing that

---

[18] In Diaz's post-deposition declaration, he states that he moved Clark to the patrol supervisor position because the patrol needed a supervisor.  Dkt. 104-2.  This is in direct conflict with his deposition testimony that he did not recall the transfer.  The plaintiffs' motion to strike the conflicting statement in the post-deposition declaration is GRANTED.

[19] This is consistent with Diaz's post-deposition declaration where he states that he "never met with Rodriguez and Clark about their purported decision to withdraw support from my campaign." Dkt. 104-2.

(1) Clark did not engage in protected speech; (2) Clark was not subjected to an adverse employment decision; (3) Diaz would have transferred Clark even if he had not engaged in allegedly protected speech; and (4) the clearly established law did not prohibit Diaz's actions. Dkt. 107.

### (a) Adverse Employment Actions

Diaz argues that the transfer was not an adverse employment action. Dkt. 107. Diaz asserts that Clark cannot show that the transfer to the patrol division caused him serious, objective, and tangible harm, pointing out that after Diaz transferred Clark to the night patrol shift, Clark continued to work for nine more months until he tendered his resignation, giving two-week's notice. *Id.* (citing Dkt. 107, Ex. 1 at 96, 97, 100, 101; Dkt. 107, Ex. 5). He notes that Clark's compensation, rank, and number of days off did not change, and the only harm Clark pointed to in his deposition is incurring toll road expenses when he temporarily did not have a take-home vehicle. *Id.* (citing Dkt. 107, Ex. 1 at 38, 39, 47). Additionally, Diaz asserts that Clark's constructive discharge claims fails as a matter of law because under Fifth Circuit law, (1) fear of future retaliation is insufficient to support a constructive discharge claim; (2) Clark did not ever file any complaints about the transfer or Diaz; and (3) Clark's resignation nine months after the transfer to the patrol division was not because of retaliation but because he had a new job at Precinct Six. *Id.* (citing Dkt. 107, Ex. 1 at 11, 96, 97, 100, 101 & Ex. 5).

Clark provides evidence that he, similar to Anderson, was stripped of administrative duties, placed on a reactive patrol, and switched from day shift to night shift. Dkts. 131; 128-9. While Clark did not lose his car allowance or the number of people he was supervising, like Anderson, the patrol job was more dangerous, at night, and he had to wear a uniform. This transfer occurred after Clark told Hernandez, who had replaced Diaz's "work wife" after the Texas Rangers

investigation, that he was no longer going to participate in Diaz's campaign.  Dkt. 128-9.  Clark

provides evidence that his boss, Luman, thought of the transfer as a demotion.  *See* Dkt. 128-5

(Luman Dec.).  Additionally, all of the plaintiffs in this case who were similarly transferred from

the civil division to patrol considered it a demotion.  This is sufficiently similar to *Click v.*

*Copeland*, where the sheriff transferred two deputies to different positions after they engaged in

protected conduct and since the positions were less interesting and prestigious, it was an adverse

employment action.  *See Click*, 970 F.2d at 110.

      While the transfer may be considered an adverse employment action, Clark has not

provided sufficient evidence that he was constructively discharged several months later.  The

evidence that Clark offers to support his constructive discharge claim is that he was "demoted,"

his job responsibilities were reduced, his wife divorced him after he was placed on night shift,

every other person who had participated in the Texas Rangers investigation had experienced a shift

change or termination, and he believed a change in the IAD department was for the purpose of

weaponizing that department so that they could bring false IAD claims against employees like

Luman and Arellano.  *See* Dkt. 131.  However, Clark stayed on the night shift for nine months and

only quit after he had secured other employment.  Clark cites a Third Circuit case for the argument

that "'a jury could conclude that the conditions of [Clark's] employment were intolerable, and that

while [Clark] had the fortitude to stay, [Clark's] strength finally failed.'"  *Aman v. Cort Furniture*

*Rental Corp.*, 85 F.3d 1074, 1084-85 (3rd Cir. 1996).  The court, however, does not find this

authority very persuasive in light of Fifth Circuit caselaw that requires working conditions in a

constructive discharge situation to be "so difficult or unpleasant that a reasonable person in the

employee's shoes would have felt compelled to resign." *Landgraf*, 968 F.2d at 429.  Additionally,

"fear of future retaliation is not sufficient to support [a] claim of constructive discharge."

*Benningfield*, 157 F.3d at 378.  Clark has not met his summary judgment burden of demonstrating there is an issue of material fact that his working conditions were that difficult or unpleasant.

Accordingly, Diaz's motion for summary judgment based on Clark's claim that he was constructively discharged is **GRANTED**.

### (b) Speaking as a Citizen on a Matter of Public Concern

Clark argues that the following is protected speech: (1) his choice not to support Diaz politically, which Clark contends he directly communicated (pre-transfer) to Hernandez and (post-transfer) to Diaz; and (2) his report to Luman and eventually the Texas Rangers about Diaz's "work wife," Bellotte.  Dkt. 131.  With regard to the first, Diaz argues that Clark did not mention his alleged withdrawal from the campaign to Diaz.  Dkt. 104.  With regard to the Texas Rangers, Diaz argues that Clark was not speaking as a citizen on a matter of public concern.  *Id.*

The court will begin with the Texas Rangers report since that was the first chronological event.  Diaz does not argue that Clark's speech to the Texas Rangers was not a public concern, nor could he plausibly do so.  "It is well established that speech exposing or otherwise addressing Malfeasance, corruption or breach of the public trust, especially within the police department, touches upon matters of public concern."  *Graziosi*, 775 F.3d at 738 (relying on *Branton v. City of Dallas*, 775 F.3d 731, 738 (5th Cir. 2001)).  Thus, the court finds that Clark was speaking on a matter of public concern when he reported Bellotte's conduct to Luman and participated in the Texas Rangers investigation.

Diaz argues, though, that Clark does not get past this prong of his prima facie burden because Clark's report and participation was as an *employee* of Precinct Two, not as a *citizen*.  Dkt. 107.  He argues that Clark's report to Luman was within his chain of command and Clark's eventual participation in the Texas Rangers investigation is merely a continuation of his report up

his chain of command to Luman; Diaz asserts that it thus follows that Clark was speaking as an employee pursuant to his official duties, not as a citizen.  *Id.*  (relying on *Lane*, 573 U.S. at 240). Specifically, Diaz contends that Clark only learned about Bellotte's misappropriation *because* he was an employee, and Bellotte's conduct undermined Clark's ability to do his job and the Precinct's ability to protect citizens.  Dkt. 107.  Diaz thus contends that reporting on an alleged theft that occurred while Clark was on duty and participating in the investigation fell within the scope of Clark's duties.  *Id.*

Clark contends that the complaint about Bellotte was not related to his ordinary job duties. Dkt. 131.  Clark was assigned to the community outreach division, and his primary responsibility was representing the Precinct at community events and interacting with the community.  *Id.* (relying on Ex. 29 at 19).  Clark also contends that he ignored his usual chain of command, bypassing both Bellotte and Verbosky, and reported the conduct to Luman.  *Id.* (citing Ex. 29 at 17).

"Under the first step of the *Pickering* analysis, if the speech is made pursuant to the employee's ordinary job duties, then the employee is not speaking as a citizen for First Amendment purposes, and the inquiry ends."  *Garcetti*, 547 U.S. at 421.  It is well established that speech concerning information acquired through employment does not necessarily transform that speech into employee, rather than citizen, speech.  *Lane*, 573 U.S. at 232.  Additionally, "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes."  *Id.* at 238.  Courts determining what constitutes "ordinary" job duties may not infer the scope of a public employee's job duties based on generalities; rather, it must consider the "day-to-day duties" of the public employee.  *Howell*, 827 F.3d at 524 (refusing "to infer solely from a Louisiana law enforcement officer's non-specific duty

to 'detect and prevent crime' that [the plaintiff], as a local police officer, had an ordinary duty to participate secretly in an FBI investigation of coworkers' and superiors' illegal conduct"). "[W]hen employees speak outside of their chain of command and outside of their job duties they are entitled to First Amendment protection." *Anderson* 845 F.3d at 603.

The questions for the court, in determining whether Clark's speech was as a citizen or an employee, are whether Clark's actions were taken outside of his ordinary job duties and outside of his chain of command.[20]  The court turns first to the chain of command.  Clark argues that he went outside of his normal chain of command because he skipped both Bellotte and Verbosky in his chain of command and reported directly to Luman.  *See* Dkt. 128-9.  Diaz argues that Luman was part of Clark's chain of command, so his speech is not protected.  Dkt. 107.  The court has reviewed the authorities, and the "chain of command" cases are not about skipping rungs in the ladder, they are about using a completely different ladder.  *See Howell*, 827 F.3d at 524 (police officer reporting to the FBI); *Gibson v. Kilpatrick*, 773 F.3d 661, 670 (5th Cir. 2014) (noting that one of the factors the Fifth Circuit has considered when determining whether public employee speech is citizen speech is "whether the employee's complaint was made within the chain of command or to an outside actor, such as a different government agency or the media").  Thus, reporting to Luman would be considered reporting within the chain of command under clearly established law. However, that does not end the inquiry, as the court must also consider the participation in the Texas Rangers investigation and whether this reporting was within Clark's ordinary duties.

---

[20] Diaz argues in his reply that the court should rely on *Williams v. Dallas Independent School District*, 480 F.3d 689, 693 (5th Cir. 2007), which indicated that a public employee's speech is pursuant to official duties if it is "made in the course of performing his employment."  Dkt. 182. However, *Williams* was decided before the U.S. Supreme Court added "ordinarily" to the mix in *Lane* in 2014.  *See Anderson*, 845 F.3d at 595–96.

Diaz argues that *Corn v. Mississippi Department of Public Safety* and *Foerster v. Bleess* support his argument that the speech is not protected because Clark was acting as an employee.[21] In *Corn*, the Fifth Circuit considered claims of two state employees whose employment was terminated after they notified the National Highway Traffic Safety Administration ("NHTSA") about an internal affairs investigation into whether "state troopers were writing 'ghost tickets' [or false tickets to deceased or nonexistent drivers] in order to receive overtime pay under NHTSA grants."  954 F.3d 268, 272 (5th Cir. 2020).  The district court had determined that the speech at issue was not outside of the plaintiffs' ordinary job duties and that they were thus speaking as employees, not as citizens.  *Id.* at 276.  One of the plaintiffs was the office director and represented the Governor, and the other was a division director.  *Id.* at 277.  The Fifth Circuit noted that under the terms of the complaint, it appeared that the plaintiffs' "job duties [were] closely related to the function of reporting falsified claims."  *Id.*  It observed that the plaintiffs learned about the ghost ticketing in the ordinary course of their employment and found that the reporting fell within the scope of their duties as those duties were alleged in the complaint.  *Id.*  Additionally, the court found that the report to NHTSA was a "continuation of their up-the-chain speech made to their employer."  *Id.*  One of the plaintiffs had already made these reports to the Mississippi Department of Public Safety ("MDPS") and the Governor.  *Id.*  The court held that "[b]ecause Plaintiffs' alleged speech first occurred up the MDPS and Governor hierarchy in [one of the plaintiff's] employee capacity, the similar external speech that trails is also unprotected as it tracks internal complaints."  *Id.* at 278.  This case is on point because Clark, like the *Corn* plaintiffs, first reported the conduct internally, and under this precedent his participation in the Texas Rangers

---

[21] The court notes that both of these cases were decided after Diaz's alleged adverse employment actions.

investigation is, as Diaz argues, a continuation of that speech.  However, there is an important distinction because in *Corn* the court determined that the speech fell within the plaintiffs' ordinary duties.  Here, Clark's ordinary duties did not involve reporting malfeasance.[22]

*Foerster* is similar to *Corn*.  In *Foerster*, the Fifth Circuit affirmed the district court's dismissal of the plaintiff's retaliation claim on a judgment on the pleadings.  No. 20-20583, 2022 WL 38996 (5th Cir. Jan.4, 2022) (per curiam).  The plaintiff was a police chief who alleged that he was fired for speaking out about a city council member who he believed was interfering in departmental discipline matters because the city council member was being blackmailed.  *Id.* at *1.  The police chief first told the city manager, and the city manager temporarily suspended the police chief.  *Id.*  While the police chief was suspended, the police chief informed the Mayor and selected City Council members.  *Id.*  The city manager fired the police chief shortly thereafter.  *Id.* The police chief sued for, among other things, violation of his First Amendment rights.

In determining if the *Foerster* plaintiff spoke as a "citizen on a matter of public concern*,* the Fifth Circuit noted that if the employee speaks "'pursuant to employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees.'"  *Id.* at *2

---

[22] Clark described his "job duties" during his deposition as follows: "Many things. One, to attend all HOA and civic-club meetings or have deputies scheduled to attend, to oversee our reserve deputy divisions, hold monthly meetings with the reserves, maintain their hours of service for their education – continuing education credits, also for providing deputies at all of Mayor Ana Diaz and Christopher Diaz's, Constable Diaz's, child's baseball games or provide reserve deputies for personal security, also for helping to organize campaign fundraisers, also to make contacts with business owners to build those relationships so that we can go back and get more money for Constable Diaz from the business owners within Precinct 2. Both him and Lieutenant Bellotte spoke to me about this. . . . I was also required to be a chauffeur for Mayor Ana Diaz and Constable Diaz with also Deputy Rodriguez for chauffeuring them to concerts, football games, baseball games and being personal security." Dkt. 131-1 at 21–22.  In his declaration, he says his "primary responsibility . . . was that of organizing events, fundraisers, silent auctions, and block walking, not law enforcement; and I spent a considerable amount of time securing donations for the Diaz campaign." Dkt. 128-9.

(quoting *Garcetti*, 547 U.S. at 424).  The court instructed that in determining whether the employee is speaking pursuant to his, her, or their official duties, the court has "considered the relationship between the speech and the employee's job, whether the speech was made up the chain of command, and whether the speech resulted from special knowledge acquired as an employee," but "[n]one of these factors [is] dispositive."  *Id.*  In considering these factors, the court noted that the police chief initially reported that a subordinate had information that was potentially embarrassing to a city council member to his direct supervisor, the city manager, and this "report was made due to his role as a department head."  *Id.*  Additionally, the report was in his direct chain of command. *Id.*  Though the later complaints were made to the mayor and some council members, the court determined that "there [was] no reason for [the court] the enter the analytical labyrinth of the statutes and ordinances relevant to the structure of city governance . . . in order to decide whether [the plaintiff] exited his chain of command" because in "'mixed' chain of command speech," the court's recent cases had "stressed that employee speech, made within or outside the chain of command and which would otherwise be unprotected from being the basis of discipline, is not transformed into protected speech simply by continuing to express those same concerns to certain external parties."  *Id.* at *3 (citing *Corn* and *Anderson v. Valdez*, 913 F.3d 472, 478 (5th Cir. 2019)).  Whether or not the police chief had exited his chain of command with the subsequent speech, because he began with his direct supervisor, the "substance of those emails was a continuation of the original complaints"; the Fifth Circuit determined that the police chief "never acted as a private citizen but instead was seeking within the structure of city government to perform his official duties in the most effective way he could."  *Id.* at *4.

The *Foerster* court distinguished *Lane v. Franks* because *Lane* involved giving truthful testimony under oath and an independent legal obligation to tell the truth, while the *Foerster*

plaintiff "was not called before any court" and "there [was] no evidence of an ongoing investigation into wrongdoing" in the city.   Additionally, the plaintiff's "ordinary job responsibilities included maintaining order and morale in his department." *Id.*  The court agreed that the facts were "troubling" because the plaintiff was reporting what he considered improper actions, but it determined that the city manager had the discretion to restrict speech in this situation—when it is made pursuant to official duties. *Id.*

Here, certainly Clark, like the *Foerster* plaintiff, worked for a law enforcement agency, but Clark was not a high-level employee responsible for making sure everything was running smoothly in the precinct.  He worked in community relations, and he reported to Luman what can only be considered a public concern and then participated in the Texas Rangers investigation, which was, unlike in *Foerster*, an "investigation into wrongdoing"[23] and, unlike *Corn*, outside of Clark's ordinary job responsibilities.  The court must consider whether these distinctions are sufficient under law that was clearly established at the relevant time to find that Clark's speech was protected.

"The First Amendment . . . protects some expressions related to the speaker's job." *Id.* *Garcetti*, 547 U.S. at 421.  However, if the statements are made pursuant to "official duties" then the employees are not speaking as citizens, but "[f]ormal job descriptions often bear little resemblance to the duties an employee is actually expected to perform." *Id.* at 424-25.  "[A] general job-imposed obligation to detect and prevent wrongdoing does not qualify as an employee's 'official duty' because 'such broad [obligations] fail to describe with sufficient detail the day-to-day duties of a public employee's job.'" *Anderson*, 913 F.3d at 477 (pointing out that *Lane*, a 2014 Supreme Court case, was not yet clearly established law when the plaintiff in that case was fired

---

[23] Clark asserts in his declaration that he "provided truthful testimony to the Texas Rangers." Dkt. 128-9.

in 2014) (also pointing out that post-*Garcetti* and pre-*Lane*, the Fifth Circuit had "repeatedly held that employees speaking in discharge of job-imposed obligations to report wrongdoing did so as public employees—not as citizens" but that *Lane* brought some "clarity").  In reporting Bellotte's alleged misconduct, even though Clark started the conversation in his chain of command and the conversation was about something he only learned about as a public employee, it was not his ordinary job as a person in community outreach to report the misconduct.  Clark would not ordinarily be involved in reporting conduct like Bellotte's.  Thus, notwithstanding the fact that he started his report within the chain of command and learned about Bellotte's conduct at work, the court finds that Clark was speaking as a citizen on a matter of significant public concern when he participated in the Texas Rangers investigation under clearly established law.

The court now turns to Clark's contention that Clark's withdrawal of support of Diaz's campaign in the face of compelled speech is protected.  As noted with the other plaintiffs, failing to support the campaign when compelled to do so is protected so long as the failure to support is demonstrated in some outward way.  Diaz contends that Clark does not provide any evidence that Diaz compelled support of his campaign. Dkt. 182.  The evidence provided by the parties shows that Clark "objected to a requirement to be involved in campaign fundraisers," and additionally, since Clark was involved in community outreach, that he attended the meetings where Diaz made demands for support.  *See* Dkt. 128-9.  Clark also asserts that on October 3, 2018, he told Hernandez, who had replaced Diaz's "work wife," that he "no longer desired to participate in the Diaz campaign."  *Id.*  Thus, Clark has shown Diaz expected him to participate in campaign functions and he demonstrated his lack of support in some outward way.  The court finds that Clark has satisfied this element of his prima facie burden as to both the Texas Rangers investigation and his silence in the face of compelled speech claim.

### (c) Casual Connection/*Mount Healthy*

Diaz argues that Clark cannot show that he knew about either Clark's decision not to support his campaign or Clark's participation in the Texas Rangers investigation, so Clark cannot show there is an issue of material fact as to causation.  Dkt. 107.

With regard to the decision not to support the campaign, Diaz argues that he did not know that Clark was not supporting the campaign.  *Id.*  Diaz testified that he did not ever meet with Clark and learn that Clark decided not to donate to the campaign. Dkt. 117-1 at 130.  He also testified that he did not remove Clark from social media and was unaware of Clark being removed from the social media.  *Id.*  Diaz did not remember reassigning Clark to the night shift.[24]  *Id.* at 132.  He also could not remember if Clark's take-home car was removed.  *Id.* 133.  Diaz's lack of memory regarding transferring Clark or Clark's decision not to donate merely indicate there is an issue of material fact; it does not destroy causation.

Clark provides various evidence to support his assertion that Diaz transferred him because he was no longer supporting Diaz's campaign.  Clark asserts that the campaign finance reports demonstrate that he discontinued donating to the campaign and that Diaz knew it because he signed them.[25]  Dkt. 131.  However, Clark states that he discontinued donating after October 25, 2018, so

---

[24] In his post-deposition declaration, Diaz asserted that he reassigned Clark to the patrol division because he needed a precinct supervisor on patrol and Clark was a good fit for the position. Dkt. 104-2 ¶ 22.  This is in direct conflict with his assertion during the deposition that he did not remember assigning Clark to the night shift, and it would be unfair for the court to rely on it as summary judgment evidence when the plaintiffs have not had a chance to cross examine Diaz on the reasons he now provides.  Accordingly, the objection to this part of Diaz's declaration is SUSTAINED.

[25] Clark asserts that the campaign finance reports demonstrate that he donated $1,720 to the campaign through October 25, 2018, and then discontinued donating. Dkt. 131 (citing Pls.' Ex. 17 (Dkts. 129-3 & 129-4)).  However, Diaz objected to this evidence because the plaintiffs, including Clark, do not provide page numbers for the court to review in this voluminous exhibit. The court sustained that objection to the extent the plaintiffs expect the court to sift through exhibit to find the evidence they contend supports their claims.  *See* Dkt. 214.  Plaintiffs' Exhibit 17 is

this does not support causation for the transfer, which occurred on October 16, 2018.  Clark also notes that during his deposition he told Diaz and Bellotte that he was not going to "go back and get more money for Constable Diaz" during business hours and that he instead was doing it during his days off.  Dkt. 131-1 at 22.  He provides arguments about other alleged discussions he had with Diaz and Hernandez, but the pages he cites to in plaintiffs' exhibit 29 for support are not included in the version that was provided to the court.  *See* Dkts. 131 at 11, 131-1.  The court cannot depend on argument as summary judgment evidence.  It may, however, rely on Clark's declaration, to the extent it has not excluded portions pursuant to Diaz's objections.  Clark indicates in his declaration that he advised Hernandez prior to his transfer that he was no longer going to participate in the campaign, was advised his shift would be changed on the same day, and was transferred to the patrol division two weeks later.  There is significant evidence in the record that Hernandez "had Diaz's ear," as noted in the discussion of other plaintiffs' claims.  Thus, the court finds that a jury could reasonably infer from this timing alone that the transfer was retaliation.

Additionally, Clark also relies on evidence that Diaz had a motive to retaliate because Clark participated in the Texas Rangers investigation.  Diaz argues that he was not aware of this allegedly protected speech, so he could not have been motivated by it.  Dkt. 107.  When Diaz was asked during his deposition if he had any knowledge of Clark participating in the Texas Rangers investigation, he said, "I can't remember."  Dkt. 117-1 at 46.  He asserted that he did not receive a copy of the investigation until about one month before his deposition.  *Id.* at 47.  In Diaz's post-deposition declaration, he states that he did not receive a copy of the Texas Rangers investigation

---

contained in docket entries 129-3 and 129-4; docket entry 129-3 is 464 pages and docket entry 129-4 is 465 pages.

and had no knowledge of Clark's alleged testimony, which is for the most part consistent with the deposition.[26]  Dkt. 104-2 ¶ 25.

Notwithstanding Diaz's assertion that he had no knowledge of the Texas Rangers investigation until his counsel gave him a copy right before his deposition, Clark testified during his deposition that Hernandez told him that Diaz was aware of the Texas Rangers investigation report.  Dkt. 131-1 at 67.  Due to the conflicting testimony, the court finds there is an issue of material fact as to whether Diaz knew about Clark's participation in the investigation.  This evidence supports Clark's assertion that he was transferred because he engaged in protected activity.

Finally, Diaz asserts that he transferred Clark for other reasons, but he cites excluded portions of his post-declaration deposition to support these reasons and thus cannot meet his *Mount Healthy* burden.

The court finds that there are issues of material fact under clearly established law as to whether the transfer was an adverse employment action and whether Diaz took the adverse employment action because of Clark's protected conduct.

Diaz's motion for summary judgment on Clark's claims is **GRANTED IN PART AND DENIED IN PART**.  Diaz's motion for summary judgment on the discrete issue that Clark was constructively discharged is **GRANTED**.  Diaz's motion for summary judgment on Clark's claim is otherwise **DENIED**.

---

[26] Except for the admission that he did receive a copy of the investigation from counsel prior to the deposition, these statements are not inconsistent.  The plaintiffs' motion to strike Diaz's declaration is OVERRULED as to this paragraph.

6.       **Ricardo Rodriguez (Motion, Dkt. 113, Response, Dkt. 136, Reply, Dkt. 183)**

Rodriguez was hired as a Precinct Two district patrol deputy on the evening shift on July 23, 2016.  Dkt. 136-1.  His days off were Thursdays and Fridays.  *Id.*  During 2016, Rodriguez participated in various campaign activities, including phone-banking and putting up signs.  *Id.*  In May 2017, he was transferred to the community outreach division where he worked under Kim Bellotte.  *Id.*  With the new job, he had Saturdays, Sundays, and holidays off, and his work was more flexible.  *Id.*  Rodriguez continued to participate in campaign events for the next couple of years.  *Id.*

On April 16, 2018, Rodriguez gave a statement to the Texas Rangers as part of the investigation into Bellotte's use of Hurricane Harvey relief for campaign events.  *Id.*  Rodriguez contends that Bellotte became hostile towards him after this, and he stopped receiving notifications and invitations to attend campaign events.  *Id.*  He was also removed from the social media outlets for the campaign and from Diaz's personal Facebook account.  *Id.*  His last participation in the campaign was attending a crawfish fundraiser in May 2018.  *Id.*

In October 2018, Clark and Rodriguez were invited to lunch with Diaz at a Mexican restaurant.  *Id.*  Clark advised Diaz that neither he nor Rodriguez were going to participate in the campaign, and, according to Rodriguez, Diaz said that was disappointing.  *Id.*  Diaz denies that this happened.  Dkt. 117-1 at 130.  Later that month, Rodriguez was advised that he was being transferred to a task force, and Luman told Rodriguez that Diaz had ordered the move.  Dkt. 136-1; *see also* Dkt. 128-7 (Williams Dec.) (noting that he did not recommend that Rodriguez be transferred to the task force; rather, Diaz told Williams he was moving Rodriguez).  Diaz testified that he made the decision with Luman's and Williams's assistance and that Rodriguez "did an

excellent job." Dkt. 117-1 at 94–95.  Rodriguez viewed this move as a demotion and noted that a section 614.023 notice was not issued.  Dkt. 136-1.

On October 9, 2018, Rodriguez attended a Diaz campaign event at a Best Western where Diaz made some statements about how he gave people chances who did not care, but they better care.  *Id.*  The next day, Rodriguez met with Hernandez, who told him that if Diaz was mad at someone, he would move them, and then used Rodriguez as an example.  *Id.*  He told Rodriguez that he was being moved to an evening-shift position.  *Id.*  Around this same time, Hernandez told Rodriguez during a different meeting that he needed to find another job.  *Id.*

On October 31, 2018, Rodriguez was assigned to an evening shift position.  *Id.*  He also started on the task force.  *Id.*  Rodriguez worked on the task force until June 9, 2019, when he "was unable to cope with intolerable working conditions" and "was forced to resign."  *Id.*  This is the same day that Clark resigned.  *See* Dkt. 128-9.

Rodriguez sued Diaz for retaliating against him or exercising his First Amendment rights, including his right to participate in the Texas Rangers investigation and the reelection campaign. Dkt. 55.  Rodriguez contends that his move to a task force, separation from Clark, and demotion to evening patrol was in retaliation for participating in the Texas Rangers investigation and discontinuing his support of Diaz's reelection campaign. Dkt. 136.  Rodriguez also asserts that he was constructively discharged.  *Id.*  Diaz moves for summary judgment on Rodriguez's claim, asserting that (1) Rodriguez did not engage in constitutionally protected conduct; (2) even if he did, Diaz was unaware of this speech or conduct and thus could not have been motivated by it; and (3) Diaz would have reached the same decisions regarding Rodriguez's conduct absent any allegedly protected activity. Dkt. 113.  Diaz also argues, like with all the plaintiffs, that the clearly established law did not prohibit his actions.  *Id.*

Diaz asserts that Rodriguez's reassignments to the patrol division and task force were not adverse employment actions and he was not constructively discharged. Dkt. 113. Rodriguez contends that his transfer to the patrol division and change to the task force was a demotion and an adverse employment action and that he felt forced to resign and was thus constructively discharged. Dkt. 136.

As far as the transfer to patrol division and the task force, Diaz argues that Rodriguez cannot show that this caused him serious, objective, and tangible harm. Dkt. 113. He points out that Rodriguez's salary, rank, and number of days off did not change. Dkt. 113 (citing Dkt. 113-1 (Rodriguez Dep.) at 36. He argues that the fact that Rodriguez subjectively felt the task force was less desirable is insufficient to rise to a constitutional injury, and notes that Brady (Diaz's expert) considers working on a task force with a federal agency to be "an incredible opportunity for a law enforcement officer." *Id.* (citing Dkt. 113-3 ¶ 54).

Rodriguez argues that he was "stripped of his administrative duties in the Community Outreach Division and placed into this task force." Dkt. 136. He points out that Kritzler, who attended the meeting during which Rodriguez was informed of his transfer, perceived it as "a less desirable position with a task force" and "perceived that Rodriguez was being demoted in that Rodriguez was being involuntarily moved out of the direct service of the Constable . . . and into some unknown investigative role, separated away from other members of the department, and then forced to work varied hours and days off." Dkts. 128-3; 136.

While Rodriguez was moved to evening shift, he was very shortly thereafter moved to the task force. Dkt. 136-2 at 27 (testifying that he was on the task force from November 2018 until he left the precinct in June of 2019). Rodriguez does not provide details about how long he was on evening patrol or how that impacted his life, and he does not indicate if he had to work different

hours, weekends, evenings, or wear a uniform and be in a dangerous position working on the task force.  *See* Dkt. 136.  The evidence he presents instead indicates that he did not want to move to the task force because he perceived it as retaliation.  Rodriguez testified that he believed he was moved to the task force because Diaz wanted to separate him and Clark after Clark told Diaz they were no longer going to participate in Diaz's campaign.  Dkt. 136-2 at 28.  Rodriguez's job with the task force was located at the Department of Commerce office, which is a completely different location.  *Id.*  When asked if in general task force positions are "generally considered more desirable," Rodriguez testified, "It depends on the person.  I mean, I don't know – each person is different if you consider patrol desirable or a task force desirable."  *Id.* at 29.  Rodriguez testified that when he was transferred, he kept his rank, his pay, and the same number of days off.  *Id.* at 36.  He never requested to be transferred back to community relations.  *Id.*  He does not recall any additional actions taken against him specifically after he was moved to the task force.  *Id.* at 55.  He did testify that it was a "toxic work environment" because "[t]hey could put false charges or [an] IAD complaint on [him] and [he] could be next."  *Id.* at 56.  He testified that during his time at the task force, he did not know if he "was going to get fired or something was going to happen or a complaint or investigation concocted against [him]."  *Id.*  He did not believe he could adequately concentrate on his job because of the stress.  *Id.*

Rodriguez also points to Kritzler's declaration as evidence that the move to the task force was an adverse employment action.  *See* Dkt. 136.  Kritzler noted that Rodriguez was not transferred to his command but that he was in the meeting where Rodriguez was informed that Diaz had ordered him to be transferred to a task force.  Dkt. 128-3.  Kritzler "perceived" this as a demotion because Rodriguez "was being involuntarily moved out of the direct service of the

Constable (essentially an administrative or support role to the constable) and into some unknown investigative role, separated from other members of the department." *Id.*

The court finds that Rodriguez has not met his burden of demonstrating that the transfer to the evening shift and to the task force were adverse employment actions. He does not provide any details about his new position. A transfer does not rise to an adverse employment action simply because the plaintiff does not like the new job or subjectively considers it less desirable, *Serna*, 244 F.3d at 483, and Rodriguez has pointed to no clearly established law holding that being separated from co-workers meets the standard of an adverse employment action either. Kritzler's testimony supports Rodriguez's suggestion that the role may have been less desirable to some officers, but that being less desirable to some is not the same as overall being considered less interesting or prestigious, and Rodriguez himself admitted different officers may have had different opinions about that. In sum, Rodriguez has not shown that the transfer caused serious, objective, and tangible harm. *See Breaux*, 205 F.3d at 152.

Rodriguez also argues that he was constructively discharged. Diaz asserts that Rodriguez has no evidence to support his claim of constructive discharge. Dkt. 113. He points out that Rodriguez admitted that nobody asked him to resign and that instead Rodriguez resigned because he feared future retaliation, which is insufficient under clearly established Fifth Circuit law to sustain a constructive discharge claim. *Id.*

Rodriguez contends that he has evidence supporting many of the *Brown* factors. Dkt. 136. He contends that he was demoted and experienced a reduction in job responsibilities and that he received badgering, harassment, or humiliation that was calculated to encourage resignation. *Id.* Rodriguez does not provide a citation to support his assertion that he was demoted and experienced a reduction in job responsibilities, and the court is unaware of any evidence demonstrating that

being part of the federal task force resulted in reduced job responsibilities.  And it is unclear from Rodriguez's evidence how long he even worked on the evening patrol before going over to the task force.  With regard to the badgering and harassment, Rodriguez points to his testimony that Hernandez told them if they wanted to go work somewhere else to do it, which Rodriguez interpreted as indicating that he and Clark needed to go find other jobs.  *Id.* (citing Dkt. 136-2 at 37).  This testimony was about a discussion that is discussed in paragraph 44 of the live complaint, *see id.*, and that paragraph in the complaint is about a conversation that occurred on October 3, 2018, *see* Dkt. 55.  This is before Rodriguez was even transferred, and it has very little probative value as to harassment Rodriguez felt when working at a task force in a completely different location for the following several months until June 2019.

Finally, Rodriguez argues that his fear of future retaliation affecting his prospects of employment elsewhere should be considered, citing a Louisiana district court case from 2018, and he argues that the cases cited by Diaz "apply in a para-military context."  Dkt. 136.  Rodriguez asserts that here he was justified in fearing future retaliation because Diaz "ha[d] all the power to demote or terminate Rodriguez unfettered by anyone or anything."  *Id.*  The problems with this line of reasoning are (1) the Louisiana district court case is not clearly established law; and (2) Rodriguez had worked on the task force for months with, it appears, no issues.  While Rodriguez notes that Diaz was in the process of replacing his command staff, making Rodriguez concerned about his future, Rodriguez was not on the command staff and was working in a different building with a federal task force.  And, regardless, under clearly established Fifth Circuit law, fear of future retaliation cannot support a claim for constructive discharge.  *Benningfield*, 157 F.3d at 378.  The court finds that Rodriguez has not presented enough evidence to support an issue of material fact that a reasonable person would have felt compelled to resign.

Because Rodriguez does not establish an issue of material fact supporting his claim that he suffered an adverse employment decision, Diaz's motion for summary judgment on Rodriguez's claims is **GRANTED**.

### 7.    Emily Rivera (Motion, Dkt. 112, Response, Dkt. 137, Reply, Dkt. 177)

Rivera was a clerk with Precinct Two until her employment was terminated on March 15, 2019.  Dkt. 137-1.  She was assigned to "community events" by Diaz, which Rivera describes as "thinly disguised political efforts during office hours." *Id.*  On February 21, 2019, Rivera advised Lee Hernandez's wife that she did not want to discuss political matters during hours she was working and that she would not attend campaign events while on the clock. *Id.*  On March 5, 2019, Rivera was invited to a meeting including Diaz, Lee Hernandez, Christy Hernandez (Lee Hernandez's spouse, who did not work at the Precinct), Jessica Duran, Eric Lister, Julian Garza, Blanca Martinez, Claudia Arellano, and John Miller. *Id.*  Rivera describes these people as the "inner circle." *Id.*  She did not respond to the invitation. *Id.*  Hernandez then confronted Rivera and informed her that Diaz needed her help. *Id.*  Rivera told him Diaz needed find a campaign manager. *Id.*  She also informed Hernandez she would tell Diaz no if she were asked to be the campaign manager. *Id.*  She asserts that she stopped supporting Diaz on March 5, 2019. *Id.*

Around this same time, Rivera was confronted by Diaz and his wife when Rivera did not support Diaz at his opponent's campaign event as requested. *Id.*  Rivera also had "liked" a post on Facebook by the opposing campaign. *Id.*  After this occurred, Rivera believed there was "nothing for [her] to do but resign while she could" because she felt she was being perceived as disloyal. *Id.*  Rivera resigned on March 15, 2019.  Dkt. 112-3.

Rivera sued Diaz for retaliating against her for exercising her First Amendment rights. Dkt. 55.  She contends that she was constructively discharged because she failed to support Diaz's

reelection campaign.  Dkt. 137.  Diaz moves for summary judgment on Rivera's claim, arguing that (1) Rivera did not engage in constitutionally protected speech or, for that matter, any speech; (2) Rivera cannot demonstrate that Diaz knew about her protected conduct and was motivated by it and, regardless, he did not take any action based on her allegedly protected conduct.  Dkt. 112.

The court begins with protected speech.  Diaz asserts that Rivera's alleged failure to support Diaz when compelled to do so is not protected speech because there was no outward manifestation of Rivera's alleged decision not to continue supporting Diaz's campaign.  Dkt. 112. He points out that Rivera did not donate to Diaz's opponent or attend any campaign events for him until after she resigned, pointing to her deposition testimony, and though she allegedly "liked" one of Jerry Garcia's Facebook posts, she has not produced evidence demonstrating this.  *Id.* (citing Dkt. 112-1 (Rivera Dep.) at 63, 67, 77, 82).

Rivera argues that she has demonstrated a lack of support for the Diaz campaign in some outward way.  Dkt. 137.  She claims in her response that she told Lee Hernandez directly that she was no longer going to participate in the campaign.  *Id.* She contends this outward lack of support is similar to Anderson saying he would not participate in the Top Golf Fundraiser or Herrera saying she was no longer going to participate in the campaign.  *Id.*  She then asserts that the campaign finance reports demonstrate that Diaz conditions employment on donations.[27]  *Id.* (citing Pls.' Ex.

---

[27] Rivera argues that the campaign finance reports support her contention that Diaz conditions employment on support, noting that employees, friends, and family members of employees donated 60% of the total of all money raised from June 2011 to June 2019, but this evidence is dubious at best.  Dkt. 137 (citing Pls' Ex. 17 (Dkts. 129-3 & 129-4)).  Several other plaintiffs also make this argument.  However, the plaintiffs do not explain how they determined who the friends and family members of the employees were.  They also do not explain their method for calculating this percentage.  The court thus sustained Diaz's objections to these reports to the extent the plaintiffs seek for the court to sift through the pages to find evidence supporting the plaintiffs' claim, do not explain their methodology, and do not provide any expert to explain the reports.  *See* Dkt. 214.

17 (Dkts. 129-3 & 129-4)).  She argues that the "claim that Diaz does not require an employee to be politically loyal to him is belied by these campaign finance reports that Diaz himself signed." *Id.*  She also points to the rhetoric that Diaz used in campaign meetings and outlined by other plaintiffs, asserting that this rhetoric is evidence of compelled speech.  *Id.* (citing Arellano Dep.)

First, the court has thoroughly reviewed Rivera's declaration, and, with regard to demonstrating she did not support the campaign, she states that she (1) told Christy Hernandez that she was not going to discuss political matters during county hours; (2) told Christy Hernandez that she would not attend meetings that were held during county hours; (3) told Christy Hernandez that she would not attend an "inner circle" event; (4) told Lee Hernandez that Diaz needed to find a campaign manager; and (5) told Lee Hernandez that she did not have time to be the campaign manager and would tell Diaz no if she were asked to do it.  Dkt. 137-1.  Additionally, she contends that she and others at work were berated by Diaz's spouse for failing to support Diaz at his opponent's campaign event (they left) and that Jessica Duran discovered that Rivera had liked a Facebook post by Jerry Garcia's campaign and confronted her about it.[28]  Dkt. 137-1.  The court finds that this is insufficient evidence that Rivera demonstrated her lack of support in some outward way.  Rivera failed to attend one inner circle event, said she did not want to discuss politics with her supervisor's wife during work hours, and felt Diaz needed a campaign manager but did not have time to do it herself.  Unlike Anderson, who directly told Diaz he was not participating in the Top Golf event and allegedly was chastised directly by Diaz for that refusal, Rivera's evidence requires multiple evidentiary leaps to get to Diaz.  Additionally, Rivera herself asserts

---

[28] Rivera testified that the "Facebook post that [she liked] was around the same time before [her] resignation.  And [she does] not recall, but it had to have been within the year of 2019, so sometime between November when he announced till March.  [She did not] recall the exact time and date."  Dkt. 137-1 at 77.

that Diaz told her at her going away lunch not to "forget about [him] in November."  Dkt. 137-1.

While this shows that Diaz was very focused on his campaign, it also goes against Rivera's

assertion that Diaz knew she had withdrawn her support from his campaign.  The court finds that

Rivera has not provided sufficient evidence of engaging in a protected activity to survive summary

judgment.

The lack of evidence that Diaz compelled speech in Rivera's case supports this conclusion.

While there is some evidence of compelled speech in that Rivera contends she was asked about

being a campaign manager and claims that Ana Diaz berated Rivera for not advocating for Chris

Diaz at his opponent's campaign event, the evidence Rivera points to of compelled speech in her

response is (1) the campaign finance reports demonstrating how much employees, in general, give;

and (2) the campaign rhetoric Diaz used at campaign events where employees had to sign in.

Dkt. 137.  With regard to the campaign finance reports, the fact that a lot of employees donated to

Diaz is not sufficient evidence that employees were *required* to donate.  First, there is likely some

percentage of employees that wanted to donate, and, second, even if the percentages the plaintiffs

cite conclusorily were backed up with citations and explanations as to how the plaintiffs arrived at

the figures, there has been no expert testimony putting the percentages Rivera cites into context

with the general population of Precinct Two or comparing it to the level of employee support of

constable candidates in general.  Moreover, Rivera does not even discuss her own financial

donations.  With regard to the campaign rhetoric, Rivera does not assert that she attended the

meetings where Diaz demanded employees contribute to his campaign.  The court finds that Rivera

has failed to present evidence that there is an issue of material fact that Rivera was compelled to

support Diaz's campaign, made a decision to discontinue her support, and demonstrated her lack

of support in some outward way that would have alerted Diaz to the speech.

Finally, even if the speech or lack thereof were protected, Diaz asserts Rivera quit on her own and was not constructively discharged and that he did not even know about Rivera's decision not to support his campaign. Dkt. 112. Rivera, however, argues that she could have interpreted Hernandez's comments about Rivera's decision not to discuss the campaign or go to meetings during office hours and not being willing to be the campaign manager—"so you just said the hell with it?"—as meaning that termination was inevitable. Dkt. 137. She cites her own deposition testimony to support this assertion; the cited testimony is as follows:

> No sir. He escalated and pulled me away from the event we were at with other community members. He pulled me aside into a hallway when he questioned me and asked me if I just said, 'So you said the hell with it?' It was just me and him. His tone was very strong. He – it – it was just him. He – there was no other witnesses or any other people in the room.

Dkt. 137-2 at 25. In response to a question about why she felt like she was "pushed to resign," she said,

> There was multiple patterns of previous employees. I saw the involvement that Diaz was requesting out of me towards his campaign. I didn't want to fall into that same pattern. I didn't want to be an employee who was targeted after refusing to participate in his campaign. And it was clearly stated by Christy Hernandez when she asked me to participate in this meeting, and I responded no, then later responded – then later just did not respond and have Hernandez immediately following after – the same day . . . isolate me and pull me aside . . . . I knew we weren't to discuss political matters during county hours.
> . . . .
> And I was not going to – like I said before, I was not going to put myself in a position where I was going to have on top of a full-time student, on top of being fully employed – full-time employee be a full-time campaign manager or full-time campaign participant. I did not have the time, and I was not going to go down the same route that the previous employees had gone down.

Dkt. 137-2 at 30–32.

The court agrees with Diaz.  Rivera contends that there was "nothing for [her] to do but resign while [she] could."  Dkt. 137-1.  She does not, however, provide any evidence that the working conditions were so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign.  Rivera resigned because she was afraid she would be fired for not continuing to support the Diaz campaign, *see* Dkt. 112-1 at 74, 131-32, because Hernandez was treating her differently, *id.* at 128.[29]  This is evident in the following testimony, which goes into her mindset when she submitted the resignation letter:

> I made up my mind right before I turned in the resignation letter. I mean, who wouldn't have made up their mind right before? It only makes sense to make up your mind right before, but it wasn't something that I decided that morning today I'm going to quit.  It was something that built up, the frustration, the fear of losing my job if I didn't contribute, all this other overwhelming stuff and other evidence.  Obviously I made up my mind right before I submitted my resignation.  It was in the middle of the day.

Dkt. 112-1 at 132.  Fear of future retaliation alone is insufficient to prove constructive discharge, *Landgraf*, 968 F.2d at 429, and the only *Brown* factor that Rivera even has circumstantial evidence to support is potentially the badgering, harassment, or humiliation factor.  The court finds there is simply not enough evidence that a reasonable person in Rivera's shoes would have felt forced to resign.

Diaz's motion for summary judgment on Rivera's claims is **GRANTED**.

---

[29] Q: "Did any of your supervisors other than Lee Hernandez who you've mentioned treat you any differently after you liked the post on Jerry Garcia's Facebook page?" A: "No, sir." Q: "Other than Lee Hernandez approaching you at that event, did Lee Hernandez treat you any differently after you liked that post on Jerry Garcia's Facebook page?" A: "Yes, sir." Q: "In what way?" A: "His demeanor, the way he addressed me.  Addressing me at the event was already a different change.  He – he had been approaching me very friendly, very welcoming, you know very – I don't know.  Welcoming would be the – I guess the word that would – that would best describe."  Dkt. 121-1 at 128.

### 8.     Dwayne Pacifico (Motion, Dkt. 111, Response, Dkt. 135, Reply, Dkt. 176)

Pacifico was hired as a deputy constable on night shift patrol in Precinct Two in March 2005.  Dkt. 135-1.  He was promoted to corporal in April 2014 and sergeant in August 2015.  *Id.* He supervised approximately ten employees on each shift he worked, attended numerous training classes, and taught stop stick and taser certification classes.  *Id.*  Pacifico's employment was terminated in June 2016 due to mental health issues related to his service in the U.S. Army during Operation Iraqi Freedom.  *Id.*  He got treatment, passed the mental health evaluation, and was rehired as a deputy on night shift patrol in October 2017.  *Id.*

In January 2018, Pacifico's wife donated money to a Diaz fundraiser in response to a demand from Luman, and Pacifico was shortly thereafter made deputy investigator for the department.  *Id.*

In May 2018, Pacifico was involved in running a criminal background check of Assistant Chief Jessica Duran, and he found a prior possession of marijuana charge and gave the report to his superiors.  *Id.*  In February 2019, when Pacifico was updating the department's drivers' license and insurance statuses as part of his regular job duties, Duran did not turn in her information, and she eventually went home sick.  *Id.*  He ran a full criminal history, which revealed that Duran was using a suspended driver's license.  *Id.*  Pacifico submitted a written report about Duran's criminal history.  *Id.*

Duran returned to work in March 2019 after an extended absence.  *Id.*  On the day she returned, Luman sent out an email with eight shift changes to be effective in two days.  *Id.*  This email did not include a transfer for Pacifico, *see* Dkt. 108-5, but Pacifico decided to discontinue supporting the Diaz campaign at that time and did not go to any other events, respond to any texts, or donate any money thereafter.  *Id.*

On March 29, 2019, the day after Duran returned to work, Pacifico was told to report to duty on night shift in the patrol division. *Id.* He was also told to turn in his assigned take-home vehicle. *Id.* He was unable to make the appropriate changes with one day of notice to report to the shift because of his personal and family schedule, but he reported to the shift on April 1, 2019. *Id.* He contends that it was a less desirable position because he lost his take-home car, had to go back to wearing a uniform, lost the ability to do extra jobs, was no longer in a proactive investigatory position, and was now in a reactive patrol assignment. *Id.* He asserts he did not receive a Section 614.023 notice for the transfer, which he considered a demotion. *Id.*

Pacifico filed a whistleblower complaint relating to the change in assignment and shift asserting retaliation for his involvement in Duran's case; the complaint was delivered to Diaz and Barbara Callistien, an Assistant County Attorney, on April 2, 2019. *Id.* The next day Pacifico's supervisor, Reed Clark, told Pacifico that Lt. Clint Brown, who was not in Pacifico's chain of command, had notified Clark that Pacifico had papers delivered to Diaz and that it was "not good" for him and that Clark needed to "keep an eye on" Pacifico. *Id.* Clark told Pacifico that Brown had it "out for" him. *Id.* Brown also inquired about Pacifico's absence on March 31, 2019—the day he was unable to report to the night shift because he had only received one day of notice for his shift change.[30] *Id.*

Pacifico sued Diaz for retaliating against him for not participating in Diaz's reelection campaign and for participating in the investigation into Duran's driving on a suspended driver's license because Duran worked closely with Hernandez and Diaz, who intervened to protect her.

---

[30] The court notes that while Diaz objected to significant portions of all of the declarations the plaintiffs submitted, there were no objections to the paragraph in Pacifico's declaration about Clark's discussion with Pacifico about what Brown said. *See* Dkt. 185 (objections to Pacifico's response).

Dkts. 55, 135, 135-1.  Diaz moves for summary judgment on Pacifico's claim, arguing that (1) Pacifico did not suffer an adverse employment action; (2) Pacifico's participation in the Duran investigation was within the course and scope of his work and is not protected speech; (3) Pacifico has no evidence that Diaz knew of his non-support of the Diaz campaign; (4) even if Diaz did know, he reassigned Pacifico as part of precinct-wide schedule changes; and (5) Pacifico cannot identify any caselaw showing that Diaz violated any clearly established law when he reassigned Pacifico.  Dkt. 111.

Assuming without deciding that Pacifico suffered an adverse employment action, the court turns to whether there is a question of material fact that Pacifico engaged in protected activity, keeping in mind that Pacifico must demonstrate some outward way that he refused to support Diaz in the face of compelled speech.  Pacifico contends that he has demonstrated his lack of support in some outward way because he refused to donate, did not attend any of Diaz's campaign events, and did not respond to texts asking for donations and attendance.  Dkt. 135 (citing Dkt. 111-1 at 200).  Additionally, Pacifico claims that the campaign finance reports show that Pacifico, personally, never gave any money to Diaz's campaign.  *Id.* (citing Pls.' Ex. 17 (Dkts. 129-3 & 129-4)).  Pacifico's wife donated money in January of 2018.  Dkt. 135-1.  He claims this donation was in response to Luman telling him he was required to donate to a Diaz fundraiser.  *Id.*  This is hardly a pattern of giving that Pacifico all the sudden stopped.  With regard to Diaz compelling speech, Pacifico points in his briefing to the meeting at Spanky's discussed by other plaintiffs and asserts that employees or those associated with employees contributed a significant amount to Diaz to demonstrate that Diaz compelled employees to support him.  Dkt. 135.  But, Pacifico does not provide evidence that he attended these meetings—in fact asserting he did not attend meetings—or that he personally ever donated to Diaz and then withdrew support.  *Id.*

Diaz asserts that the campaign finance reports do not show that Pacifico outwardly engaged in any conduct, and the fact that other employees donated is not evidence that Pacifico did not support Diaz or at some point withdrew support.  Dkt. 176.  Diaz argues that these allegations of non-support are insufficient to demonstrate an outward manifestation of Pacifico's alleged decision not to support Diaz.  *Id.*  Diaz additionally asserts that Pacifico provides no evidence that Diaz compelled Pacifico to support his campaign other than another plaintiff's discussion of Diaz's stump speech at a campaign event, which is insufficient.  *Id.*

The court agrees with Diaz.  While certainly the court relies on the stump speech to demonstrate that Diaz compelled the plaintiffs to participate, here there is no evidence indicating that Pacifico heard or knew about that speech at that time.  The only evidence of Pacifico being compelled to give or participate is Luman telling him to donate one time.  Of course, there is evidence that other employees donated to Diaz's campaign.  But, not Pacifico.  Pacifico only indicates that his spouse gave once in response to the request from Luman.  He does not indicate that he went to events and then suddenly stopped supporting Diaz.  There is no evidence of an outward indication of his decision not to donate in the face of compelled speech.  In fact, according to Pacifico's declaration, he "was no longer a Diaz campaign supporter" after the email on March 30, 2019, when Duran returned to work.  His transfer was communicated on this same day.  It was effective April 1, 2019.  There is simply not enough time between Pacifico's alleged decision to stop supporting Diaz's campaign and the adverse employment action for any reasonable juror to determine that Diaz figured out that Pacifico had stopped donating and participating with the evidence Pacifico has provided.  Under clearly established Fifth Circuit law, there has to be "some outward manifestations of the allegedly protected First Amendment activity," *Jordan*, 516 F.3d at 298, and some link to demonstrate that the speech or lack thereof was a motivating factor in the

decision, *Mt. Healthy*, 429 U.S. at 287.  There is not.  Diaz's motion for summary judgment on Pacifico's claim is **GRANTED**.

      **9.**      **Sara Cynthia Vara-Leija (Mot., Dkt. 109, Response, Dkt. 133, Reply, Dkt. 175)**

Vara-Leija joined Precinct Two in 2013 as a senior sergeant/administrative worker who worked Monday through Friday on the day shift.  Dkt. 128-8.  Vara-Leija testified in the Texas Rangers investigation regarding Bellotte in April 2018, and she contends that she then stopped participating in Diaz campaign functions.  *Id.*  Six months after her testimony and decision to discontinue supporting the campaign, Diaz ordered her to participate in the high-water rescue team even though she had knee replacement surgery scheduled and a medical waiver in place.  *Id.*  Five months later, she was assigned to work under a supervisor who she had just filed a complaint against, but she was assigned back to her normal position two days later.  *Id.*

The next month, Vara-Leija was commended by her TCOLE field supervisor for a flawless audit, yet she was told by Luman, representing Diaz, that she would no longer be the TCOLE designee or on the Advisory Board and was stripped of her duties to report employee changes to TCOLE.  *Id.*  These duties were given to Bianca Martinez.  *Id.*  Vara-Leija contends that this was a demotion, yet she was not provided with a section 614.023 notice.  *Id.*  In the same month, she was told to cease working on the Violent Parolee Task Force, and inquiries for help with mental health issues or domestic violence were no longer being routed to her.  *Id.*  Also, Diaz transferred her responsibilities relating to processing new applicants to Latrisha White and ordered Vara-Leija to work in uniform.  *Id.*

In June 2019, Vara-Leija was reassigned as quartermaster overseeing a property room, which she contends is a less prestigious position than her prior one, and then in July 2019, she was ordered to move out of her office into a cubicle.  *Id.*  In mid-July she was advised her help with

the upcoming firearms qualifications was no longer needed. *Id.* She asserts that after all of these duties had been taken away, she had no real duties left. *Id.*

On July 25, 2019, Vara-Leija met with Hernandez and Paul Martinez and was notified that she was being transferred to the night watch commander position. *Id.* This was a patrol shift and reactive assignment, which she asserts was less desirable than her administrative position. *Id.* She notes that she had no patrol experience, and her patrol training dated back to 1978. *Id.* She was not provided with tactical training. *Id.* On August 2, 2019, after one week on this position, she sent a "letter of involuntary resignation" to Diaz. *Id.*

Vara-Leija contends she was stripped of her job duties, demoted, reassigned, and constructively discharged in retaliation for discontinuing her support of Diaz's campaign. Dkt. 55. Diaz seeks summary judgment on Vara-Leija's claims, asserting that (1) Vara-Leija did not engage in any speech or activity; (2) Vara-Leija did not suffer an adverse employment action as (a) she cannot show her transfer caused serious, objective, and tangible harm, and (b) she cannot show she was constructively discharged; (3) there is no causal connection between her allegedly protected speech and any adverse employment actions because Diaz did not know about her decision not to donate or participate and had other reasons for his employment decisions; and (4) the clearly established law did not prohibit the actions Diaz took. Dkt. 109.

Diaz first asserts that even with non-verbal speech, there must be some outward manifestation of protected First Amendment activity, and Vara-Leija does not produce any evidence that she supported Diaz's opponent, only that she did not support Diaz. Dkt. 109. He points out that Vara-Leija testified that she did not vocalize her intent not to participate in the campaign. *Id.* (citing Dkt. 109-1 at 15, 30).

110

Vara-Leija asserts that she demonstrated her lack of support for Diaz in some outward way. Dkt. 133.   She argues that the campaign finance records demonstrate that she discontinued donating in August 2016 and her brother discontinued donating after October 25, 2018.[31]   *Id.*   She also, like the other plaintiffs, points to the speeches Diaz gave at meetings where deputies and civilian employees signed in.   *Id.* (citing Dkt. 128-8).   She notes, like the other plaintiffs, that Diaz demanded that employees take out loans to financially support the campaign.   *Id.* (citing Dkt. 128-8).

While Vara-Leija points mostly to the same evidence for compelled speech that the other plaintiffs provide, she has little evidence demonstrating "some outward manifestations of the allegedly protected First Amendment activity."   *Jordan*, 516 F.3d at 298.   Her only evidence is the campaign finance reports, which have extremely limited probative value since the plaintiff does not provide the page numbers to support her contentions.   Even if she did sufficiently support her argument with the appropriate citations to admissible evidence supporting her assertions of donations, she argues that she stopped giving in 2016 and her brother was donating some into 2018.   The court finds that this is not enough evidence of an outward demonstration that she withdrew support for a reasonable jury to determine that she engaged in constitutionally protected speech.[32]   Diaz's motion for summary judgment on Vara-Leija's claim is **GRANTED**.

---

[31] Vara-Leija asserts that the campaign records show that she donated $685 from November 2013 to August 2016, and her brother donated $505 from April 2013 through October 25, 2018.   Dkt. 133.   She points out that the records indicate that the person who Diaz gave her job responsibilities to donated a substantial amount of money.   *Id.*   She does not provide page numbers for the records supporting these contentions, and as noted previously, the court sustained Diaz's objections relating to the plaintiffs requiring the court to sift through voluminous records in search of their evidence.   *See* Dkt. 214.

[32] Vara-Leija's claims based on her participation in the Texas Rangers investigation were dismissed for failure to state a claim, and she did not move to amend.   *See* Dkt. 63.

10.     **Mary Ann Carrion (Motion, Dkt. 106, Response, Dkt. 130, Reply, Dkt. 173)**

Mary Ann Carrion was the Chief Clerk for Harris County Constable's Office during the relevant time period until June 3, 2019.  Dkt. 130-1.  Carrion refused a request to take over as Diaz's campaign manager when Kim Bellotte left after the Texas Rangers investigation.  *Id.*  Carrion says "[s]hortly thereafter, starting in the summer of 2018, [she] was gradually stripped of [her] job duties."  *Id.*  In May 2019, Carrion advised Chief Luman that she no longer wanted to donate to the Diaz campaign, and she thereafter refused to participate in any Diaz campaign fundraisers.  *Id.*  Carrion contends that she was then informed by Luman she needed to submit a daily or weekly report to Lee Hernandez so that he and Diaz would know what she was doing.  *Id.*  Diaz denied ever learning that Carrion had withdrawn support during his deposition.  Dkt. 117-1 at 180.

Carrion contends that the "writing was on the wall" in June 2019 when she had been stripped of all her official responsibilities.  Dkt. 130-1.  Diaz points out that Carrion did not experience a decrease in salary and, in fact, her pay increased from $39.06 to $41.01 per hour on March 22, 2019.  *Id.* (citing Dkt. 106, Ex. 1 at 102; Dkt. 106, Ex. 5).  Her benefits and title also remained the same.  *Id.*  Diaz did not, however, recall reassigning Carrion's work during his deposition.[33]  Dkt. 117-1 at 180–86.  Regardless, Carrion claims that she had already seen numerous other employees lose their jobs or be demoted after taking "some form of action against Diaz and his favored supporters," and she was thus "forced to resign" on June 3, 2019.  *Id.*

---

[33] In Diaz's declaration, he claims that he redistributed Carrion's workload after she almost missed a deadline for a report to "prevent similar mistakes."  Dkt. 105-2.  However, this is in direct conflict with his testimony that he did not remember why he redistributed Carrion's workload.  It would be unfair to allow Diaz to present this reason after the deposition when the plaintiffs are unable to cross examine him about the purported reasons.  Accordingly, the motion to strike the post-deposition declaration as it relates to the reasons Diaz reassigned Carrion's work is GRANTED.

Carrion sued Diaz for retaliating against her for exercising her First Amendment rights. Dkt. 55. Diaz moves for summary judgment on Mary Ann Carrion's claims, arguing that Carrion does not have evidence to support any of the elements of the prima facie case of First Amendment retaliation. Dkt. 106.

Diaz argues that Carrion did not suffer an actionable adverse employment action and was not constructively discharged. *Id.* He argues that the redistribution of her duties is not an adverse employment action, noting that under Fifth Circuit law, "'workload decisions are administrative matters, not adverse employment actions.'" *Id.* (citing *Dorsett v. Bd. of Trustees for State Colls. & Univ.*, 940 F.2d 121, 122-23 (5th Cir. 1991)). Carrion's salary remained the same and, in fact, she received a raise in March 2019, and her benefits and title remained constant from March 2018 until she resigned. *Id.* (citing Carrion's deposition). Diaz argues that Carrion cannot show she was constructively discharged because she cannot show that a reasonable person in her situation would have felt compelled to resign. *Id.* (citing *Landgraf*, 968 F.2d at 429). He points out that Carrion retained her position only with different assignments and that she made no attempts to resolve her concerns before she resigned.[34] *Id.* (citing Dkt. 106, Ex. 1 at 28, 29, 35, 36, 44, 102).

With regard to whether stripping Carrion of her responsibilities is an adverse employment action, she concedes that each of the acts, taken independently, would not amount to an adverse employment action, but she argues that collectively they were adverse because after all of these activities were removed, she had very little to do. *Id.* She also points out that Diaz reassigned her

---

[34] In her deposition, Carrion stated that she did go to Diaz to ask about the reassignment of payroll duties, and Diaz told her that he wanted someone else to do it. Dkt. 106, Ex. 1 at 28. She did not recall asking him about the FMLA responsibilities, and she said that her responsibilities with the Chapter 59 and Chapter 18 reports were reassigned during a meeting with the command because Diaz was saying the reports were not timely filed. *Id.* at 29. Carrion asserted that the reports were timely filed and there was just a glitch in the system. *Id.* at 30. She explained this to Diaz, but he still wanted somebody else to handle the responsibility. *Id.*

duties to his political supporters who were Carrion's subordinates and who in some cases were unqualified, and the redistribution was close in time to her decision to stop supporting the campaign. *Id.* Many of her purchasing, payroll, and budget responsibilities were given to Jessica Duran in the summer of 2018; her FMLA responsibilities were given to Lupe Flores, Dora Lopez, and Duran in April 2019[35]; her Chapter 59 and Chapter 18 record keeping and reporting was assigned to Rene Vela in April 2019; she was removed from the hiring process when two new civilians were hired without her approval, both with connections to Diaz, in May 2019; her payroll duties were given to one of these newly hired civilians later in May 2019; and also in May 2019 she was ordered to start reporting to Lee Hernandez and submit daily or weekly reports detailing her activities and assignments. *Id.* (citing Dkt. 130-1 (Ex. 20)). Carrion asked why these reports were needed when Duran did not have to complete them, and Hernandez advised they knew what Duran, who was helping with an upcoming event, was doing. *Id.*; Dkt. 130-1. Carrion claims that her only remaining duties were to sign two timesheets and process new hire paperwork. *Id.* Carrion argues that in each plaintiff's case, duties were reassigned to supporters of the Diaz campaign who were less qualified. *Id.*

In reply, Diaz asserts that the change in responsibilities that Carrion asserts was an adverse employment action is not on the Fifth Circuit's list of "ultimate employment decisions," and the Fifth Circuit has declined to expand this list. Dkt. 173 (relying on *Breaux*, 205 F.3d at 157). He additionally asserts that Carrion was not constructively discharged because she retained her

---

[35] Luman substantiates this, asserting that Diaz ordered him to remove Carrion from all FMLA responsibilities and assign them to Carrion's subordinate, but Diaz did not provide a reason for the change. Dkt. 128-5.

position with these different assignments and then when she decided to resign, she did not make any attempt to resolve her complaints.[36]  *Id.*

The court agrees that reassigning Carrion's duties is not on the list and is not actionable in and of itself.  However, Carrion alleges constructive discharge, so the court must consider whether Diaz's actions would have led a reasonable employee to feel she had no choice but to resign.  The court does so by considering the seven *Brown* factors that must be weighed when determining if an employee was constructively discharged.  *See* Part V.B.1, *supra*.  Carrion was not demoted, her pay was not reduced (and in fact increased), she does not provide evidence that she was badgered or harassed, and she was not offered early retirement.  However, her job responsibilities were drastically reduced, and while she was not necessarily reassigned to work under a younger supervisor, her responsibilities were given to inexperienced workers, which she claims she found demeaning.

This factual scenario is similar, in some ways, to *Stephens*, 955 F.2d at 1027.  In *Stephens*, which is an age discrimination case, the Fifth Circuit determined that "the cumulative effect of [the defendant's] actions made the working conditions [of the plaintiff] so intolerable that a reasonable person would have felt compelled to resign."  955 F.2d at 1027.  The plaintiff was demoted from division head to a sales position, asked to train his successor, and stripped of supervisory duties.  *Id.*  However, the facts then diverge.  In *Stephens*, his salary was also reduced by more than $10,000 a year, and each time a responsibility was taken from the plaintiff or his salary was cut, his boss would ask him if he was going to quit.  *Id.*  Here, Carrion actually received

---

[36] Diaz cites the following docket entries to support this statement: Dkt. 130-2 (Carrion Dep.) ¶ 72; Dkt. 130-5; Dkt. 130-1 at 128, 129, 135, 144.  These citations do not make sense with the pages or paragraph numbers provided, and the court suspects Diaz's numbering is off.  However, there is generally evidence in the record supporting this statement, including Carrion's deposition and declaration and Diaz's declaration.

a raise, and there is no indication that anybody in the office was harassing her about quitting. She subjectively felt humiliated because of the situation, but if one considers the totality of circumstances in light of the very high burden the Fifth Circuit places on plaintiffs who allege constructive discharge, Carrion had not met her burden of demonstrating that a reasonable jury could find she was constructively discharged.

Because the court finds that Carrion has not presented an issue of material fact that she suffered an adverse employment action, the court need not analyze the other factors of her prima facie burden. Diaz's motion for summary judgment on Carrion's claims is **GRANTED**.

### 11.    Jerry Luman (Motion, Dkt. 110, Response, Dkt. 134, Reply, Dkt. 181)

Jerry Luman was a chief deputy working under Diaz in Precinct Two. Dkt. 134. As noted previously, Luman is the person to whom Anderson originally reported Bellotte's alleged misappropriation of Hurricane Harvey relief items. Dkt. 128-5. Luman participated in the investigation with the Texas Rangers on February 13, 2018. *Id.* He asserts that he lost confidence in Diaz beginning with the events that led to the Texas Rangers investigation and that he discontinued his financial and fundraising contributions to Diaz's reelection bid thereafter. *Id.* Then, he decided to drop his support for Diaz in early 2019 in light of both the investigation and the "demotions and firing of good deputies for political disloyalty." *Id.*

In May 2019, Diaz directed that an IAD investigation be conducted by Precinct One because Luman allegedly made derogatory statements to Lee Hernandez. *Id.* Luman was placed on indefinite suspension by Diaz on May 6, 2019, pending the outcome of the investigation. *Id.* Lee Hernandez was promoted to chief deputy soon after Luman was suspended. *Id.* The IAD investigation report indicated that Luman had been untruthful during a polygraph examination in response to questions about statements he had made. Dkt. 110-4. Diaz terminated Luman's

employment on July 30, 2019, and the termination letter stated that the decision was "based on [Diaz's] loss of confidence, lack of trust and faith in [Luman's] continued ability to perform [his] duties, and actions that demonstrate[d] [Luman] no longer support[ed] [Diaz's] strategy and vision moving forward." Dkt. 110-6.  Luman was dishonorably discharged, but Luman petitioned to have his dishonorable discharge corrected to an honorable discharge, and the State Administrative Law Judge agreed to make the correction.  Dkt. 128-5.

Luman sued Diaz for retaliating against him for exercising his First Amendment rights. Dkt. 55.  Luman alleges that he did not support Diaz's reelection campaign and was fired as a result.  Dkt. 134.  He also contends that his interest in political association outweigh Diaz's interest in efficient administration.  *Id.*  Diaz moves for summary judgment on Luman's claim that Diaz retaliated against him for exercising his First Amendment rights because (1) Luman did not engage in any constitutionally protected speech and, even if he did, he was a confidential employee whose loyalty was an essential element of his position, so the Government's interest outweighs Luman's speech interest; (2) Luman cannot establish a causal connection between his protected speech and Diaz's terminating his employment when he failed a polygraph examination; and (3) there was no clearly established law prohibiting the actions Diaz took.  Dkt. 110.

Assuming without deciding that Luman's decision to discontinue financial support and being replaced by a strong supporter of the Diaz campaign is sufficient evidence of a protected activity, the court turns to whether the Government's interest in Luman's loyalty to Diaz outweighs Luman's speech interest.  Diaz argues that even if the court determines that Luman's decision to not donate time or money to the campaign is protected, there can be no reasonable argument that Luman was not a confidential employee who participated with Diaz in creating and implementing policy throughout the Precinct Two Constable's Office.  *Id.*  As chief deputy, he occupied the

second-highest ranking position in the department. *Id.* (citing Dkt. 110-1 at 39). Diaz contends that Luman assisted him in formulating and carrying out his directions and visions for the precinct. *Id.* (citing Dkt. 110-1 at 40; Dkt. 110-2 ¶ 8; Dkt. 110-7). Luman's duties were significant, including acting as a decisionmaker in the absence of Diaz. *Id.* (citing Dkt. 110-2 ¶ 8; Dkt. 110-7). Diaz points out that Luman eventually failed in his duties as chief deputy by undermining Diaz's ability to provide efficient services to the citizens of the Precinct. *Id.* As an example, Diaz points out that Luman admitted during his deposition that he discouraged new deputies from growing with the office because the opportunities were limited. *Id.* (citing Dkt. 110-1 at 279 (explaining that he told new deputies that at the constable's office "every four years you got to worry about if you have a job or not")). Diaz contends that Luman's conduct created a strain within the precinct that could have disrupted the effective performance of public services, and this outweighs any First Amendment right he is claiming. *Id.*

Luman responds that Diaz has "failed to show the applicability of the *Elrod/Branti* exception that allows for patronage dismissal." Dkt. 134. He relies on *Vojvodich*, in which a sheriff had not alleged that the plaintiff deputy's political activities had any impact on the operations of the department. *Id.* (citing *Vojvodich*, 48 F.3d 886). He contends that Diaz likewise has not alleged that Luman's refusal to support Diaz politically is an appropriate requirement for his job. *Id.* Luman also asserts that Diaz has not alleged that Luman's failure to support Diaz affected the Precinct's ability to provide governmental services. *Id.*

Diaz replies that because Luman occupied a critical role in the constable's office and his duties strongly influenced the deputies and staff at the precinct, Diaz had to be assured of his trust and loyalty. Dkt. 181. Diaz asserts that Luman's conduct created a strain within the precinct that could have disrupted and prevented the effective performance of public service. *Id.*

The court has considered the *Connick/Vojvodich* factors discussed in Part V.B.3, *supra*, and finds, based on the evidence submitted by the parties, that Diaz's need for a loyal chief deputy outweighed Luman's First Amendment interest in not politically supporting Diaz.  The Precinct Two Standard Operating Procedures list the duties of the chief deputy as including, among many other responsibilities, developing and implementing departmental policies, supervising and evaluating the work of all supervisors and administrative staff, managing personnel, acting as the spokesperson of the department, and serving as the Constable's designees in all matters in the absence of the Constable.  Dkt. 110-7.  Diaz had to be able to count on Luman to take over for him as needed.   While "party affiliation is not necessarily relevant to every policymaking or confidential position," *Branti*, 445 U.S. at 518, Diaz has shown that his "interest in promoting the efficiency of the services provided by its employees outweighs the employee's interest in engaging in the protected activity," *Vojvodich*, 48 F.3d at 885.  Essentially, if the interests of the person who is representing the Constable when he is not there are not aligned with the Constable, it would impact the service that Constable was elected to provide.

It is true that in *Vojvodich* the Fifth Circuit found it important that the defendant had stated that the plaintiff's political activities were irrelevant to his decisions and that they had no effect on the operations of the department, 48 F.3d at 886.  Here, Diaz stated that he "did not consider Chief Deputy Luman's contribution or participation, if any, in my reelection campaign.  If Chief Luman made the decision to withdraw his support from my campaign, I was never aware of the decision.  Chief Deputy Luman never told me verbally or in writing about his choice, and if he did, I would have still fired him because of the results of Precinct One's investigation."  Dkt. 110-2.  In *Vojvodich*, the defendant disavowing a requirement for political loyalty was one piece of the puzzle, and certainly important to a determination of whether political loyalty is a necessary

119

component of a job.  The main feature of the inquiry, however, is weighing public concern against disruption, and there was a disruption caused in this case by Diaz's concerns that Luman could not execute his vision and strategy for Precinct Two.  The need to support Diaz's views for the department is necessarily intertwined with Diaz's political stances for the upcoming election. Even if Diaz was not concerned about how much Luman supported him financially, as the *Click* court said, "money alone does not buy happiness," *Click*, 970 F.2d at 108, and Diaz relied on other types of political support that Luman was not providing and, at least according to the IAD report Diaz received from Precinct One, undermining.  Thus, notwithstanding the assertions that Diaz said he was not requiring Luman to support him in the campaign, Luman's political loyalty to Diaz was essential for Luman to be able to carry out the supervisory responsibilities required of a chief deputy.

Diaz's evidence establishes that Diaz had a legitimate reason to believe Luman was no longer supporting him in the manner needed to run the department in the way Diaz desired.  As noted above, Luman's letter of termination states, "My decision to terminate you is based on my loss of confidence, complete lack of trust and faith in your continued ability to perform your duties, and actions that demonstrate that you no longer support my strategy and vision moving forward." Dkt. 110-6.  This is based at least in part on the outcome of an investigation conducted by a separate precinct.  On May 23, 2019, Diaz had asked Precinct One to conduct an objective investigation of Luman's commitment and service to Diaz's policies and vision for Precinct Two. Dkt. 110-3 (Brady Rep.).  The resulting report, dated July 19, 2019, noted that the allegation was that Luman "displayed a lack of commitment and ha[d] displayed concerning behavior that undermined the Constable's ability to operate the Precinct 2 Office with efficiency; which has caused questions of his competency to perform his duties as the Chief Deputy."  Dkt. 110-4.  Part

of the IAD investigation included Luman taking a polygraph examination on July 12, 2019. *Id.* Luman was found to "untruthful" and there were "deceptive criteria" present in response to questions that a reasonable juror could determine undermined Diaz's authority. *Id.* (noting, for example, that Luman's response of "no" to a question about telling another employee that Diaz would soon be indicted was untruthful). Luman's employment was terminated thereafter.

The court finds that Diaz's interest in Luman's loyalty outweighs Luman's interest in not supporting Diaz and that Diaz has demonstrated that he had a valid reason to terminate Luman's employment. Diaz's motion for summary judgment on Luman's claims is **GRANTED**.

### 12.    Norman Verbosky (Motion, Dkt. 114, Response, Dkt. 138, Reply, Dkt. 178)

Verbosky was the assistant chief deputy with Precinct Two. Dkt. 138-1. In May 2018, Verbosky was interviewed by the Texas Rangers about Bellotte's involvement in the Diaz campaign. *Id.* After the interview, Verbosky declined to provide Diaz with any further assistance to his campaign and quit attending campaign events. *Id.* He did so because he "lost faith in [Diaz's] judgment and his ethics." *Id.* Verbosky asserts that he advised Diaz in meetings about "things he could not do" and advised Diaz that he and Bellotte "should not be doing things either," but his advice was "overlooked." *Id.*

Verbosky went out on FMLA leave for medical issues associated with cancer in November 2018. *Id.* Verbosky returned on February 11, 2019, and Diaz, through Luman, inquired if Verbosky wanted to retire. *Id.* He did not. *Id.* On March 7, 2019, Diaz, through Luman, terminated Verbosky's employment, effective immediately. *Id.* The termination letter indicated that Verbosky's employment was being terminated because of Diaz's lack of confidence and trust. *Id.* The text of the termination letter mirrors the text used in Luman's termination letter several months later. *See id.* Verbosky asserts he had no disciplinary history and had never been written

up. *Id.* He also was not provided with a section 614.023 notice. *Id.* Hernandez replaced Verbosky. *Id.*

Verbosky sued Diaz, asserting that Diaz retaliated against him for exercising his First Amendment rights. Dkt. 55. Verbosky contends that Diaz terminated his employment because he did not support Diaz's reelection campaign, and that Diaz's interest in efficient administration does not outweigh Verbosky's interest in political association. Dkt. 138. Diaz moves for summary judgment on Verbosky's claim, asserting that (1) Verbosky never spoke but merely silently did nothing; (2) Verbosky was a confidential employee whose loyalty was an essential element of his position and thus the government's interest outweighs his speech interest; (3) Diaz was unaware that Verbosky stopped supporting him and thus could not have been motivated by Verbosky's lack of support; and (4) Diaz fired Verbosky based on Kuhns's recommendation to restructure the command structure and because Diaz believed Verbosky was not a good fit for the new structure. Dkt. 114. Diaz contends that clearly established law did not prohibit him from firing Verbosky. *Id.*

### (a) Confidential Employee

Assuming without deciding that Verbosky's decision to stop donating to the campaign in the face of compelled speech is protected activity and that he demonstrated his lack of support in some outward way, the court turns to whether Diaz's interest in efficient services outweighs Verbosky's speech interest. Diaz asserts that even if Verbosky engaged in protected speech, he cannot show that his interests as a citizen outweighed Diaz's interest in promoting the efficiency of public services performed through the Precinct's employees. Dkt. 114. He asserts that Verbosky was a confidential employee who participated with Diaz in creating and implementing policy throughout the Precinct Two Constable's Office. *Id.* He notes that Verbosky held the third

highest ranking position within the Precinct, and he assisted Diaz in formulating and carrying out Diaz's directives and vision for the precinct.  *Id.* (citing Dkts. 114-3, 114-4).  His duties included (1) developing and implementing departmental policies and programs; (2) formulating budgetary and procurement plans; (3) investigating incidents; (4) acting as a liaison between the precinct and other constable departments and all other law enforcement agencies; and (5) supervising activities of the division.  *Id.* (citing Dkt. 114-4).  Diaz contends that because of Verbosky's critical role, Diaz had to be assured of the trust and loyalty of his assistant chief deputy.  *Id.* (citing Dkt. 114-2, 114-3).  Additionally, he asserts that "Verbosky's position enabled him to advance Constable Diaz's vision and strategy, if he acted faithfully, or to undermine Constable Diaz's policies by overt or covert opposition."  *Id.* (citing Dkt. 114-3).  He thus argues that Verbosky's right to participate, or not participate, in political activity does not outweigh the precinct's ability to provide efficient public service.  *Id.*

Verbosky argues that Diaz does not indicate that political loyalty to Diaz is necessary to performing Verbosky's position.  Dkt. 138.  He also does not demonstrate how Verbosky's lack of political loyalty impacted the ability to provide government services.  *Id.*

In reply, Diaz asserts that his faith and confidence in Verbosky's ability to implement his strategy for Precinct Two was crucial as he as in a confidential role.  Dkt. 178.  Diaz contends that his interests in protecting and serving he citizens easily outweigh Verbosky's asserted First Amendment rights.  *Id.*

Like with Luman, the court finds that Verbosky's role within the precinct was one in which it was critical that he support Diaz's vision for the department.  One example is that Verbosky was a liaison between the precinct and other law enforcement agencies, thus essentially representing the constable's vision for the precinct.  The distinction between Luman's factual scenario and

Verbosky's is that Diaz does not provide any evidence demonstrating how Verbosky was undermining Diaz's vision other than Diaz's conclusory statements in his post-deposition declarations.

Additionally, even though Diaz contends he lost confidence and faith in Verbosky, he sent Verbosky two offers of reinstatement.  Dkt. 114-2 (Brady Dec.).  Diaz contends that when he sent the offers of reinstatement, he intended to adopt "job descriptions and new guidelines for each of my command staff to avoid future conflict and mistakes."  Dkt. 114-3.  The first offer indeed states that Diaz planned to do this.  Dkt. 114-7.  It also states that Diaz "may have unfairly concluded that at least some of [the] problems [relating to poor communications and lack of structure leading to a failure to address or respond to problems] could have been avoided through [Verbosky's] role of assistant chief."  *Id.*  In the second letter Diaz notes that he had brought in a management consultant "to help get the office back on track" and that there were "problems with communication and expectations that [went] back longer than [Diaz would] like to admit."  Dkt. 114-8.

The court finds that this question is infused with factual innuendo requiring the assistance of a jury if none of the other elements are dispositive.

### (b) Causal Connection/*Mount Healthy*

Diaz argues that Verbosky has not provided any evidence that that Diaz was aware of Verbosky's allegedly protected actions and even if he were, Diaz had a different reason to terminate Verbosky's employment.  Dkt. 114.  With regard to the former, Diaz contends he was not aware of Verbosky's decision not to support the Diaz reelection campaign.  *Id.* (citing Dkt. 114-3).  Diaz notes that Verbosky provided only irrelevant evidence in response to his discovery request asking him to identify any evidence supporting the contention that Diaz knew

about any alleged protected speech. *Id.* (citing Dkt. 114-9). In addition, Verbosky provides no evidence that he told anyone that he was not supporting Diaz, and he admitted in his deposition that he never conveyed his lack of intent to support Diaz to anyone. *Id.* (citing Dkt. 114-1 at 19, 20, 24).

Verbosky argues that (1) the campaign finance reports show that he discontinued donating on October 25, 2018, and Diaz knew when Verbosky made his last contribution because he signed the reports and his wife was the campaign treasurer[37]; (2) Hernandez wrote a letter to Diaz about the "volatile" office environment on April 12, 2019, noting that certain individuals, later clarified to include Verbosky, were working against his departmental goals and agenda; (3) in a June 19, 2019 letter, Hernandez indicated that there was a coup orchestrated by Luman, Verbosky, and others to undermine Diaz's agenda; and (4) Rene Vela, who replaced Williams in the IAD office, believed all the plaintiffs supported Jerry Garcia. Dkt. 138. Verbosky contends that a jury may infer from this evidence that because Hernandez believed Verbosky was not loyal and other high-ranking officials believed he supported Garcia, that Hernandez's use of the term "agenda of Constable Diaz" related to the election. *Id.* Verbosky additionally notes that Bellotte, Diaz's "work wife," would report to Diaz who was coming to campaign events, and the jury may conclude that because Hernandez replaced Bellotte, he had a similar relationship with Diaz. *Id.*

In reply, Diaz argues that Verbosky has not provided any evidence that Diaz was aware of Verbosky's actions, and Verbosky admits that he never conveyed his lack of support to Diaz.

---

[37] **According** to Verbosky's response, the campaign finance reports show that he donated $2,261.66 from June 28, 2013 to October 25, 2018, and Hernandez donated substantially more. Dkt. 138. However, he cites generally to the voluminous reports to substantiate this statement, so the court considers this only an argument since it has ruled that it will not sift through the voluminous reports in search of the plaintiffs' evidence. *See* Dkt. 214. In Verbosky's declaration, he indicates that at least as of March 2019 he did not financially support Diaz's campaign. *See* Dkt. 138-1.

Dkt. 178.  With regard to the letters,[38] Diaz points out that under *Jordan v. Ector County*, Diaz's

assumptions or bad motives are not enough to create First Amendment liability.  *Id.*

During his deposition, Verbosky said that he did not recall telling anybody that he would

not be donating going forward.  Dkt. 114-1 at 19.  He did not recall anyone asking him to donate

time after the last event he participated in in the fall of 2018.  *Id.* at 19–20.  He did not recall telling

anybody that he would not be donating any more time.  *Id.* at 20.  When asked if he ever made it

known he had withdrawn his support, he said:

> I just pulled back on going to all – to all the events he was having.
> I – I pulled back on meetings.  I pulled back on, you know, giving
> more monies.  I didn't interact with the Constable or Lt. Bellotte.
> She organized the events, and I just kind of backed away from it,
> because I was more concerned with illegal activities going on.

Dkt. 114-1 at 20.  He then clarified that he did not give money or political support after the fall of

2018, and he quit going and being involved in meetings and such.  *Id.* at 20-21.  When asked if he

said when telling others that he "could not afford to give a campaign donation" if he told anyone

that he would not be donating because he was withdrawing support, Verbosky responded that he

did not recall saying that.  *Id.* at 24.

The court finds that this situation is similar to *Steadman*, where the "bad motive alone

[was] insufficient under [Fifth Circuit] case law to establish a First Amendment claim" when the

Texas Rangers Chief assumed an applicant was a "women's libber," but she had not said anything

about her beliefs regarding equality.  179 F.3d at 368.  Verbosky went out on medical leave shortly

after his last alleged campaign donation, and when he returned, his employment was terminated

about a month later.  Verbosky does not identify specific events he failed to attend or indicate that

---

[38] Diaz asserts the letters are inadmissible, but the court ruled in a separate order that it would
consider the letters since they likely can be admitted as business records or public records at trial.

anybody asked him to donate money and he refused.  While certainly Diaz may have noticed Verbosky did not donate since right before his medical leave, given the fact Verbosky was on medical leave at the time, it is a steep inferential leap to assume that he quit donating because he did not support Diaz's campaign.  All of the evidence the plaintiffs provide to show that Diaz knew Verbosky made this quiet decision not to support Diaz's campaign requires inference upon inference and is insufficient to rise to the level of a constitutional violation.[39]

Diaz's motion for summary judgment on Verbosky's claims is **GRANTED**.

### 13.   David Williams (Motion, Dkt. 115, Response, Dkt. 140, Reply, Dkt. 184)

Williams was hired to be a senior lieutenant overseeing IAD, Training, Communications, & Criminal Warrants in April of 2015.  Dkt. 128-7.  He had over thirty years of law enforcement experience.  *Id.*  Later, managing the evidence room was added to his responsibilities.  *Id.*

In February 2018, Williams participated in the Texas Rangers investigation, and he advised Diaz not to rehire Bellotte after the investigation concluded.  *Id.*  Williams advised Diaz that he (Williams) would have to investigate Bellotte if she were rehired.  *Id.*  Bellotte chose to resign.  *Id.*

On April 1, 2019, Williams was removed from his job as a senior lieutenant where he wore plain clothes and worked on IAD cases on day shift with weekends and holidays off to a previously non-existent night watch commander position.  *Id.*  He contends that he was the only person in the

---

[39] Diaz also asserts that he did not take any action based on the allegedly protected speech but instead fired Verbosky because of Kuhns's recommendation to change the structure of the command staff.  Dkt. 114.  Diaz contends that he did not believe Verbosky was a good fit as the Assistant Chief because of Diaz's vision for the future of the precinct.  *Id.* (citing Dkt. 114-3). Verbosky moves to strike this statement in Diaz's post-deposition declaration; he asserts that the contention that he relied on Kuhns's recommendation is in direct conflict with Diaz's deposition testimony.  Dkt. 138.  The court agrees that this is in direct conflict with Diaz's deposition in that in the deposition, Diaz agreed that Harris County hired Kuhns *after* Verbosky was terminated. Dkt. 117-1 at 106.  Diaz does not offer any explanation for this change of story, and the portion of Diaz's declaration indicating that he relied on the Kuhns report when terminating Verbosky is STRICKEN.

department and assigned to a newly created shift. *Id.* He was stripped of his responsibilities in the IAD and told to vacate his office. *Id.* He had previously been in Kritzler's chain of command, but now he reported to Kritzler. *Id.* He was replaced by Rene Vela. *Id.* He did not receive a section 614.023 notice. *Id.*

Diaz at first did not recall Williams being transferred to the evening patrol shift position during his deposition. Dkt. 117-1 at 194. However, he then noted that Williams was placed in the night watch command because "he was the best qualified." *Id.* He discussed how after a consultation with Dr. Kuhns they restructured the department and stated that it was better to have sufficient supervisors on the night shift for officer safety and liability of the department. *Id.* at 195–96. He did not recall, however, why Kuhns recommended the creation of an evening shift patrol watch commander. *Id.* at 196. This is consistent with Diaz's post-deposition declaration, in which he states that he "assigned Lieutenant Williams as an evening watch supervisor to balance his workload and to address the supervisory needs of the department." Dkt. 104-2. He additionally states in the declaration that Williams's experience and leadership skills "would be beneficial to the evening watch." *Id.* These statements are also consistent with an undated presentation that Diaz represents is Kuhn's recommendation. Dkt. 115-5. The presentation clearly indicates that there was no supervisor assigned to the evening watch on district patrol and that this could cause problems with safety and liability. *Id.* Additionally, there is a recommendation to assign somebody to be the night commander. *Id.*

On May 30, 2019, Williams contends that he was reassigned again. Dkt. 128-7. He was moved to the South East Texas Export Investigation Group (SETEIG) task force that he once supervised. *Id.* This is around the time Rodriguez resigned. *See* Part V.C.6, *supra.* Now, Williams was to conduct field investigations. Dkt. 128-7. Hernandez advised Williams of the

reassignment and also asked for a contribution to Diaz's campaign. *Id.* Diaz testified that Williams was on the task force concurrently with his work as patrol watch commander. Dkt. 117-1 at 197. In his post-deposition declaration, he states that Williams "expressed an interest in the [SETEIG] position." *Id.*

On June 6, 2019, Williams did not attend Diaz's Casino Night fundraiser and did not contribute any money or items to the event. Dkt. 128-7. He advised Luman that he was not participating in Diaz's political events. *Id.*

On June 12, 2019, Williams was moved to the night watch commander shift again. *Id.* Diaz states in his declaration that this move was due to the task force ending. Dkt. 104-2. Williams states that he was the only person on the shift. Dkt. 128-7. Nobody had been in the position since he was moved to the task force. *Id.* He was ordered to start wearing a uniform. *Id.* He did not have any supervisory responsibilities. *Id.* He had to return his keys to the "command hallway" on June 20, 2019.[40] *Id.* On June 24, 2019, Eric Slaughter and Paul Martinez were promoted to captain, and Williams, who had more experience than these colleagues, was relegated to vehicle maintenance issues. *Id.*

On July 5, 2019, Williams's wife had an anxiety-induced bout of Bell's Palsy. *Id.* On July 17, 2019, Williams, who was an exempt employee, left work early. *Id.* His police vehicle was burglarized. *Id.* He reported this to Houston Police Department. *Id.* On July 24, 2019, Williams was suspended without pay after multiple IAD investigations were initiated against him relating to events that unfolded on the day the vehicle was burglarized. *Id.*

---

[40] Diaz did not recall this happening during his deposition, though he did agree that Vela was placed in Williams's old office. Dkt. 117-1 at 200. He said, "I don't know the reason why." *Id.*

The IAD investigation report, submitted by Vela on July 17, 2019, sustained charges of insubordination, untruthfulness, and extra employment. Dkt. 115-6. It found that charges of policy or criminal violations relating to time sheet discrepancies were unfounded. *Id.* The report revealed that Paul Martinez recommended separation of employment because of untruthfulness, insubordination, and a violation of extra employment policy. *Id.* The deputy chief (Hernandez) and a constable concurred in sustaining the allegations. *Id.* Hernandez, however, provided a separate letter. *Id.* After investigating, Vela determined, as stated in the report, that Williams violated three Precinct Two policies: (1) Williams violated the insubordination policy by altering his work schedule without obtaining authorization from Captain Martinez, who had informed all supervisors on July 12, 2019, that they must obtain approval prior to changing their schedules; (2) Williams violated the untruthfulness policy by (a) stating he did not work at Hendricks Polygraph, and (b) telling Martinez that the burglary of his vehicle happened at SETEIG when it happened at Hendricks Polygraph; and (3) Williams violated the extra employment policy by (a) not reporting Hendricks Polygraph as an extra job, and (b) working at Hendricks Polygraph while on suspension. *Id.* Hernandez's separate letter recommended demoting Williams to senior deputy and placing him on patrol. Dkt. 115-7.

Williams provides evidence calling into question the IAD findings about lying to Martinez about the location of the burglary and the extra employment allegations. First, he provides a report that he provided to Martinez on the date of the vehicle burglary in which he states that he was going to SETEIG but had stopped at a business, which was three miles from SETEIG, to use an operable fax machine, and that the vehicle was burglarized while he was in the business faxing FMLA paperwork. Dkt. 140-3. He also provides the police reports, which provide the correct location of the burglary. Dkt. 140-2. The location was the building in which Hendricks Polygraph

is located.  As far as his alleged extra employment at Hendricks Polygraph, he provides a declaration from the owner of the business stating that Williams had not been paid for administering the polygraph examinations he administered on July 18 and 23, 2019, and had in fact refused compensation.  The owner stated that Williams had not received compensation from the business for any work performed since he started working at Precinct Two in April 2015. Dkt. 140-1.

Regardless, on August 9, 2019, Williams was demoted four ranks and 13 paygrades to Deputy-V, and placed on a day shift patrol with weekdays off.  Dkt. 115-8 (memorandum from Paul Martinez to Williams); Dkt. 128-7.  He was also required to attend a field training program and to reimburse Harris County for the damages to the vehicle and a stolen rifle vest.  Dkt. 115-8. The Deputy V position was an entry/academy level position at police officer pay.  Dkt. 128-7. Williams also was given no credit for his years of experience.  *Id.*  He was ordered not to work any extra jobs or even volunteer work during his free time, which reduced his pay to approximately $45,000 a year.  *Id.*

During his deposition, Diaz recalled that Williams was demoted to deputy, and he said it was the right decision because it was the decision he made.  Dkt. 117-1 at 212.  In his post-deposition declaration, Williams expanded on his reasons, noting that the decision was due to an IAD investigation relating to the burglary of his vehicle finding that Williams was not truthful, and that Captain Paul Martinez had recommended that Diaz fire Williams but Hernandez recommended the demotion.  Dkt. 104-2.  Diaz asserts that he decided to demote, place Williams on probationary status, and temporarily suspend extra employment based on "Williams' respected career in law enforcement."  *Id.*

On August 14, 2019, Williams contends that he filed a formal grievance with Harris County via his chain of command (there was no grievance coordinator).  This grievance went unanswered, and he filed a second one on August 26, 2019, that also went unanswered.  Dkt. 128-7.

On August 17, 2019, Williams was admitted to the hospital with uncontrolled hypertension. *Id.*

On August 28, 2018, Williams retired; he contends he needed to acquire a livable wage to support his family.  *Id.*

Williams sued Diaz for retaliating against him for exercising his First Amendment rights. Dkt. 55.  Williams contends that Diaz violated his right to freedom of belief, speech, and association by demoting him and constructively discharging him because he did not support Diaz for reelection.  Dkt. 140.  Diaz moves for summary judgment on Williams's claims, arguing that (1) Williams did not engage in any speech or activity, and even if he did, he was in a highly confidential role and his interests as a citizen do not outweigh Diaz's interest in promoting the efficiency of public service performed by the Precinct; (2) William's reassignment was not an adverse employment action because Williams cannot show how the reassignments caused him serious, objective, and tangible harm; (3) Williams resigned on his own volition and was not constructively discharged; (4) Williams cannot demonstrate a causal connection between his speech and the alleged adverse employment actions, as Diaz was not aware that Williams decided not to donate to or participate in the campaign, the reassignment back to night patrol after the task force was because the task force was terminated at Precinct Two, and Williams was demoted as a result of the IAD investigation, which found that he was untruthful, insubordinate, and had violated Precinct Two's extra employment policy; and (5) the clearly established law did not prohibit Diaz's actions.  Dkt. 115.

132

**(a) Adverse Employment Actions: Transfers**

Williams contends he suffered numerous adverse employment actions: (1) he was demoted to night watch commander on April 1, 2019; (2) he was demoted and assigned to the SETEIG task force that he once supervised on May 30, 2019; (3) he was transferred back to night watch commander on June 12, 2019; (4) he was demoted to Deputy V on August 9, 2019; and he was constructively discharged. Dkt. 140. Diaz asserts that Williams fails to show how the reassignments caused Williams serious, objective, and tangible harm. Dkt. 115. Diaz argues that he initiated the transfer to night watch command, in part, to alleviate Williams's workload, and it did not affect his rank, pay, or benefits. *Id.* (citing Dkt. 115-1 at 86, Dkt. 115-3 ¶ 39. During his deposition, Williams agreed that Diaz had told him that Williams "had been very busy and overworked" and had "alluded" that this was why he reassigned the duties. Dkt. 115-1 at 86. As far as the reassignment to the task force, Diaz likewise contends it was not an adverse employment action because it did not affect Williams's rank, pay, or benefits, and Williams had expressed interest in the task force. Dkt. 115 (citing Dkt. 115-1 at 287, 298-90, 292). Diaz asserts that Williams also acknowledged that the task force was important during his deposition. *Id.* (citing Dkt. 115-1 at 286).

Williams asserts in response to Diaz's arguments that he initially occupied a senior lieutenant position where he worked in plain clothes on IAD cases, was on the day shift, and had weekends and holidays off. Dkt. 140. He contends that the night watch commander position was basically operating as a deputy, and he was stripped of a majority of his assignments, including supervision of the IAD, criminal warrants, recruiting, and background investigations, and he was ordered to vacate his office. *Id.* (citing Dkt. 128-7). The next alleged adverse employment action occurred about two months later on May 30, 2019. *Id.* Williams replaced Rodriguez on the

SETEIG task force, which Diaz admits; Rodriguez was a deputy. *Id.* Williams asserts that he was originally third in line to Diaz, and outranked only by Luman and Verbosky, yet with the transfer to the task force he was replacing a deputy. *Id.* Williams admits that he did not voice opposition to the reassignment, but he contends he would have been insubordinate if he had since the move was ordered by Diaz. *Id.* Williams next notes that the reassignment back to night shift on June 12, 2019, was "even worse than the last night watch commander position" because he was ordered to wear a uniform for the first time during his tenure at Precinct Two. *Id.* (citing Dkt. 128-7). And, finally, Williams asserts that the transfer to Deputy V on August 9, 2019, which a demotion of four ranks and thirteen paygrades, among other things, was clearly an adverse employment decision. *Id.*

In reply, Diaz reiterates that transfers are not adverse employment actions in the Fifth Circuit unless they are sufficiently punitive. Dkt. 184. Diaz contends that Williams has not met his summary judgment burden of submitting admissible evidence showing he suffered an adverse employment action, and the evidence clearly shows his reassignments did not impact his rank, pay, or benefits. *Id.*

Starting with the last change first, the court agrees with Williams that his demotion to deputy following Vela's recommendations after the IAD investigation was an adverse employment action that indeed involved a change in rank, pay, and benefits. The other transfers are closer calls. As Diaz notes, there were no changes to Williams's pay or rank. Unlike the other employees transferred to evening or night patrol, Williams does not argue that he was in more danger when he was transferred to night watch commander than he had been in the IAD. He did, however, lose weekends off and the benefit of working normal business hours. Also, Kritzler had previously been lower on the chain of command than Williams, and now Williams had to report to Kritzler,

and he indicates that he had a definite reduction in job responsibilities, which would have likely made the job less interesting.  Since this is a close call, the court resolves it in favor of Williams.

Williams has not, however, provided sufficient evidence to demonstrate there is an issue of material fact supporting his contention that the transfer to the task force was a constitutional injury.  While Williams makes much of the fact that he was replacing a deputy, he does not discuss what his duties were or how other officers viewed the task force assignment.  And he did testify that the task force was important.  *See* Dkt. 115-1 at 286 ("The program was important.").  The court finds that there is a question of material fact as to whether this is an adverse employment action.

With regard to the transfer back to night watch commander shift, Williams was the only person on the shift, was ordered to start wearing a uniform, had no supervisory responsibilities, and had to return his keys to the "command hallway."  Dkt. 128-7.  *Id.*  Additionally, Slaughter and Martinez were promoted to captain, while Williams claims he was relegated to vehicle maintenance issues.  *Id.*  While this again is a close call, the court finds the subsequent transfer back to night watch presents enough questions of material fact that a jury is needed to determine if it was an adverse employment action.

Thus, the initial transfer to watch commander and the transfer back to night watch commander after being on the task force, which came with additional negative consequences for Williams, may have been adverse employment actions under clearly established law.  The demotion that occurred after the IAD investigation was an adverse employment action.

### (b)    Adverse Employment Action: Constructive Discharge

Diaz contends that Williams was not constructively discharged and instead resigned on his own volition.  Dkt. 115.  He points out that Williams admitted that nobody asked him to resign

and he chose to do so on his own during his deposition. *Id.* (citing Dkt. 115-1 at 139, 140, 165). He asserts that there is no evidence that Williams took any actions to resolve any concerns he had prior to resigning, and merely asked for a week of leave when informed about his demotion to deputy. *Id.* (citing Dkt. 115-1 at 138).

Williams contends that he was constructively discharged because he was demoted, experienced a reduction in salary, a reduction in job responsibilities, received an assignment to menial or degrading work, and was subject to badgering, harassment, or humiliation calculated to force him to resign. Dkt. 140 (citing Dkt. 128-7). He asserts that Diaz promoted Hernandez, Martinez, and Slaughter over him, and points out that Hernandez particularly was unqualified. *Id.* (citing Dkt. 140-5 (Stewart Dec.)).

In reply, Diaz argues that while Williams "**contends** he was constructively discharged, . . . [he] fails to adduce any evidence demonstrating his working conditions were objectively intolerable." Dkt. 184.

Considering all of the employment actions cumulatively, Williams meets some of the *Brown* factors. There is some evidence that Williams had decreased responsibilities and had to work under a less experienced individual, *see Haley*, 391 F.3d at 649–50, and at least the final transfer was punitive and less prestigious and less interesting than Williams's job with the IAD. *Id.* There is also some evidence of humiliation as Williams replaced a deputy when he moved to the task force, when he had previously supervised deputies, and he had to wear a uniform when he was moved back to the night watch commander position even though he had never had to wear a uniform before. *Id.* He also provides evidence that people he outranked were quickly promoted over him and claims that he tried to file grievances. The court finds that Williams has met his

burden of demonstrating there is an issue of material fact supporting his constructive discharge claim.

### (c) Causation/*Mount Healthy*

Assuming without deciding that Williams engaged in protected activity, the court turns to causation and *Mount Healthy*. As far as causation, Williams must show that the alleged protected activity—his refusal to support Diaz's campaign when compelled to do so— was a substantial or motivating factor for the adverse employment actions Diaz took. *Mt. Healthy*, 429 U.S. at 287. Williams cannot do so.

With regard to the first transfer to night watch, Diaz provides evidence that he moved Williams to the watch commander position in respond to Kuhns's recommendations, because Williams was the best qualified for the job, and because Diaz was overworked.[41] Dkt. 115 & Exs. 1, 2, 3; *see also* Dkt. 115-4 (email to Williams from Kritzler regarding the transfer) ("The primary function of this transfer is to allow greater Supervision coverage on Evening Shift. We appreciate your willingness to assist with this transfer and look forward to having your expertise utilized on this shift."). Williams even testified during his deposition that Diaz told him at the time that he wanted to give him a break because he had been very busy and overworked. Dkt. 115-1 at 86.

---

[41] Williams moves to strike Diaz's post-declaration deposition statements regarding relying on Kuhns's report when transferring Williams to the night shift commander position. Dkt. 140. However, while there are instances in Diaz's deposition where he responds that he does not remember certain things, like what Callistien had said about the appointment of Kuhns, he did testify that he remembered that Kuhns said Precinct Two needed more night watch deputies or more night watch command. Dkt. 117-1 at 107. He said he "want[ed] to say that we did change out some of our command staff" but noted that he would need to "look at it to see" because it had "been so long ago." *Id.* He also testified that problems with a lack of supervisors on night shift was "fixed . . . with . . . the . . . consulting of Dr. [Kuhns]." *Id.* at 195. His declaration points to both the need to balance Williams's workload and the supervisory needs of the department. Dkt. 115-3. The court finds that the testimony does not clearly conflict. Accordingly, Williams's motion to strike is DENIED.

Additionally, Williams contends that Diaz knew he was no longer contributing because his last contribution according to the campaign finance reports was October 25, 2018, but he asserts that the first campaign event that he did not attend occurred on April 9, 2019.  *See* Dkt. 140 (explaining that Williams believes Diaz was aware that he decided to no longer support the campaign because he discontinued contributing and attending events).  It is unclear if there were even events at which to donate between these dates.  Regardless, the initial transfer to night watch was on April 1— more than a week *before* Williams failed to attend a campaign event.  Williams also points to Hernandez's letter written on April 12, 2019, as evidence that Diaz has a motive to take adverse employment actions against Williams; the letters referred to individuals in power who were working against Diaz, later clarified to include Williams.  *See id.* (citing Pls.' Exs. 23, 24).  This initial Hernandez letter, like the event Williams did not attend, is dated after the initial transfer. Williams notes that Vela testified that all of the plaintiffs supported Jerry Garcia, and while he did not, "Hernandez and Diaz likely concluded that he was a supporter because of Williams' decision not to support Diaz politically."  *Id.*  However, even if Diaz realized Williams did not attend the April 9 event and Vela and Hernandez told him that Williams supported Garcia, which is a substantial evidentiary jump, this happened *after* Diaz decided to transfer Williams to night watch for completely different—and valid—reasons.  The court finds that Williams has failed to present an issue of material fact as to causation for the initial transfer to night watch.

The transfer to the task force after Williams stopped participating was not sufficiently adverse to rise to a constitutional violation, so the court turns to the third alleged adverse action, the transfer back to night watch.  Diaz contends that he transferred Williams back to the night shift because the task force ended.  Dkt. 115 & Ex. 3.  Williams's argument centers around his contention that no supervision was actually needed on the night shift because during the two weeks

he was on the task force, nobody else took his place on that shift, and Curry and Battencourt were already supervising that shift. Dkt. 140. However, the question on causation is whether Williams's lack of support was a substantial or motivating factor in the decision, *Mt. Healthy*, 429 U.S. at 287, and here the evidence indicates that the position Williams had ended, so Diaz was reacting to that circumstance rather than proactively deciding to take negative actions against Williams in retaliation for First Amendment activity. Since Diaz had not filled the night watch position in the intervening two weeks, putting Williams back in that position was a legitimate decision. That being said, Williams asserts that the position was worse than before because he had to wear a uniform, had nobody to supervise, and other people at the Precinct had been promoted to positions he found more favorable than night watch commander. He has not, however, provided any evidence indicating that Diaz made the decisions regarding this apparent reduction in status. The only evidence he has presented to support the changes is Williams's declaration, in which he states *Hernandez* ordered him to wear a uniform. Dkt. 128-7. He also states that the keys to the Command Hallway "were demanded from [him]," but he does not say by whom.[42]  *Id.*  While certainly Diaz promoted Hernandez, and there is evidence Hernandez supported Diaz, there is no reason to infer that Diaz told Hernandez to take away Williams's keys, change his office, or tell Williams to wear a uniform. It is Williams's burden to come forth with evidence indicating there is an issue of material fact that his refusal to continue supporting Diaz's campaign was a motivating factor for Diaz's action. Williams has not met his burden of demonstrating that there is a question

---

[42] While not necessarily probative, during Diaz's declaration, he was asked, in passive voice, if he recalled that "on or about June 20, 2019, Williams' key to the command hallway was – was taken from him." Dkt. 117-1 at 199. He responded that he did not recall. Diaz also testified that he knew Williams had an office in the command hallway and he did not know if it was moved. *Id.* at 200. He did recall that Vela was placed in Williams's old office at some point, but he did not recall why. *Id.*

of material fact that the employment actions relating to his move back to the night shift commander position were taken because Diaz was retaliating against him for not supporting Diaz's reelection campaign.

With regard to the demotion, Diaz contends that he demoted Williams based on the outcome of Vela's IAD investigation, and he provides evidence that the individuals participating in the investigation recommended to him either that he terminate Williams's employment or demote him. Williams takes issue with the outcome of the investigation, providing evidence that he did not get paid for his work at the polygraph business. Dkt. 140 & Ex. 4. The IAD investigation report notes that Williams also advised Vela he did not receive compensation, but Vela still found he was in violation of the extra employment policy. *See* Dkt. 115-6. The procedures require that employees file a request form for every job worked, and they cannot work extra employment while on suspension. *Id.* Williams provides evidence that he told Martinez that he had stopped at the polygraph business, which was near the task force office where he had to pick something up, but Vela found Williams was untruthful because he told Martinez that he was at the task force office when the break-in occurred. *Id.* While Williams's evidence may be indicative that the conclusions in the IAD report were not all correct, that does not change the fact that the team recommended, based on the conclusions in the report, to demote or terminate Williams, and this provides a legitimate reason for Diaz's adverse employment action. Additionally, even though Williams's evidence calls some of the outcomes of that report into question, there was still a finding of insubordination for Williams changing his work schedule without approval after Martinez had advised Williams and other supervisors that they must obtain approval. *See* Dkt. 115-6.

The court finds that either Williams has not shown that his allegedly protected activities were the motivating factor for adverse actions that Diaz allegedly took, or Diaz has shown that he would have taken the same adverse employment actions absent Williams's alleged protected activity.  With regard to the alleged constructive discharge, Diaz actually had sufficient cause to terminate Williams's employment based on the IAD investigation outcome because Martinez had recommended dismissal.  Williams's constructive discharge claim would fail without the demotion supporting the *Brown* factors.  Accordingly, Diaz's motion for summary judgment on Williams's claim is **GRANTED**.

## VI.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The plaintiffs seek partial summary judgment in their favor because Diaz cannot show that he would have taken the same employment actions in the absence of protected conduct.  Dkt. 117.  The plaintiffs argue that Diaz has failed to rebut the presumption of discrimination by offering evidence of a nondiscriminatory reason for his employment decisions because Diaz denied having knowledge or memory about the various personnel decisions he made relating to the plaintiffs during his deposition.  *Id.*  The plaintiffs point out that Diaz said, "I don't know" 317 times during his deposition and "I can't remember" 196 times.  *Id.*  (citing Dkt. 117, Ex. 1).  They argue, thus, that Diaz "failed to provide one iota of proof that he had a valid reason for the adverse employment actions he took in this case."  *Id.*  They concede that Diaz repeatedly "denied that he required Plaintiffs to be politically loyal to him or that he would have terminated them for supporting another candidate," but they argue that this is inconsequential because he "never provided any testimony stating that his adverse employment decisions were for any other reason."  *Id.*

Diaz responds that the plaintiffs must defeat the presumption of qualified immunity and meet their prima facie burden on their First Amendment retaliation claims before he needs to prove

a legitimate reason for his employment actions and that the plaintiffs can do neither.  Dkt. 125.

With regard to the prima facie burden, Diaz reiterates his summary judgment arguments that (1) no

plaintiff has identified any facts demonstrating an adverse employment action; (2) no plaintiff has

evidence demonstrating that the plaintiff spoke as a matter of public concern; (3) no plaintiff has

identified any facts or provided any evidence that the plaintiff's speech interests outweigh the

government's interest in providing public services; and (4) no plaintiff has evidence that the

allegedly protected speech was a substantial or motivating factor of the employment actions taken

by Diaz.  *Id.*  Diaz also asserts that he would have reached the same decisions in the absence of

protected conduct.  *Id.*  He contends that the plaintiffs "offer cherry picked facts from their *only*

evidence: Constable Diaz's deposition testimony" and close their eyes to Diaz's declaration and

the declaration of his law enforcement expert, Kenneth Brady.  *Id.*  Diaz asserts that his decisions,

notwithstanding his deposition testimony that he did not recall why he made the decisions, were

"part of department-wide changes to restructure Precinct Two in order to address the department's

needs for officers in different shifts."  *Id.*  Finally, he argues that the plaintiffs cannot defeat his

qualified immunity, and the burden is on the plaintiff to do so.  *Id.*

The plaintiffs assert that Diaz has missed the boat in his response and that he should know

the reasons for the decisions.  Dkt. 149.  They argue that Diaz cannot defeat summary judgment

with an affidavit that contradicts his sworn testimony during his deposition—particularly without

explanation.  *Id.*  The plaintiffs reiterate that Diaz's sworn testimony was that he did not remember

why he took the employment actions at issue.  *Id.*

Certainly, the parties in this case are like two ships passing in the night.  While the court

agrees with the plaintiffs that Diaz's deposition testimony that he does not remember why he took

certain employment actions does not support his *Mount Healthy* defenses with regard to various

plaintiffs, the court also agrees with Diaz that the plaintiffs must be able to prove their prima facie case before the court reaches the defense.  And, as demonstrated by the extensive discussion above, none of the plaintiffs has a slam dunk prima facie case; there are questions of material fact.  Where the burden shifts to the defendant, there generally is enough evidence from Diaz's deposition testimony, the portions of his declaration that do not directly conflict with his deposition testimony, and the admissible portion of his expert Brady's declaration as well as record evidence to raise an issue of material fact for the jury.  *See, e.g.*, Dkt. 117-1 (Diaz Dep.) at 83, 87 (Q: "Did you require Marcus Anderson to be politically loyal to you?" A: "No." Q: "If you had found out that Marcus Anderson had supported Jerry Garcia, would you have terminated Marcus Anderson for that?" A: "No.") (Q: "[D]id you ever require [Anderson] to donate to the Diaz campaign?" A: "No." Q: "If had you found out that Marcus Anderson had not donated to the Diaz campaign, would you have terminated him?" A: "No.") ("Q: Did you ever make any employment decision with regards to Marcus Anderson based upon his contributions to the Diaz campaign?" A: "No."), Dkt. 104-2 ("I did not condition or require anyone to participate or donate to my campaign" and "never factored any employee's monetary contributions or participation in my reelection campaign when making employment decisions regarding the employee.") (stating that Harris County hired Jay Kuhns to "restructure and address the needs of Precinct Two" and "Kuhns emphasized Precinct Two's lack of evening shift supervision"); Dkt. 104-7 ¶ 10.  *But see, e.g.*, Dkt. 117-1 at 143 (Q: "Did you order the transfer of Marcus Anderson to a night position?" A: "I can't remember." Q: "Did you order Marcus Anderson be placed on night shift?" A: "I can't remember." Q: "Do you recall if Marcus Anderson was placed on night shift?" A: "I can't remember.").  In other words, Diaz does not rely only on portions of the post-deposition declaration that clearly conflict with his deposition testimony to meet his burden.  A reasonable jury could find that Diaz does not remember all of the

employment actions he took with regard to specific defendants but does remember generally what the needs of the Precinct were, and it could find by a preponderance of evidence that these needs are why he took many of the individual employment actions at issue. Credibility must be determined by the jury at trial.

Accordingly, the plaintiffs' motion for partial summary judgment (Dkt. 117) is **DENIED**.

## VII. CONCLUSION

The plaintiffs' motions to strike Diaz's post-deposition declaration (Dkts. 128, 131, 132, 133, 134, 135, 138, 140) are **GRANTED IN PART AND DENIED IN PART** as discussed in Part III, *supra*, and within the discussion of Diaz's evidence relating to each motion for summary judgment he filed in Part V, *supra*.

Diaz's motion for summary judgment on Anderson's claim (Dkt. 104) is **DENIED**.

Diaz motions for summary judgment on Clark's claim (Dkt. 107) is **GRANTED IN PART AND DENIED IN PART**. Specifically, Diaz's motion for summary judgment on the discrete issue that Clark was constructively discharged is **GRANTED**. Diaz's motion for summary judgment on Clark's claim is otherwise **DENIED**.

Diaz's motions for summary judgment on the following claims are **GRANTED**: Arellano's claim (Dkt. 105), Herrera's claim (Dkt. 108), Zavala's claim (Dkt. 116), Rodriguez's claim (Dkt. 113), Pacifico's claim (Dkt. 111), Vara-Leija's claim (Dkt. 109), Rivera's claim (Dkt. 112), Carrion's claim (Dkt. 106), Luman's claim (Dkt. 110), Verbosky's claim (Dkt. 114), and Williams's claim (Dkt. 115).

The plaintiffs' motion or partial summary judgment (Dkt. 117) is **DENIED**.

Signed at Houston, Texas on September 1, 2022.

Gray H. Miller
Senior United States District Judge